**In re Brice M. HUTCHINGS, Debtor.**

**Brice M. Hutchings, Plaintiff,**

**v.**

**Ocwen Federal Bank, FSB, Banc One, N.A., f/k/a The First National Bank of Chicago, Defendants.**

**Bankruptcy No. 99–01302–BGC–13. Adversary No. 02–00162–BGC–13.**

United States Bankruptcy Court, N.D. Alabama, Southern Division.

Sept. 7, 2006.

Heather M. Bellew, Law Offices of Heather Bellew, LLC, Oneonta, AL, for Debtor.

**MEMORANDUM OPINION ON COMPLAINT FOR VIOLATION OF STAY UNDER § 362**

BENJAMIN COHEN, Bankruptcy Judge.

## I. Background

The matter before the Court is a *Complaint for Violation of Stay Under § 362* filed on June 25, 2002, by Mr. Brice M. Hutchings, the debtor. After notice, a trial was held on October 7, 2004. Appearing were the debtor; his attorneys Mr. Andre M. Toffel, Mr. Harrison Willis, and Ms. Heather Bellew; and the defendants' attorney, Mr. Jay Ross.

The matter was submitted on testimony, exhibits, the record in this adversary proceeding, the record in Bankruptcy Case No. 99–01302–BGC–13, and arguments and briefs of counsel.

## II. Summary

The debtor had a mortgage debt with the defendant's predecessor when he filed the pending Chapter 13 case on March 2, 1999, but he failed to make all of his post-petition mortgage payments. To address that problem, the debtor filed a handwritten letter with the Court on April 1, 2002, requesting permission to refinance his home. The Court treated the debtor's request as a motion and granted it on April 26, 2002.

The defendant Ocwen, or its predecessor, mistakenly believed the Court's April 26, 2002, order granted it relief from the stay.[1] Based on that belief, the defendant

---

1. Ocwen was not granted relief from the stay at any time during the case, and the April 26, 2002, order did not address the stay. In addition, there is nothing to indicate that a motion for relief was pending at the time, although the circumstances surrounding prior motions are confusing. Ocwen Federal filed a *Motion for Relief from Stay* on August 16, 1999. Proceeding No. 19 in the main case. The motion was scheduled for a hearing on August 31, 1999. On August 30, the attorney for Ocwen called the Court and withdrew the motion. See Proceeding No. 22. On March 23, 2000, Banc One, NA, fka the First Bank of Chicago, filed a *Motion for Relief from Stay*. Proceeding No. 30. The complaint in the adversary proceeding states that Ocwen was the servicing agent for Banc One. Banc One's motion was set for a hearing on April 18, 2000. Proceeding No. 31. After the hearing, the parties submitted an order which the Court entered on May 5, 2000. Proceeding No. 34. A renewed motion for relief was filed on October 18, 2000. Proceeding No. 39. The Court denied that motion on December 1, 2000. After the Court denied the motion, on January 16, 2001, counsel for the movant sent the Court a proposed order and joint stipulation signed by movant's counsel but not by debtor's counsel. There is no proceeding number. After calling counsel's office with-

attempted to collect its debt from the debtor through telephone calls and letters. The defendant first called the debtor on May 11, 2002, and made its last call to the debtor on June 12, 2002. During that thirty-day period, the defendant contacted the debtor numerous times. After discovering its mistake, the defendant stopped contacting the debtor, although the defendant does admit that it violated the stay.

In his complaint, the debtor alleged damages cause by the defendant's stay violation. At trial, the debtor proved that the damages he did suffer were the result of prosecuting the stay violation, not a result of the stay violation.

Based on the evidence, the Court finds that the debtor did not prove that he suffered any damage because of the mortgage company's violation of the stay, other than damages associated with his prosecution of that violation. And in agreement with the vast majority of reported decisions on this issue, this Court finds that those damages are not recoverable through this proceeding. Therefore, the Court finds that judgment is due to be entered in favor of the defendant and against the debtor on the complaint for violation of the stay.

### III. Contentions

The debtor contends that the defendant Ocwen violated the automatic stay when Ocwen's representatives contacted him attempting to collect a pre-petition debt. Ocwen admits that it violated the stay.

Mr. Hutchings also contends that he is entitled to damages because of Ocwen's stay violation. In that regard, he does not contend, and there is no evidence to suggest that he could contend, that he suffered any damage during the time Ocwen violated the stay.

Similarly, Mr. Hutchings does not contend, and again there is no evidence to suggest that he could contend, that he was required to file the pending complaint either to stop Ocwen from doing anything, to undo anything Ocwen did, or to force Ocwen to redress any damage he suffered because of Ocwen's stay violation. Ocwen had at the time the complaint was filed, stopped contacting the debtor and Ocwen's attorneys confirmed with the debtor's attorney that it would cease contacting the debtor.

What Mr. Hutchings does contend is that he is entitled to damages caused after Ocwen violated the stay. Those damages relate strictly to Mr. Hutchings prosecution of the stay violation. In that regard, Mr. Hutchings claims compensatory damages of: (1) $800 in wages for the time from work he spent attending court hearings and visiting his attorneys' office; (2) $50 for gasoline for transportation in connection with those same activities; and (3) $52,235.99 in attorneys fees for prosecuting this adversary proceeding. He also seeks punitive damages.

While Ocwen admits that it violated the stay, it contests the debtor's claim for damages.

### IV. Issues

The general issue is: May a debtor recover for a stay violation where no damages were proven to have been caused by that violation?

The determinative issue is: If the debtor was not injured by the stay violation, is the debtor entitled to recover costs result-

---

out resolving this matter, the Court responded with a letter explaining that a proper motion should be filed if counsel wanted the December 1, 2000, modified. The Court received an amended order on March 29, 1001 (dated March 1, 2001) from counsel for the movant. The Court did not enter the amended order.

On April 4, 2001, the Court received a second joint stipulation with an order. Again the stipulation had been signed only by counsel for Ocwen. The Court did not take any action on the proposed order. On April 1, 2002, the debtor filed his request to refinance his home. Proceeding No. 52.

ing solely from the debtor's prosecution of an action to redress the stay violation?

## V. Holding

Like most courts, this Court abhors stay violations. But, while stay violations may be inherently wrong, they are not inherently harmful.[2] Yes, Ocwen violated the stay, but there is no evidence that Mr. Hutchings was injured by that violation. The vast majority of reported cases on the issue of whether a debtor who was not injured by a stay violation may recover against the violator hold that the debtor may not recover. This Court agrees. Therefore, without an injury caused by the violation, Mr. Hutchings is not entitled to any recovery.[3] As summarized immediate-

---

**2.** The argument could of course be made that creditors cannot decide whether, or when, to observe the automatic stay, and that there must be consequences for those who intentionally disregard it. Otherwise, creditors may presume they are free to repeat their actions, events that would of course lead to an erosion of the very protection that the stay was intended to provide. That reasoning of course leads to the conclusion that a stay violation is, in and of itself, punishable. But as discussed below, before punitive sanctions may be imposed, even in the context of willful stay violation, specific standards must be met. Those standards were not met in this case.

**3.** Even if all of the damages Mr. Hutchings claims were the direct result of Ocwen's stay violation, he would not be entitled to the amount of punitive damages claimed because of the tremendous disparity between the amounts of compensatory and punitive damages he claims. Writing for the United States Supreme Court in Court in *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003), Justice Anthony M. Kennedy explained:

> [I]n . . . [*BMW of North America, Inc. v. Gore*, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996)], we instructed courts reviewing punitive damages to consider three guideposts: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. *Id.* at 418, 123 S.Ct. 1513. And while the Supreme Court has not imposed a "a bright-line ratio which a punitive damages award cannot exceed" *State Farm* at 425, 123 S.Ct. 1513, Justice Kennedy suggests, "Our jurisprudence and the principles it has now established demonstrate, however, that, in prac-

tice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *Id.* at 425, 123 S.Ct. 1513.

Therefore, even if this Court found that Mr. Hutchings suffered all $850 worth of compensatory damages because of Ocwen's stay violation, applying the maximum single-digit multiplier of nine would equal only $5,600 in punitive damages. This result is particularly bothersome in light of Justice Kennedy's explanation about the importance of the degree of a violator's reprehensibility, remarks that could easily be used to describe the importance of the test applied in deciding the proper amount of damages from a section 362(h) violation. Justice Kennedy wrote:

> "[T]he most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *Gore*, 517 U.S., at 575, 116 S.Ct. 1589. We have instructed courts to determine the reprehensibility of a defendant by considering whether the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident. *Id.*, at 576–577, 116 S.Ct. 1589. The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect. It should be presumed a plaintiff has been made whole for his injuries by compensatory damages, so punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punish-

ly below, this Court's holding is based on three general conclusions.

## A. Only an Injured Party May Recover Under Section 362

While the Court finds that Ocwen violated the stay, the preponderance of the evidence is that Mr. Hutchings *was not injured by Ocwen's stay violations.* First, the evidence is uncontroverted that Ocwen's "stay violating" contact with Mr. Hutchings ended *before* the pending complaint was filed. Mr. Hutchings' attorney's office confirmed that Ocwen *ceased* its contact with the debtor before the complaint was filed and *confirmed that Ocwen's behavior would not resume.* Consequently, Mr. Hutchings was not required to file the pending complaint either to stop Ocwen from contacting him or to enjoin Ocwen from violating the stay.[4] Second, the only damages Mr. Hutchings claims *are those associated with the prosecution of the pending complaint.*[5] And the only evidence offered to prove *any* damages was evidence of damages that occurred *after* Ocwen ceased its contact with him. No evidence was offered to prove any damages caused by Ocwen's stay violation.[6] Consequently, the Court must conclude that Mr. Hutchings was not injured by Ocwen's actions. And as the many cases discussed later in this opinion explain, only an injured party may recover under section 362(h). And that recovery includes costs and attorneys fees.[7]

## B. Mitigation of Damages

The Court also finds that Mr. Hutchings is not entitled to an award of actual damages, including costs and attorneys fees, because he failed to mitigate his damages. As explained above, the *only damages Mr.*

---

ment or deterrence. *Id.,* at 575, 116 S.Ct. 1589.

*Id.* at 419, 123 S.Ct. 1513 (emphasis added). As this opinion explains, while Mr. Hutchings could be regarded as a target of financial vulnerability and Ocwen's actions were repetitive, there is no evidence that Ocwen's actions were physical, were indifferent to or a reckless disregard for health or safety, or were the result of intentional malice, trickery, or deceit.

4. At trial the Court expressed its concern about this situation. In discussing the procedure the parties and the Court would follow in addressing the debtor's damages, particularly attorney's fees, the Court stated:

I need to do, since this doesn't come up very often, I need to do some research on the question of whether—at what point attorney's services become necessary and remain necessary. I mean, obviously if you have to jump in and do something for your client in order to stop something from happening, you know, that is fine, but at some point things keep rocking along and then you have to determine whether it is necessary for you to have spent a certain amount of time to do this, that, and the other and go to trial and then after trial and that type of thing. So I need to do a little research

on that. I have done it before. I just haven't done it in some time.
Transcript at 9.

5. Even if some occurred otherwise, that is before the prosecution or in association with the actual stay violation, no evidence was offered to prove any such damages and there is no proof that such damages occurred.

6. The argument could be made that but for Ocwen's stay violation, Mr. Hutchings would never have had to have filed anything. Any concern that argument raises is of course what is discussed later in regard to Mr. Hutchings' responsibility to mitigate any damages he might have incurred.

7. The issue of the reasonableness and necessity of the claimed attorneys' fees in this proceeding was to be the subject of a separate hearing. At trial, the Court explained that it would first make a determination on punitive damages and compensatory damages, other than attorneys' fees, and address fees and costs second. Transcript at 9–10. However, because the Court finds that Mr. Hutchings was not injured and therefore he is not entitled to *any* compensatory or punitive damages, including attorneys fees, a second hearing on the amount of attorneys fees is not necessary. See Transcript at 6–10.

*Hutchings claims* relate to his prosecution of the pending action against Ocwen. There is no evidence that he had any damages before he filed this complaint. And as mentioned above, because Ocwen's conduct had ceased, it was not necessary for Mr. Hutchings to take any action to stop that behavior. In contrast, under the law of mitigating damages, Mr. Hutchings had the responsibility to avoid the damages he incurred by not filing his action.

### C. Punitive Damages

The Court also finds that Mr. Hutchings is not entitled to punitive damages. According to the preponderance of the evidence, Ocwen's representatives' actions were not egregious, vindictive, malicious, or accompanied by bad faith.

### VI. FINDINGS OF FACT

#### A. Mr. Hutchings' Chapter 13 Bankruptcy Case

Mr. Hutchings borrowed $63,750.00 from Ameriquest Mortgage Company on July 25, 1998. His obligation to repay that loan is represented by a note he executed to Ameriquest in that amount on that date. The note, which is secured by a mortgage on the debtor's home, requires repayment of the unpaid principal balance, with interest, in 360 monthly installments. The note is an adjustable rate note. The beginning interest rate was 10.5%. The rate is adjusted every six months based on a specified index. The amount of the monthly payment may fluctuate, of course, depending on the interest rate being charged at any particular time. The amount of the monthly payment for the first six months of the loan, based on the beginning interest rate, was $583.00.

On March 2, 1999, Mr. Hutchings filed a petition under Chapter 13 of the Bankruptcy Code. The attorney who prepared and signed the petition was Mr. William H. Roe, who is now deceased.

In his schedules, Mr. Hutchings listed the debt he owed to Ameriquest but did not identify Ameriquest as the creditor to whom the debt was owed. Instead, he identified Aurora Loan Services as the creditor. Aurora Loan Services, Inc. was the loan servicing agent for Ameriquest.

According to his bankruptcy schedules, on the date he filed his petition, Mr. Hutchings was $1,287.00, or roughly two payments, in arrears on his mortgage payments. According to Mr. Hutchings' schedules, that amount represented the payments which came due under the note in December 1998 and January 1999. In his "Chapter 13 Plan Summary," Mr. Hutchings proposed to pay that arrears over a period of 60 months through payments to the Chapter 13 trustee. He proposed to make his current mortgage payments as they came due directly to the mortgagee.

On April 27, 1999, Mr. Hutchings filed an amendment to his petition to add his unpaid, April 1999, $583.15, post-petition mortgage payment. That addition brought his total mortgage arrears to $1,864.15. Once again, he identified Aurora as the creditor for that debt.

On May 5, 1999, Ameriquest transferred the servicing of the loan to Ocwen Federal Bank. And Aurora assigned Ameriquest's arrearage claim, ostensibly for purposes of pursuing payment of that claim in Mr. Hutchings' bankruptcy case, to Ocwen. An order authorizing Aurora's transfer of the arrearage claim to Ocwen was entered in Mr. Hutchings' bankruptcy case on May 10, 1999.

Mr. Hutchings' proposed Chapter 13 plan was confirmed on May 13, 1999. The plan called for him to pay his current mortgage payments directly to his mortgagee as they come due. In addition he was to pay $82 a week to the standing Chapter 13 trustee for 60 months. In

turn, the trustee would disburse those funds to pay Mr. Hutchings' debts, including his mortgage payment arrearage. Inexplicably, the confirmation order lists Aurora as the creditor to whom both the arrearage payment and the current monthly mortgage payments were to be paid. Also, despite Mr. Hutchings' amendment to add the missed post-petition payment, the order lists the amount of the payment arrearage as $1,281.00.

On July 21, 1999, Mr. Hutchings filed a document styled "Amendment to Schedules," which, despite the misnomer, was actually a motion to allow Mr. Hutchings to modify his confirmed plan to include an additional $1,750 in unpaid post-petition mortgage payments. Those payments had become due in May 1999, June 1999, and July 1999. To cover that increased amount, Mr. Hutchings proposed to increase his weekly plan payment to $98.00. In the motion, Mr. Hutchings denominated Ocwen as the creditor to receive the payments on the mortgage arrearage from the trustee. The motion was not set for hearing. The notice of the motion issued by the Bankruptcy Court Clerk's office provides that unless an objection to the relief requested in the motion was filed within 20 days, "the Court may grant the Debtor's Motion without further notice," and "[i]f an objection and request for hearing are timely filed, a hearing will be scheduled by a subsequent notice of hearing." *Notice of Amendment to Schedules and Motion to Modify* (Proceeding No. 17 filed in Bankruptcy Case No. 99–01302–BGC–13 on July 27, 1999). Although there were no objections filed to the motion, an order was not entered either granting or denying the motion. But, Mr. Hutchings did begin making the increased plan contributions requested in the motion.

Ameriquest assigned its mortgage to the defendant, Banc One, N.A., on February 28, 2000. Banc One filed a motion for relief from the stay on March 23, 2000. A hearing on the motion was held on April 18, 2000. The matter was resolved by agreement. The parties prepared and submitted a proposed order embodying their agreement. The Court entered that order on May 5, 2000. It provides:

> The automatic stay provided by 11 U.S.C. § 362(a) is continued in effect but not unless the debtor resumes his regular monthly mortgage payments and further pays to Banc One the additional sum of $4,976.98 which represents all post-petition arrearage, attorney fees and costs through the month of April, 2000 on or before May 4, 2000.

> Thereafter, the movant is granted leave to request an immediate hearing to renew the Motion for Relief From Stay should the debtor fail to make any payment when it becomes due, beginning with the payment due May 1, 2000.

*Order* entered May 5, 2000, Proceeding No. 34.

In the meantime, on April 7, 2000, the Chapter 13 trustee filed a motion to modify Mr. Hutchings' plan to require Mr. Hutchings to increase his plan payments to $121 a week. The motion was granted on May 11, 2000.

Around this same time, Banc One changed lawyers. One of its new lawyers filed a motion on October 18, 2000, to have the motion for relief from the stay which Banc One had previously filed on March 23, 2000, and which was purportedly resolved by the agreed order entered May 5, 2000, reset for additional hearings. Banc One's motion was set for a hearing for November 14, 2000. That hearing was continued to November 28, 2000. No one appeared for Banc One at the hearing on November 28, 2000. Consequently, its motion was denied for failure to prosecute. The merits of the motion were not argued or considered.

On November 15, 2000, Mr. Hutchings filed a petition to modify his confirmed plan to include both his current mortgage payments and his accumulated mortgage arrearage of $4,498.88. He also asked for his plan payments to be increased to $613.00 biweekly. Mr. Hutchings' petition to modify was granted on March 12, 2001.

On April 1, 2002, Mr. Hutchings filed a handwritten letter with the Court requesting that he be permitted to refinance his home.[8] The letter was treated as a motion. Accordingly, it was set for hearing on April 4, 2002. Notice of the hearing was provided by the clerk's office to Mr. Hutchings' creditors, including Ocwen and Banc One. Mr. Hutchings, Mr. Roe, and Mr. Charles King, the assistant Chapter 13 trustee attended the hearing. The motion was granted on April 26, 2002. But according to his testimony, Mr. Hutchings was not successful in refinancing his home loan.

Mr. Hutchings filed the present adversary proceeding on June 25, 2002.

Mr. Hutchings was granted a discharge on December 5, 2003.

### B. Mr. Hutchings' Testimony

#### 1. Contact from Ocwen

Mr. Hutchings testified that Ocwen began contacting him after this Court entered its April 26, 2002, order that allowed Mr. Hutchings to refinance his home. He testified that the first time that someone from Ocwen attempted to call him was on a Saturday morning (to his home) while he was at work. The record confirms that first call was made on May 11, 2002. Transcript at 162.

The person calling spoke with Mr. Hutchings' wife, who in turn called Mr. Hutchings at work and gave him a tele-phone number. Mr. Hutchings called the number and talked to someone named "Jennifer." He told her that he was in debtor's court and gave her his attorney's (Mr. Roe) name and telephone number. Jennifer told him that she would make a note of what he told her. Mr. Hutchings did not make a written note of either the call his wife answered or his call to Jennifer. And he does not remember the date the calls occurred.

According to Mr. Hutchings, he subsequently received a telephone call from a person at Ocwen who identified himself as "Anthony." Mr. Hutchings testified that, during their conversation, Anthony told him that, "Ocwen wants their damn money." Transcript, page 166. Again Mr. Hutchings did not make a memorandum of that call and does not remember the date he received that call.

Mr. Hutchings complained to Mr. Roe about the calls. Mr. Roe told him in the future make a note of the name of the person calling and the time and date of the call. He took Mr. Roe's advice. Ultimately, he compiled a handwritten list of six calls he received from May 26, 2002, through June 3, 2002. That list was admitted into evidence as Plaintiff's Exhibit 13.

Mr. Hutchings testified that he told each Ocwen representative who called that he was in bankruptcy, and he provided the representative with Mr. Roe's name and telephone number. However, in his deposition testimony, he said that he did not inform any of the Ocwen representatives who called him that he was in bankruptcy, but instead only told them to call his attorney and provided them with Mr. Roe's name and telephone number. At trial, Mr. Hutchings testified:

---

8. Why he chose to act pro se is not apparent from the record and has not been explained to the Court.

Q. Now each time that they called you, Ocwen, based on the times you have just testified to, did you tell them that you had filed bankruptcy when they contacted you?

A. Several times.

Q. But not all of the times?

A. Maybe once I didn't. The one that I couldn't talk to was on the answering machine.

Q. Mr. Hutchings, do you remember telling in a deposition to the lawyer for Ocwen back in early May on page 104—

MR. ROSS: Judge, may I approach?

THE COURT: Yes, sir.

Q. I will read you the question on page 104. The question is:

"Each time did you tell them that you had filed bankruptcy when they contacted you?"

If you will read your answer starting on line thirteen.

A. "I didn't tell them. I told them to call my attorney and gave them the number."

Transcript, page 197.

According to Plaintiff's Exhibit 13 (Mr. Hutchings' list of six calls) and his testimony, the following are the calls he received from Ocwen from May 26, 2002, through June 3, 2002.

1. May 26, 2002, at 5:45 p.m.—Mr. Hutchings received a telephone call at home from a representative of Ocwen who, according to him, refused to give him her name or otherwise identify herself. This call appears on Plaintiff's Exhibit 13.

2. May 27, 2002—Mr. Hutchings went home for lunch and discovered a message on his answering machine from an Ocwen representative. According to the message, Ocwen called to determine when he would pay Ocwen. This call appears on Plaintiff's Exhibit 13.

3. May 28, 2002—Mr. Hutchings received two telephone calls from "Anthony;" one in the morning at work and a second at home around one o'clock in the afternoon. He told "Anthony" to contact Mr. Roe and again provided him with Mr. Roe's telephone number. The first call appears on Plaintiff's Exhibit 13. The second does not.

4. June 1, 2002—"Jennifer" left a message on Mr. Hutchings' answering machine at home asking him to pay the money he owed Ocwen. This call appears on Plaintiff's Exhibit 13.

5. June 2, 2002—A female caller, who identified herself as a representative of Ocwen, left a message on Mr. Hutchings' home answering machine. The message requested Mr. Hutchings to make arrangements to pay the money he owed to Ocwen. This call appears on Plaintiff's Exhibit 13.

6. June 3, 2002—A person named "Betty," called and left a message on Mr. Hutchings answering service. She identified herself as an Ocwen representative and asked Mr. Hutchings to contact her about making a payment on his mortgage. She left a number for him to call. This call appears on Plaintiff's Exhibit 13.

The caller identification mechanism on Mr. Hutchings' telephone indicated that between 8:41 a.m. and 9:45 a.m. on June 2, 2002, 24 calls were made to his home telephone number *from* the number that "Betty" left in her message. He did not, on that occasion, actually speak to Betty or anyone else from Ocwen. Upon discovering that those calls had been made to his house, Mr. Hutchings immediately

went to his attorney's office. He said that he took his telephone with him and showed it to Mrs. Roe.[9]

Mr. Hutchings first testified that he did not receive any telephone calls from Ocwen's representatives after June 3, 2002. He later testified that "Jennifer" called him at work on June 12, 2002, and told him that he needed to make arrangements to pay the debt he owed to Ocwen. Mr. Hutchings made a note of that call. His note was admitted into evidence as Plaintiff's Exhibit 19. Mr. Hutchings was sure that the June 12, 2002, call was the last one he received from Ocwen or its representatives. Transcript at 194.

In characterizing the calls he did receive from Ocwen's representatives, Mr. Hutchings testified that none were threatening in nature, or contained any threats, or could be characterized as "threatening." He testified, "None of them was...." Transcript at 191.

He also testified that none of the callers were rude, and that none of the calls that he received from Ocwen's representatives could be characterized as rude. The single exception was his conversation with "Anthony" who used the word "damn". Mr. Hutchings testified:

Q. But my question is the calls, except for the one from Anthony where he used the word profanity, they were not rude or threatening to you; correct?

A. No, no, not in that way. I am not going to lie about it.

Transcript at 192.

Mr. Hutchings testified that he received several letters from Ocwen which he characterized as threatening. He delivered those letters to Mr. Roe. One document he received was a letter dated June 18, 2002, from Banc One's attorneys advising him

that foreclosure had been instituted. Plaintiff's Exhibit 20. Enclosed with the letter was a copy of the mortgage foreclosure notice which indicated that his property would be sold at a foreclosure sale on July 23, 2002. He immediately delivered those to Mr. Roe's office. Mr. Roe was not in; he gave them to Mrs. Roe.

Mr. Hutchings testified that when he went to Mr. Roe's office, most of the time he spoke with Mr. Roe's wife, who worked in the office. But, he did say he spoke with Mr. Roe about the contacts he had received from Ocwen's representatives, "over seven or eight times...." But he added he spoke with Mrs. Roe about those contacts, "About four or five times...." Transcript, page 174–75. He said that on several occasions Mrs. Roe called Ocwen for him, in his presence.

### 2. Damages

#### a. No Damages Occurred *Before* Mr. Hutchings Filed His Complaint

Mr. Hutchings did not testify that he was injured by Ocwen's stay violation and his testimony does not contain any proof that he suffered any damages because of Ocwen's stay violation. As discussed later, the only evidence presented in regards to actual damages related to lost wages, the cost of gasoline, and attorneys fees, all of which occurred after he filed his complaint.

#### (1) Lost Wages

Mr. Hutchings testified about his lost wages. He was specific about the time he lost and the reason for losing that time. On direct examination Mr. Hutchings explained the amount of his damages for missing work. He testified:

Q. *And do you remember the number that we submitted that you gave us?*

A. One week.

9. Mr. Hutchings did not, in his deposition testimony, mention that he took his telephone to his attorney's office, or that he showed the telephone to Mrs. Roe.

Q. One week's worth of work?

A. Uh-huh.

Q. Was that the eight hundred dollar figure?

A. That's right.

Q. So you estimate that you have missed about one week's worth of work in dealing with all of this?

A. That's correct.

Q. And that is eight hundred dollars?

A. Yes.

Transcript at 157.

On cross examination, he explained the reason why he missed work. He testified:

Q. How much income did you lose from your employment as a result of tending to this with Mr. Roe and coming down here today?

MR. TOFFEL: Judge, he has already answered that, I thought.

THE COURT: Well, it is cross-examination. He can go into it.

A. Eight hundred dollars is what I told him, plus today.

Q. That is including today, eight hundred dollars?

A. No, plus today.

Q. Okay. Eight hundred dollars even, right?

A. Yeah, for the week I lost.

Q. Is it your testimony you make eight hundred dollars a week working at Valley Ford?

A. I make eighteen dollars an hour.

Q. But back in 2002 you told me you made—

A. I made fourteen dollars an hour, plus commission. I made more money back then than I do now.

Q. But didn't you testify in your deposition that you accumulated some vacation time and you really didn't lose quite that much money?

A. No, no. I don't use vacation unless I go with my wife.

Q. All right. So you didn't use vacation time back in 2002?

A. No, I didn't.

Q. And you made eight hundred dollars a week back in 2002; correct?

A. I made more than that.

Q. Eight hundred dollars a week?

A. I made more than eight hundred dollars.

Q. Now, do you have any pay stubs or other documentation that you brought to court?

A. No. I have some at home.

Q. For all of this time that this case has been pending you haven't shared that with anybody else; correct?

A. No, I haven't.

Q. Okay. And back at that time it was twelve dollars an hour times forty hours a week; correct?

A. Uh-huh.

Q. Four hundred and eighty dollars?

A. Four eighty.

Q. And then the difference between eight hundred and four eighty would have been commission that you would have made had you been there, correct?

A. That's right.

Q. But you didn't really take off a full week of work during that time; did you?

A. I took one or two days through that.

Q. Okay. So if you got a letter when you would go home, as you testified, and it was from Ocwen, you would go run to Mr. Roe's office; correct?

A. Well, I was right there at Mr. Roe's office.

Q. But the week's worth of work that you lost wasn't in one week, though, was it?

A. It was running around in this courthouse or something like that.

Q. All right. So one week included time at Mr. Roe's office, correct?

A. No, it didn't have anything—I can pass by Mr. Roe's office going home.

Q. So one week of running down to this courthouse; right?

A. Running around to different places—courts, trying to get—

Q. Well, you went to Mr. Toffel's office; correct?

A. That's right.

Q. How many times did you go to his office?

A. I went down twice.

Q. Two times. That was one day each time?

A. Uh-huh.

Q. So it was two days at Mr. Toffel's office; correct?

A. Uh-huh.

Q. And one other time did you run to the courthouse?

A. I have been down here several times. Every time I come down here, they put the case off. That has been going on three years.

Q. How many times have you been to this courthouse?

A. Several times.

Q. Do you remember how many?

A. Well, it might have been five or six. I didn't have to stay.

Q. So you took off all day if you didn't have to stay?

A. Well, my time is worth something, sir.

Q. Okay. So if you got here in the morning and the case got continued, you didn't go back to work; correct?

A. Yes, sir, I went back. I went back by there.

Q. But you know it is forty hours even, correct?

A. I know it is forty hours even.

Q. Not thirty-nine?

A. No, not thirty-nine.

Q. And not forty-one?

A. No, sir.

Q. And then we are talking about missing work for today; right?

A. That's right.

Transcript at 181–84 (emphasis added).

What is conspicuously absent are any wages he lost because of time he was required to spend dealing with Ocwen's stay violation. While Mr. Hutchings described time he spent working with his attorney before he filed the pending complaint, he clearly suggested that he did not suffer any damages because of that time.

Mr. Hutchings testified:

Q. Do you have an estimate as to how many times you talked with Mr. Roe about these contacts from Ocwen? Not refinancing but just this thing that we are here on today.

A. I know it would have to be over seven or eight times I have been in his office with—

Q. With Mr. Roe?

A. With Mr. Roe, not counting Mrs. Roe.

Q. How many times with her?

A. About four or five times with her.

Q. Okay.

A. I have sat with her and watched her fax papers for me to Ocwen.

Transcript at 174–75.

But apparently, Mr. Hutchings did not suffer any damages through the loss of wages or the like because of the time he was required to spend with Mr. or Mrs. Roe. As quoted above, he testified:

Q. Okay. So if you got a letter when you would go home, as you testified, and it was from Ocwen, you would go run to Mr. Roe's office; correct?

A. Well, I was right there at Mr. Roe's office.

Q. But the week's worth of work that you lost wasn't in one week, though, was it?

A. It was running around in this courthouse or something like that.

Q. All right. So one week included time at Mr. Roe's office, correct?

A. **No, it didn't have anything—I can pass by Mr. Roe's office going home.**

Q. So one week of running down to this courthouse; right?

A. Running around to different places—courts, trying to get—

Transcript at 183 (emphasis added).

As discussed below, any lost wages Mr. Hutchings suffered because of the time he spent dealing with Ocwen's stay violation occurred *after* he filed the pending complaint, primarily because of his visits to this Court.[10]

### (2) Medical Expenses

In regard to other damages he might have suffered because of Ocwen's stay violation, Mr. Hutchings testified that he did not require medical attention because of the calls and letters that he received from Ocwen. He said that he has high blood pressure, but that the condition existed prior to his first receiving any of those calls and letters, and that he had been receiving medical treatment for that condition prior to his first receiving any of those calls and letters. He claimed, however, his dealings with Ocwen "... kind of raised [his blood pressure] up." Transcript, page 176 (parenthetical added).

### (3) Fees or Costs

Mr. Hutchings did not testify that he incurred, or actually owes, any attorneys fees as a result of Ocwen's purported stay violation, or for the institution or prosecution of this adversary proceeding. To the contrary, he specifically testified that he has *no* agreement with his attorneys regarding the amount or payment of any compensation to them for the work involved in this adversary proceeding:

Q. Mr. Hutchings, do you have any agreement with your attorney on attorney fees?

A. No, I don't.

Q. Do you have any written contract with him in regard to attorney fees?

A. No, I don't.

Transcript at 196–97.

### (4) Personal Expenses

Mr. Hutchings suggested that "this Ocwen deal" was the genesis of some personal difficulties between his wife and him:

Q. Relating to the problems about what we are here about today, not about the refinancing, what, if any, other problems have you personally had?

---

10. Even if this evidence in some way suggests that Mr. Hutchings may have incurred some damages because of time he spent with his attorney before he filed the pending complaint, the burden is on him to prove those damages, not for this Court to extricate that proof from the evidence offered. Unfortunately for Mr. Hutchings, he did not prove those damages.

A. Well, like I said in my deposition, it has caused me and my wife to separate for six months behind this, with this Ocwen deal. See, I have been trying to get out from under them for a pretty good while. That is what I was trying to say. The refinancing don't bother me. Trying to get out from under Ocwen do. See, what Ocwen, they don't understand, they—I am going to say it again. They have overcharged me for what they bought.

Transcript, page 179.

Mr. Hutchings did not provide any additional information and the Court cannot make any determination solely from his one line conclusory accusation that Ocwen's telephone calls and letters representing Ocwen's purported stay violation were the cause of Mr. Hutchings separation from his wife. Clearly, he did not specifically testify that the telephone calls and letters caused his separation. Therefore, any conclusion with respect to the cause of that separation and its connection, if any, to the actions of Ocwen's representatives must be based on pure speculation, which of course, is impermissible. *Regardless, Mr. Hutchings did not suggest that he is seeking any form of damages for said separation.*

Moreover, it is apparent from Mr. Hutchings testimony, taken as a whole, and from the context in which he tersely mentioned his separation, that when he speaks of "this Ocwen deal" he is referring primarily to the difficulties he had in attempting to have the debt he owes to Banc One refinanced. According to Mr. Hutchings, those difficulties arose because of his disagreement with the pay-off figure provided to him by Ocwen. He claimed that amount was excessive.

### b. Damages Occurred in Connection with Filing His Complaint

In contrast to the above, all of the damages Mr. Hutchings claims, *and all proven,* are those associated with his prosecution of the pending adversary proceeding. Those damages were incurred either in preparing to file the suit or in preparing for court appearances after the suit was filed. Whichever, this record is absolutely clear. Whatever the damages were incurred, are damages that arose *after* Ocwen ceased its contact with him and after his attorney had confirmed that such contact would not reoccur. Those damages are discussed below.

#### (1) Lost Wages

Mr. Hutchings is claiming actual damages of $800. That amount represents wages and commissions he did not earn from missing about 40 hours of work. While Mr. Hutchings may have missed 40 hours and therefore did not earn $800 from that time, the missed time he identified at trial is easily identified as time spent in prosecution of his lawsuit after that suit was filed.

As quoted above, Mr. Hutchings testified that the time he lost from work was time spent, "running around in this courthouse or something like that." Transcript at 183. He added, "Running around to different places—courts . . . ." *Id.*

Mr. Hutchings did not specify what "courts" he was referring to although it is apparent that he was talking about this bankruptcy court. He explained, "I have been down here several times." Transcript at 184. He estimated that he has come to the bankruptcy court five or six times, but that each time he came, "they put the case off." *Id.*

Mr. Hutchings added that some of the time he lost was time he spent because he

was required to go to Mr. Toffel's office twice.

In contrast to the time he spent after Ocwen ceased its contact, Mr. Hutchings specifically testified that he did not lose any time from work as a result of the trips that he made to Mr. Roe's office, visits that would have probably occurred *during the time of Ocwen's stay* violation. His testimony explicitly explains why he lost time from work after he filed the pending adversary proceeding as compared to not losing any time before. He testified:

Q. Okay. So if you got a letter when you would go home, as you testified, and it was from Ocwen, you would go run to Mr. Roe's office; correct?

A. Well, I was right there at Mr. Roe's office.

Q. But the week's worth of work that you lost wasn't in one week, though, was it?

A. It was running around in this courthouse or something like that.

Q. All right. So one week included time at Mr. Roe's office, correct?

A. No, it didn't have anything—I can pass by Mr. Roe's office going home.

Transcript, page 183.

At the time of trial, Mr. Hutchings worked as an auto technician for Valley Ford in Oneonta, Alabama. He worked on commission and was guaranteed a certain salary. From those sources, his average hourly rate was eighteen dollars.

Mr. Hutchings also explained that by not working during the time spent at the trial on this matter he also would lose $144 in wages.

**(2) Gasoline**

According to his testimony, Mr. Hutchings' problems with Ocwen also cost him about $50 for gasoline he used traveling back and forth to his attorney's office and the bankruptcy court. He lives about 45 to 50 miles from the bankruptcy courthouse.

**c. Summary of Mr. Hutchings Testimony about the Damages He Claims**

In summary, given the complexity of the facts in this matter, this Court cannot overemphasize Mr. Hutchings's testimony that the only damages he claims are compensatory damages for lost wages and travel reimbursement. On cross examination he stated:

Q. And just the forty hours even and the travel time today is what you are asking the court for compensatory damages; correct?

A. That is right.

Transcript at 195–96.

And the record is equally clear in regard to those specific damages, whether any occurred before Mr. Hutchings filed his complaint or not, that the only damages Mr. Hutchings *proved* are those that occurred *after* he filed his complaint against Ocwen.[11]

**C. Testimony of Mrs. Doris Roe**

Mrs. Doris Roe and Mr. Bill Roe, Mr. Hutchings former bankruptcy attorney, were married for about 30 years. Mr. Roe is deceased. While they were married, Mrs. Roe managed Mr. Roe's law office.

Mrs. Roe testified that Mr. Hutchings came into the office several times regarding telephone calls he received from Ocwen. She did not testify who, according to Mr. Hutchings, had called him, or how many phone calls he had received. She testified that she explained to Mr. Hutchings that if he received additional calls from Ocwen that he should write down the

11. This factual conclusion is of course critical to this Court's ultimate conclusions.

date and time of the call and the name of the person calling.

Regarding the calls Mr. Hutchings had already received, she testified that she, "immediately turned [Mr. Hutchings] over to Mr. Roe to handle, and they worked through that. . . ." and that she presently, "can't say for a fact what happened there." Transcript at 22–23 (parenthetical added). The history of these calls and related activities are discussed below.

On May 24, 2002, Mrs. Roe talked with someone named "Mr. Garfield," an Ocwen representative. She made contemporaneous notes of that conversation which were admitted into evidence as Plaintiff's Exhibit 12. Mrs. Roe telephoned Mr. Garfield because of Mr. Hutchings' representations about the Ocwen telephone calls and the information he received that Ocwen was prepared to foreclose his mortgage. Mr. Hutchings specifically asked her to call Ocwen. When she called she was referred to Mr. Garfield, who told her that he was in possession of an order from this court dated April 26, 2002, dismissing Mr. Hutchings' case.

The record in this case reflects that an order was entered in this case on April 26, 2002, granting Mr. Hutchings motion to refinance his home loan. No order dismissing his case was entered.

Mrs. Roe attempted to explain to Mr. Garfield that the April 26, 2002, order did not dismiss Mr. Hutchings bankruptcy case. Mr. Garfield told her that the order he possessed reflected that the case had been dismissed; however, he did not read the order to her or explain its content. Mrs. Roe responded that regardless of the document he was relying on, the case was still open and the mortgage payments were being made through Mr. Hutchings' Chapter 13 case. In addition, she expressed her desire that he and other Ocwen representatives should refrain from calling Mr. Hutchings.

Mr. Garfield asked Mrs. Roe to send a copy of the April 26, 2002, order to him by facsimile She attempted but was unsuccessful. Apparently the facsimile number provided to her was not operational. She called Ocwen and spoke to Mr. Richard Morris, another representative. Mr. Morris told her to send the document to him. He provided another number. Mrs. Roe testified that she then successfully sent a copy of the April 26, 2002, order to Mr. Morris by facsimile.

The next contact Mrs. Roe had with Mr. Hutchings was when he brought in the June 18, 2002, letter he received from Ocwen's attorneys notifying him of the impending foreclose. A notice of foreclosure was included with that letter. Plaintiff's Exhibit 20. After reviewing those documents, Mrs. Roe immediately called Mr. Ledyard, the attorney who signed the letter. He was not in his office. Mrs. Roe spoke to his secretary. Mrs. Roe told Mr. Ledyard's secretary about her dealings with Mr. Garfield and Mr. Morris. In addition, she told the secretary that the foreclosure was improper and demanded that it be discontinued.

Mr. Ledyard called Mrs. Roe within the hour. **Mr. Ledyard told her that he had relayed her message to his client, and that his client agreed that foreclosure was improper. Mr Ledyard directed the foreclosure be discontinued.** Transcript at 29–31.

Mr. Ledyard followed the telephone call with a facsimile of June 21, 2002, that included the same information and intentions. That letter reads in pertinent part:

This will confirm our conversation that we have communicated to our client your concern about the validity of the foreclosure of the above referenced file. Apparently, our client has confirmed it does not have the authority to proceed with foreclosure and therefore, has in-

structed us to stop any foreclosure actions **immediately.**

Plaintiff's Exhibit 24 (emphasis added).[12] **The pending complaint was filed on June 25, 2002.**[13]

### D. Ocwen's Comment/History Log and Other Exhibits, and the Testimony of Mr. Kurt Bryant, an Ocwen Representative

Mr. Kurt Bryant is a default servicing liaison at Ocwen. He researches litigated accounts. He began researching Mr. Hutchings' account about two weeks before his May 7, 2004, deposition. He reviewed Mr. Hutchings' note and mortgage, as well as, "his files, his comment log, history, his transaction payment history, all of his origination docs, things of that nature." Transcript at 36.

Based on his review, Mr. Bryant concluded that Ocwen violated the automatic stay in Mr. Hutchings' bankruptcy case, "about four or five times." Transcript at 39. His opinion was that the violations were the result of human error. He stated that the first error occurred when Ocwen's bankruptcy coordinator, Mr. B.S. Praveen, removed the bankruptcy flag from Mr. Hutchings' account. Mr. Bryant explained that a bankruptcy flag is ordinarily placed on an account when someone files bankruptcy so that any one working on the account will know not to call the borrower and to be certain to abide by all of Ocwen's rules and regulations relating to borrowers in bankruptcy. When Mr. Hutchings filed his bankruptcy case, a bankruptcy flag was placed on his account.

Mr. Praveen removed the flag from Mr. Hutchings account on May 9, 2002.

Mr. Bryant identified Plaintiff's Exhibit 3, which is entitled "Comments/History log for 3751229," as, "a log of basically the customer service and all of the phone calls and dealings with this account from a day-to-day basis." Transcript at 37. According to Mr. Bryant, the log should reflect, and in this case does reflect, every contact with Mr. Hutchings by Ocwen's employees and every communication between Mr. Hutchings and Ocwen's employees regarding Mr. Hutchings' account. It does not, however, reflect, and is not intended to reflect, the activities of Ocwen's attorneys, including any communications or contact between Ocwen's attorneys and Mr. Hutchings or his attorney.

Mr. Bryant did not speak to Mr. Praveen about the reason the bankruptcy flag was dropped. Apparently Mr. Praveen no longer worked with Ocwen when Mr. Bryant started reviewing the account. The ostensible reason the flag was removed is however reflected in the accounts "comment/history log." The notation describing that event reads:

> BK RELIEF MOTION GRANTED, ORDER SIGNED as per pacer, relief was granted on 4/26/2002.

Plaintiff's Exhibit 3 at 10.

According to Mr. Bryant, that log entry reflects that Mr. Praveen removed the bankruptcy flag from the account because he believed that an order granting Ocwen relief from the stay had been entered by this Court. According to Mr. Bryant, the

---

**12.** Mrs. Roe advised Mr. Hutchings of the conversation, the letter, and the results. Transcript at 33. The pending complaint was filed on June 25, 2002.

**13.** The Court presumes that Mr. Hutchings' theory is that if he suffered any damages before filing his complaint, no matter how

slight, that he is then entitled to "punitive" damages under section 362(h) for Ocwen's violation of the stay. As discussed throughout this opinion, before punitive damages are proper, there must be proof that the violator's actions were egregious, vindictive, malicious, or accompanied by bad faith. There is no such proof here.

information from Pacer Net, (one of the Judiciary's electronic docket systems), was not erroneous. The docket entry simply reflected that an order had been entered and provided a "bullet" for the reader to select to read the order. The docket entry did not reflect that the order entered related to the automatic stay. Mr. Praveen's interpretation of what he saw on Pacer Net, which interpretation prompted him to remove the bankruptcy flag from Mr. Hutchings' account was, therefore, necessarily erroneous. He apparently did not read the order, an order that would have explained that it did not relate to the automatic stay but related only to Mr. Hutchings' request for permission to refinance his mortgage. For whatever reason, the flag was removed and Ocwen proceeded with its collection efforts.

Mr. Bryant testified that Ocwen has procedures designed to prevent its representatives from contacting borrowers who are in bankruptcy. He did not know and could not explain why those procedures failed to identify Mr. Praveen's mistake in Mr. Hutchings' case until after Ocwen's representatives had contacted Mr. Hutchings several times. Consequently, after the bankruptcy flag was dropped, Mr. Hutchings began receiving letters and telephone calls from Ocwen regarding his past due mortgage payments.

Similarly, according to Ocwen's practice and procedure at the time, after the bankruptcy flag was dropped from Mr. Hutchings' account, the account was programmed into an automatic dialing system. Under that system, collectors who talk with delinquent borrowers over the telephone do not have discretion to select which accounts they review or which individuals they call. The computerized telephone system randomly selects and automatically dials the telephone numbers of account debtors. The collectors job is simply to talk to the account debtor whose

telephone number has been called. The collectors are not assigned exclusive accounts. They do not have paper files. And they even do not physically dial the telephone. And in particular, collectors are not permitted to initiate telephone calls independently of the automatic system. To do so would violate Ocwen's instructions. In short, collectors conduct calls directed to them by the computer.

Mr. Bryant explained that once the dialing system initiates a telephone call, the system automatically makes a record of the call in the computerized account history log. The system simultaneously projects the information contained in the log onto the collector's computer screen. In that way, the collector knows to whom he or she is calling and will have the information that he or she will need to discuss the account. The collector's job is to discuss the account with the debtor. Once the conversation with the debtor, (or whomever he or she has spoken with), has been completed, the collector manually records the results or substance of the conversation in the log.

Mr. Bryant testified that Ocwen's policies and procedures specifically require its collectors to record the essence of all conversations into the log and that they are specifically trained and directed to do so. Failure by a collector to log the substance of a telephone call into the log would constitute a violation of Ocwen's policies and procedures and would be a direct violation of instructions given to them by their employer.

In practice, a collector would have no incentive not to log a telephone conversation with an account debtor. The collector's compensation is, in part, based on what he or she collects. Consequently, if the account debtor were to pay something on the account after speaking with the collector, and the collector did not log the

conversation, the collector would not receive the incentive bonus he or she would otherwise have become entitled to receive since there would be no record that the payment was made in response to his or her call.

Mr. Bryant testified that, if the collectors are unsuccessful in their efforts to collect the loan, the loan is referred to "loan resolution consultants." The loan resolution consultants are the only people who are authorized to initiate telephone calls to the borrowers or the borrowers' attorney. He testified, "They are the only ones that dial the phone numbers." Transcript at 62. He added that their job is to, "do what they can to work out a solution with the borrower." Transcript at 80.

Mr. Hutchings' account history log indicates that his loan was assigned to the loan resolution consultants on June 3, 2002. Any calls made to Mr. Hutchings' attorney either before or after that date were made manually by loan resolution consultants. And the only call, according to the account history log, made directly to Mr. Hutchings after that date, June 11, 2002, to be precise, was made manually by a loan resolution consultant. All of the calls made directly to Mr. Hutchings before June 3, 2002, were dialed by the automatic dialing system. And any conversations with Mr. Hutchings because of those automatic dialings were with collectors. Each of the automatically dialed calls, which, according to the log, numbered 10, can be readily identified on the log by the presence of the annotation "Davox Phone Call Out" in the comments section which appears to the right of the call.

Mr. Bryant testified that he works in the Orlando, Florida office with the collectors. His work station is approximately five feet away from a large room where the collectors work at individual desks. In fact, from his office he can observe all of the collectors when they work. There are from 50 to 100 collectors working in that area. Each performs work on hundreds of accounts every week.

Mr. Bryant conceded that it would have been possible for a collector to have initiated a call to Mr. Hutchings but not logged the call. He stated, however, that, in his experience, is it unlikely that any collector actually initiated a call to Mr. Hutchings and, furthermore, that any collector had a conversation with Mr. Hutchings that he or she failed to record on the log. Moreover, he has no personal knowledge of any case in which a collector's telephone conversation with an account debtor was not posted to the log.

Mr. Bryant testified that it is unlikely that any collector used profanity in any conversation with Mr. Hutchings because it is likely that such language would have been overheard, subjecting the collector to discipline. Moreover, the distinct probability of being overheard and disciplined for such inappropriate language would have, more than likely, been sufficient to have dissuaded any collectors from using profanity with Mr. Hutchings, or with any other account debtor. The collectors' desks are, as he explained, all in one large room, arranged in diagonal rows. Each row includes five or six collectors. Each row of collectors is flanked on both sides by supervisors' desks. Consequently, it is unlikely that a collector could say anything inappropriate to an account debtor without being overheard by a supervisor. He testified, "And if it was heard, the supervisor would probably tackle the guy." Transcript at 118.

In addition, for oversight, Ocwen randomly records conversations between its collectors and account debtors. Furthermore, collectors are randomly checked by Ocwen's quality assurance department regarding their behavior, demeanor, and, as Mr. Bryant explained, "how they speak to

borrowers." Transcript at 74. Mr. Bryant admitted, however, that he did not talk to any of the collectors who, according to the log, made phone calls to Mr. Hutchings and cannot, for that reason, testify of his personal knowledge that anyone who called Mr. Hutchings used profanity.

## 1. Correspondence

The evidence reflects that Mr. Hutchings received five items of correspondence from Ocwen and its attorneys between May 10, 2002, and June 21, 2002, relating to the collection of his mortgage deficiency.

### a. May 10, 2002

The first correspondence, dated May 10, 2002, purports to have been initiated and authored by the law firm of "Moss, Codilis ..." et al. Plaintiff's Exhibit 9. However, according to Mr. Bryant, that letter was automatically initiated and generated by Ocwen's computer system after the "bankruptcy flag" was dropped from Mr. Hutchings' account. He testified, "The instruction is, once the BK flag drops, the demand letter goes out which you have seen...." Transcript at 62. Apparently when the bankruptcy flag was dropped, a computer generated the letter and directed it to be mailed. No attorney, or collector, or other person had any hand in composing that letter, or requesting that it letter be sent to Mr. Hutchings, or in making the decision to send the letter. Mr. Bryant testified:

Q. Did the computer for Ocwen automatically then send out the thirty-day demand letter?

A. Yes, it did.

Q. No individual physically made that decision once the flag, to use your language, was lifted; correct?

A. That's correct.

Transcript at 96–97.

Ocwen's first letter notified Mr. Hutchings: (1) he was in default; that the amount necessary to cure the default was $16,899.77; (2) demanded he cure the default within 33 days from the date of the letter; and (3) informed him that his mortgagee would exercise its rights under the mortgage, including the right to accelerate and foreclose, if he did not pay the full amount of the default within the designated time period. The letter furthermore informed Mr. Hutchings that "Moss, Codilis, *et al.*," would not contact him at work by telephone if he would send them a written request that he not be contacted at work; and that "Moss, Codilis, *et al.*," would not contact him at all, except by legal action, if he would send them a written request that he not be contacted except by legal action.

### b. May 22, 2002

The second correspondence, dated May 22, 2002, contained no demand, but instead offered Ocwen's assistance in helping Mr. Hutchings resolve his deficiency and informed him that there were several alternatives. The correspondence is conciliatory and suggests a cooperative relationship between the parties with the common goal of facilitating Mr. Hutchings' efforts to keep his home. It reads in part:

Ocwen is here to build a mutually beneficial relationship, rectify any problems, resolve any issues and assist you with your needs. We are experienced in assisting our borrowers in resolving their delinquency and would like to present you with some of the alternatives that you may have available regarding your delinquent loan.

Plaintiff's Exhibit 11.

### c. June 4, 2002

The third correspondence, dated June 4, 2002, also purports to have been authored by the law firm of "Moss, Codilis, *et al.*," but was, according to Mr. Bryant, actually initiated by Ocwen's computer system.

Plaintiff's Exhibit 15. It informed Mr. Hutchings that "Moss, Codilis, *et al.*" had been engaged by Ocwen to contact him regarding his delinquent mortgage loan and to work with him on Ocwen's behalf to resolve that delinquency and avoid foreclosure. It requested certain financial information through a form included with the letter and explained alternatives to foreclosure. Those included taking advantage of "an alternate payment method" which might permit him to cure his default and retain his home. The correspondence read, "While it is our primary objective to assist Ocwen in the collection of past due amounts on your loan, we do want to work with you to find the best available alternative for you and our Client to bring your mortgage loan obligation current." Plaintiff's Exhibit 15.

### d. June 18, 2002

The fourth correspondence, dated June 18, 2002, was authored by and sent to Mr. Hutchings by Ocwen's outside counsel, "Pierce, Ledyard, *et al.*" Plaintiff's Exhibit 20. The letter informed Mr. Hutchings that foreclosure proceedings had been instituted. Enclosed with the letter was a foreclosure notice which indicated that a foreclosure sale would take place on July 23, 2002, for the purpose of satisfying the mortgage debt owed by Mr. Hutchings.

### e. June 21, 2002

The fifth correspondence, dated June 21, 2002, also purports to have been authored by the law firm of "Moss, Codilis, *et al.*," but was, according to Mr. Bryant, actually initiated by Ocwen's computer system. Plaintiff's Exhibit 22. It reiterated to Mr. Hutchings that a foreclosure sale had been scheduled and implored him to contact Ocwen for the purpose of discussing possible alternatives that might preserve his credit and save his property. The correspondence provided:

> Although Moss, Codilis has made several attempts to contact you regarding the

serious situation concerning your home, we have received no response from you. A FORECLOSURE SALE HAS BEEN SCHEDULED ON THE ABOVE–REFERENCED PROPERTY.

We urge you to contact us to:

1. Discuss possible alternatives;

2. Preserve your credit; and

3. Save your property

PLEASE CONTACT ME UPON RECEIPT OF THIS LETTER.

Plaintiff's Exhibit 22.

### f. Information from the Correspondence

In hindsight, while it may not have been the best idea, with the exception of the foreclosure letter that Ocwen's outside counsel sent to Mr. Hutchings, all of the letters sent to Mr. Hutchings were generated by Ocwen's computer. The collectors did not compose the letters and had no discretion to change them. The collectors did not personally prepare, handle, or mail the letters. They did not put the letters into envelopes, or take the envelopes to the company mail room, or put them in the mail. And, except for the first letter, which is dated May 10, 2002, the collectors simply requested that the letters be sent and filled in the applicable information or figures relative to Mr. Hutchings' account.

Mr. Bryant testified that Ocwen's procedures require that correspondence sent to a borrower or the borrower's representative also be recorded on the account history log. He said that he has no personal knowledge of any case in which an item of correspondence sent to a borrower or the borrower's representative was not recorded in the applicable account history log. Indeed, all of the letters described above, which have been admitted into evidence, are referred to and described in the account history log which was maintained by

Ocwen for Mr. Hutchings' loan. Mr. Bryant acknowledged, however, that Plaintiff's Exhibit 4, which purports to be an "Adjustable Rate Mortgage Payment Change Notice" dated December 27, 2001, that was ostensibly (according to the information on the letter) mailed by "Ocwen's Loan Servicing Department" to Mr. Hutchings, is not on the log.

On direct examination, Mr. Bryant was asked whether or not a record of Ocwen's receipt of the last page of Plaintiff's Exhibit 5, (which purports to be a letter that was ostensibly sent by facsimile by Mr. Roe to an Ocwen representative named Ernie Santiago), appears on the log. In that letter, which is dated February 26, 2002, Mr. Roe requested a detailed breakdown of the amount needed to payoff Mr. Hutchings' mortgage loan. After first reviewing the log, Mr. Bryant was unable to find an entry that described the facsimile from Mr. Roe to Mr. Santiago, and, therefore, testified that the log did not reflect Ocwen's receipt of the document. However, upon further review of the log, on cross-examination, he was able to locate an entry on the log made by Mr. Santiago on March 13, 2002, which reflects Ocwen's receipt of Plaintiff's Exhibit 5. The fact that the entry was made by Mr. Santiago, who was the intended recipient of the fax, supports Mr. Bryant's conclusion that the entry reflects Ocwen's receipt of the document. Furthermore, the log entry reads, "Received Payoff Quote Request: (1) William H. Roe . . ." That of course, coincides with the fact that Mr. Roe's letter was, in fact, a "payoff request." Plaintiff's Exhibit 3, page 13.

There is no evidence that any other item of correspondence was sent by either Mr. Roe or Mr. Hutchings to Ocwen during that period. Also, the accuracy of Mr. Bryant's revised conclusion is supported by the fact that Mr. Roe's otherwise typed letter bears a handwritten notation, pur-

portedly authored by Mrs. Roe (since it bears the signature "doris roe"), which reads, "4th Request 3-13-02," because that date coincides with the date of the log entry referred to by Mr. Bryant. Plaintiff's Exhibit 5 (last page). Those circumstances suggest that it is more likely than not that the March 13, 2002, log entry describes Ocwen's receipt of that letter. Consequently, it cannot be concluded that, as Mr. Hutchings insists, a record of Ocwen's receipt of Plaintiff's Exhibit 5 does not appear on the log.

On direct examination Mr. Bryant was also asked whether a record of Ocwen's receipt of Plaintiff's Exhibit 8, purporting to be a letter drafted by Mr. Roe on May 2, 2002, appears on the log. The letter, which requests additional information regarding the interest element of the payoff amount claimed by Ocwen in relation to Mr. Hutchings' anticipated refinance of his home loan, was apparently signed by Mrs. Roe for Mr. Roe, as the initials "dr" appear on the document directly underneath signature "William H. Roe." The letter's intended recipient was, once again, Mr. Ernie Santiago.

Again, after a review of the log, Mr. Bryant was unable to locate an entry which he could identify as Mr. Roe's May 2, 2002, letter. The log, however, reflects an entry made on May 17, 2002, which may reflect Ocwen's receipt of Plaintiff's Exhibit 8. The entry reads, "Written customer correspondence received via mail." Plaintiff's Exhibit 3 at 15. The next entry on the log, which was also made on May 17, 2002, only a few seconds after the entry described by Mr. Bryant, reads, "Written Inquiry Received." Mr. Roe's letter indeed constitutes "written customer correspondence," as referred to in the first May 17th entry, and, as well, constitutes an "inquiry" as referred to in the second May 17th entry.

When asked about those entries on cross-examination, Mr. Bryant testified that he does not think that they refer to Mr. Roe's May 2, 2002, letter. He did not explain why he did not think that those entries referred to Mr. Roe's letter. Nevertheless, he was given the opportunity to review the log again. After that review he was able to locate an entry which may describe Ocwen's receipt of Mr. Roe's May 2, 2002, letter. That entry, which is dated May 23, 2002, reads, "Written Inquiry Completed; Boroeres [sic] attorney expressed concern regarding the interest owed on this loan. Would like an explanation. Will raise flag. Details: done." Plaintiff's Exhibit 3 at 9.

Indeed, Mr. Roe's May 2, 2002, letter, expressed concern regarding the interest Ocwen was claiming Mr. Hutchings owed on his loan. There is no evidence that either Mr. Roe or Mr. Hutchings, or anyone on Mr. Hutchings behalf, mailed any other item of correspondence to Ocwen during that same time period. Those circumstances suggest that it is more likely than not that the log entry made on May 23, 2002, reflects Ocwen's receipt of Mr. Roe's May 2, 2002, letter. Moreover, given those circumstance, and despite Mr. Bryant's unexplained and otherwise inexplicable opinion to the contrary, it cannot be concluded that Mr. Roe's letter is not also the subject of the two entries made to the log on May 17, 2002, as described above. Consequently, it cannot be concluded that, as is insisted by Mr. Hutchings, the log does not reflect Ocwen's receipt of Plaintiff's Exhibit 8.

In contrast, according to the account history log, Ocwen did not receive the facsimile of the April 26, 2002, order that Mrs. Roe said that she sent to Mr. Morris' attention on May 24, 2002. Mr. Bryant, of course, cannot, say, of his own personal knowledge, whether or not Ocwen received that item. He did not ask "Mr. Morris,"

the intended recipient, whether the item was received. The fact that it is not on the log suggests to Mr. Bryant that Ocwen never received it. The company's rules of procedure require all incoming documents, whether received by facsimile or otherwise, to be "imaged" and posted to the account history log. Transcript at 137. According to Mr. Bryant, that belief is bolstered by the entry on the log, dated May 28, 2002, subsequent to the date Mrs. Roe purportedly sent the facsimile. That entry relates to a conversation by one of Ocwen's collectors with Mr. Hutchings, in which the collector told Mr. Hutchings that Ocwen's records did not reflect receipt of anything similar. The entry reads:

> Davox Phone Call Out; Customer Contact—No Commitment; tb .. tt mr he sed that he does not know why we are still calling him ... advsd him that we do not hav the info for the BK .... he sed that his attrny faxed it to Moss ... advsd him that I do not show anything on it ... he will hav his attrny cb later tdy ....

Plaintiff's Exhibit 3 at 9.

According to his interpretation of the log, Mr. Bryant testified that between the time the bankruptcy flag was dropped May 9, 2002, and June 21, 2002, when Ocwen realized that the flag had been dropped, Mr. Hutchings was called no more than 11 times by Ocwen's automated collection call system. He testified that Mr. Hutchings was not reached on most of those calls as a collector spoke to him only on three of those occasions. However, in response to messages left for him by the various collectors who attempted to contact him, Mr. Hutchings called Ocwen on three occasions. On one of those occasions, he was asked to call back because of problems with Ocwen's computer system. On the

other two occasions, Mr. Hutchings had conversations with Ocwen's representatives.[14]

## 2. Telephone Calls

The log of transactions for Mr. Hutchings' account, (Plaintiff's Exhibit 3), includes 19 telephone calls made either to or from Ocwen between May 9, 2002, and June 21, 2002. Those include, as explained in detail below, eight calls completed to either Mr. Hutchings' home telephone or his work telephone. It also includes five incoming calls made to Ocwen telephones by Mr. Hutchings and Mrs. Roe. Mr. Hutchings made three of those. Mrs. Roe made two. The remaining six log entries describing telephone activity during the relevant time represent calls that were terminated prematurely or where the identity of the caller or the intended recipient could not be determined.

Before discussing the specific calls, it is important to recognize that none of the entries on the log which describe outgoing calls identifies the number called or for whom the call was intended. That information can be gleaned only, if possible, from the comments posted on the log. Furthermore, none of the entries on the log which describe incoming calls identifies the number from which a call was placed or by whom the call was placed. Again, that information can be gleaned only, if possible, by implication from the comments posted on the log. With these limitations, the individual calls identified by the log are reviewed below.

### a. May 11, 2002, at 9:22:45 a.m.—Call # 1

The log lists a call *placed* by Ocwen's automated calling system on May 11, 2002, at 9:22:45 a.m. The log does not indicate to whom the call was intended or the number called. The statement appearing in connection with the log entry reads, "Davox Phone Call Out; Tele Residence, Left Message...." Plaintiff's Exhibit 3 at 10.[15] According to Mr. Bryant, that entry represents that: (1) the call was made by Ocwen's automatic system to Mr. Hutchings' home telephone number; (2) the call was either intercepted by Mr. Hutchings' answering machine or by someone other than Mr. Hutchings; (3) a message was left; (4) and there was no conversation with Mr. Hutchings.

### b. May 11, 2002, at 9:23:46 a.m.—Call # 2

The log lists a second call *placed* by Ocwen's automated calling system on May 11, 2002, this one at 9:23:46 a.m. The log does not indicate to whom the call was intended or the number called. The statement appearing in connection with the log entry reads, "Davox Phone Call Out; Free Dial Account...." Plaintiff's Exhibit 3 at 10. According to Mr. Bryant, that entry represents that the automatic system attempted to dial a telephone number, but that the call was interrupted and terminated by a computer problem.

### c. May 11, 2002, at 10:19:11 a.m.—Call # 3

The log lists a call *received* by Ocwen's automated calling system on May 11, 2002,

14. At trial, each party implied considerable interest in Mr. Bryant's interpretation of the entries in the log. It is important to note that Mr. Bryant admittedly has no firsthand knowledge about those entries. He did not participate in any of activities described on the log. He was not involved in any of the circumstances associated with the entries on the log. In addition, because he has not talked to the individuals who made the entries on the log, he does not have any secondhand knowledge of the events and circumstances described on the log.

15. All of the log entries quoted are quoted exactly as they appear in the exhibit.

at 10:19:11 a.m. The log does not identify who placed the call or from what number it was placed. The statement appearing in connection with the log entry reads, "Davox Phone Call In; Note; ASKED BOR TO CALL BACK B/C COMPUTER WAS FROZEN...." Plaintiff's Exhibit 3 at 10. According to Mr. Bryant, that entry represents that Mr. Hutchings ("BOR" being shorthand for borrower) called the number provided by the Ocwen's collector in the message left for Mr. Hutchings at his home at 9:22:45 a.m. that day. The statement also explains that the collector answering the call could not, because of a problem with her computer, access the information relative to Mr. Hutchings' account, and therefore asked him to call later.

### d. May 11, 2002, at 10:40:15 a.m.—Call # 4

The log lists a second call *received* by Ocwen's automated calling system on May 11, 2002, this one at 10:40:15 a.m. The statement appearing in connection with the log entry reads:

> Davox Phone Call In; Customer Contact—No Commitment; spke with bwr he called in, I advised tad iao 16,804,77 for 22 payments, i advised last payment we rec'd was in the year 00—he says he has been making monthly payments to the debt court, i explianed all we rec/ his prep. payments.—i advised of demand issued and exp. date, he would like his bankkr attorney to call Monday to get this resolved/ William Roe will be calling, and it is ok to give any info to him. he gave wrk # 625–3122—says 853–6185 is an old wrk # . mailing address is still correct.

Plaintiff's Exhibit 3 at page 10.

According to Mr. Bryant, that entry represents that Mr. Hutchings called Ocwen and spoke with a collector named "Jennifer Sawot." Ms. Sawot told Mr. Hutchings that the arrears on his account was

$16,804.77. She explained that the amount represented 22 missed payments, and that no mortgage payment had been made since the year 2000. Mr. Hutchings told her that he had been paying his monthly payments into the debtors' court. She told him that Ocwen received payment for prepetition payments. Also according to Mr. Bryant's translation of the log statement, Ms. Sawot advised Mr. Hutchings that:(1) a written demand for payment had been sent; (2) the amount listed in the demand represented the arrears owed; and (3) the arrearage amount would change on June 12, 2002. He told her that he would have Mr. Roe call and resolve the matter.

### e. May 11, 2002, at 10:40:37 a.m.—Call # 5

The log suggests a third call *received* by Ocwen's automated calling system on May 11, 2002, this one at 10:40:37 a.m. The statement appearing in connection with the log entry reads, "Davox Phone Call In; Certified 3rd Party per Cust; William Roe. Bankr.Attorney ...." Plaintiff's Exhibit 3 at 10. According to Mr. Bryant, that entry was made by Ms. Sawot, the same person who had just spoken with Mr. Hutchings. In addition, according to Mr. Bryant, the statement represents that the call was made by Mr. Roe who ostensibly called to discuss Mr. Hutchings' account.

Mr. Bryant's interpretation of that entry is improbable. If Ms. Sawot handled both the 10:40:15 call and the 10:40:37 call, only 22 seconds elapsed between the time the first call began and the beginning of the second call. The detailed note Ms. Sawot posted about her conversation with Mr. Hutchings indicates clearly that she could not have completed that call in 22 seconds. Therefore, she could not have completed that call and typed a detailed description of it, in shorthand or otherwise, in 22 seconds. In addition, despite having posted a very detailed description of her con-

versation with Mr. Hutchings, Ms. Sawot did not post any description of the conversation that Mr. Bryant thinks she had with Mr. Roe. Consequently, the Court must conclude, contrary to Mr. Bryant's testimony, that 10:40:37 post simply reflects Ms. Sawot's entry of additional information pertinent to the 10:40:15 conversation she had with Mr. Hutchings. The 10:40:37 entry does not therefore indicate Mr. Roe made a call to Ocwen or that Ms. Sawot and Mr. Roe had a conservation on that occasion.

### f. May 15, 2002, at 10:03:03 a.m.—Call # 6

The log lists a call *placed* by Ocwen's automated calling system on May 15, 2002, at 10:03:03 a.m. The log does not indicate to whom the call was placed or to what number it was placed. The statement appearing in connection with the log entry reads, "Davox Phone Call Out; Tele Business, No Message; on hold for a long while...." Plaintiff's Exhibit 3 at 10.

Using Mr. Bryant's methods, the statement represents that the call was: (1) made to Mr. Hutchings' workplace; (2) the call was answered by someone other than Mr. Hutchings; (3) the person answering the call placed the collector on hold; and (4) after being on hold for awhile, the collector disconnected the call without talking to Mr. Hutchings.

### g. May 15, 2002, at 5:08:12 p.m.—Call # 7

The log lists a second call *placed* by Ocwen's automated calling system on May 15, 2002, this one at 5:08:12 p.m. The log does not indicate to whom the call was placed to or what number was called. The statement appearing in connection with the log entry reads: "Davox Phone Call Out; Tele Business, Left Message; LADY ...." Plaintiff's Exhibit 3 at 10.

Again, using Mr. Bryant's methods, the statement represents that: (1) the automatic system called Mr. Hutchings' work-

place; (2) the call was answered by an unidentified lady; and (3) the collector left an unspecified message for Mr. Hutchings with that lady and discontinued the call without talking to Mr. Hutchings.

### h. May 16, 2002, at 8:48:32 a.m.—Call # 8

The log lists a call *received* by Ocwen's automated calling system on May 16, 2002, at 8:48:32 a.m. The statement appearing in connection with the log entry reads:

Davox Phone Call In; Customer Contact—No Commitmant; bwr calle din, I advised of the totra iao 16,804,77 and he sttd that he should nto be due for 22 omts and i advised well he was in b/k and when he came out this is what he is showing due for bwr sttd that he is going down to the court house and find out where all his money went and call back ....

Plaintiff's Exhibit 3 at 10.

According to Mr. Bryant, that entry reflects Mr. Hutchings called Ocwen and spoke with a collector. The statement indicates that the collector told Mr. Hutchings that the arrears in his account was $16,804.77, and that Mr. Hutchings was 22 payments behind. Mr. Hutchings disagreed and indicated that he would try to determine why funds he paid through his Chapter 13 case did not satisfy his mortgage debt. Apparently, Mr. Hutchings incorrectly believed that his Chapter 13 payments were funding his current mortgage payments.

### i. May 16, 2002, at 10:25:51 a.m.—Call # 9

The log lists a call *placed* by Ocwen's automated calling system on May 16, 2002, at 10:25:51 a.m. The log does not indicate to whom the call was placed or what number was called. The statement appearing in connection with the log entry reads, "Davox Phone Call Out; Note; bwr al-

ready called this morning . . . ." Plaintiff's Exhibit 3 at 10. According to Mr. Bryant, that entry represents that the automatic system dialed a telephone number, but that the attempted call was interrupted and terminated before the call was answered.

### j. May 22, 2002, at 10:09:27 a.m.—Call # 10

The log lists a call *placed* by Ocwen's automated calling system on May 22, 2002, at 10:09:27 a.m. The log does not indicate to whom the call was placed or what number was called. The statement appearing in connection with the log entry reads, "Davox Phone Call Out; Customer Contact—No Commitment; brrw sttd that we need to spaeak to the attorney william roe .. Gave number 205–625–3208. . . ." Plaintiff's Exhibit 3 at 9. According to Mr. Bryant, that entry represents that: (1) Ocwen's automatic system dialed Mr. Hutchings' telephone number; (2) and Mr. Hutchings answered the call and had a conversation with a collector; (3) Mr. Hutchings gave the collector Mr. Roe's telephone number and told the collector to call Mr. Roe; and (4) and that the call was then terminated.

### k. May 24, 2002, at 1:46:41 p.m.—Call # 11

The log lists a call for May 24, 2002, at 1:46:41 p.m. and identifies the call as, "Davox Phone Call Out." That phrase suggests that a call was *placed* by Ocwen's automated calling system. In contrast, the statement appearing in connection with the log entry indicates that the call was *incoming*, not *outgoing*. The statement reads:

> Davox Phone Call Out; Note; DORIS ROE attorney for mr. hutchings called in wanting to know why we were calling bw .. I adv her that there was a Relief

frm BK grnated 4/26 she adv that motion was for the bw to refinance hm and not for u to cntct him to collect the debt .. I adv her that pmnt were not being md .. She adv that the pmnt are being md by trustee .. David rogers . . . 205 323 4631 . . . . . I adv her that we would research issue and call her bk .. Her # 205–625–3208 .. She adv us not to have any cntct with her client .. I adv that we will not until issue is resolved . . . .

Plaintiff's Exhibit 3 at 9.

Mr. Bryant was not asked to comment on this entry. Indeed, it is self-explanatory. As Mrs. Roe testified, she called Ocwen for Mr. Hutchings. Mr. Garfield "Headl___," a collector, answered the call.[16] Mrs. Roe asked Mr. "Headl___" why Ocwen was calling Mr. Hutchings. Mr. Headl___ told her that Ocwen believed that relief from the stay was granted on April 26, 2002. Mrs. Roe told Mr. "Headl___" that Ocwen was mistaken as the April 26, 2002, order granted Mr. Hutchings the right to refinance his home mortgage and did not grant Ocwen relief from the stay. Mrs. Roe demanded that Ocwen stop calling Mr. Hutchings. Mr. "Headl___" said that Ocwen would research the issue and, in the meantime, would not attempt to contact Mr. Hutchings. Unlike Mrs. Roe's testimony, however, the comments do not reflect that she told Mr. "Headl___" that she would send a copy of the April 26 order by facsimile or that she was provided a telephone number to do so.

### l. May 24, 2002, at 1:51:25 p.m.—Call # 12

The log reflects, in agreement with Mrs. Roe's testimony, that Mrs. Roe called Ocwen again at 1:51:25 p.m. on May 24,

---

16. Many names entered on the log were truncated where the form provided insufficient room for them to be completed. Mr.

"Headl___" is apparently the same person that Mrs. Roe identified as "Mr. Garfield" in her testimony.

2002, shortly after she completed her conversation with Mr. "Headl____." According to the log, her second call was answered by Mr. Richard Irvine. The statement appearing in connection with the log entry reads:

> Phone Call In; Phone Call In; Note; Doris w/ bwr's attorney wanted to know why we are still cll'g the bwr while he is in b/k, adv her of the note on 05/06 which stt relief was granted, she stt the motion for the relief was only so the bwr cld refi, adv her to fax a copy of the form to our b/k dept., she asked if we wld stop cll'g the bwr now, adv her not until we get the form and ck it out.

Plaintiff's Exhibit 3 at 9.

Again, Mr. Bryant was not asked to comment. But again, this entry is self-explanatory. As Mrs. Roe testified, she called Ocwen immediately after her conversation with Mr. "Headl____." Mr. Richard Irvine, a collector, answered the call.[17] Mrs. Roe asked Mr. Irvine why Ocwen was calling Mr. Hutchings. Mr. Irvine told her that Ocwen believed that it was granted relief from the stay on April 26, 2002. Mrs. Roe told Mr. Irvine that Ocwen was mistaken and she explained the purpose of the April 26, 2002, order. Mr. Irvine asked her to send a copy of the order by facsimile to Ocwen's bankruptcy department. Mrs. Roe also demanded that Ocwen stop calling Mr. Hutchings. Mr. Irvine told her that Ocwen would not stop calling Mr. Hutchings until it received the order and researched the matter.

### m. May 24, 2002, at 1:55:33 p.m.—Call # 13

The log lists a third call *received* by Ocwen's automated calling system on May 24, 2002, this one at 1:55:33 p.m. Mr. Bryant was not asked to interpret the statement accompanying that entry.

The log entry does not identify the caller and does not list the number from which the call was made. A statement accompanies the call, but offers little information. It reads, "Phone Call In; Phone Call In; Transferred Call; to 60 plus ...." Plaintiff's Exhibit 3 at 9. Mr. Hutchings did not testify that he personally called Ocwen on May 24, 2002. And the two phone calls Mrs. Roe made to Ocwen are listed on the log at 1:46:41 p.m. and at 1:51:25 p.m. Based on these facts, the Court may reasonably conclude that the called listed for May 24, 2002, at 1:55:33 p.m. was not made to Mr. Hutchings.

### n. May 28, 2002, at 10:10:01 a.m.—Call # 14

The log lists a call *placed* by Ocwen's automated calling system on May 28, 2002, at 10:10:01 a.m. The log does not identify to whom it was made or the number called. The statement appearing in connection with the log entry reads:

> Davox Phone Call Out; Customer Contact—No Commitment; tb .. tt mr he sed that he does not know why we are still calling him ... advsd him that we do not hav the info for the BK .... he sed that his attrny faxed it to Moss ... advsd him that I do not show anything on it ... he will hav his attrny cb later tdy ....

Plaintiff's Exhibit 3 at 9.

The May 28, 2002, entry is self-explanatory. Ocwen's automated calling system dialed Mr. Hutchings' telephone number. Mr. Hutchings answered the call. He told the collector handling the call that he did not understand why Ocwen was still calling him. He also told the collector that Mrs.

---

**17.** *Mr. Irvine is apparently the same person that Mrs. Roe identified as Mr. "Richard Mor-* ris" *in her testimony.*

Roe sent the information relating to his bankruptcy. The collector told Mr. Hutchings that Ocwen's records did not reflect that Mrs. Roe had sent a facsimile. Mr. Hutchings told the collector he would have his attorney call Ocwen that day, and the call was terminated.

### o. May 31, 2002, at 11:41:31 a.m.—Call # 15

The log lists a call *placed* by Ocwen's automated calling system on May 31, 2002, at 11:41:31 a.m. The log does not indicate to whom the call was made or to what number. The statement appearing in connection with the log entry reads, "Davox Phone Call Out; Tele Business, No Message; was put on hld but Mrs didn't rtrnm." Plaintiff's Exhibit 3 at 9.

According to Mr. Bryant, this entry reflects that the automatic system dialed Mr. Bryant's telephone number, ostensibly at work. The information in the statement indicates: (1) the call was placed to Mr. Hutchings' workplace; (2) the call was answered by someone other than Mr. Hutchings; (3) the person answering the telephone placed the caller on hold; (4) after being on hold for awhile, the collector terminated the call without talking to Mr. Hutchings.

### p. May 31, 2002, at 4:39:31 p.m.—Call # 16

The log lists a second call *placed* by Ocwen's automated calling system on May 31, 2002, this one at 4:39:31 p.m. The log does not identify to whom the call was made or what number was caller. The statement appearing in connection with the log entry reads, "Davox Phone Call Out; Tele Business, No Message. . . ." Plaintiff's Exhibit 3 at 9.

According to Mr. Bryant, this entry reflects that the automatic system dialed Mr. Bryant's telephone number, again ostensibly at work. The information in the statement indicates: (1) the call was placed to Mr. Hutchings' workplace; and (2) the call

was discontinued without the collector talking to Mr. Hutchings or leaving a message.

### q. June 5, 2002, at 2:42:52 p.m.—Call # 17

The log lists an *outgoing* call made by one of Ocwen's employees on June 5, 2002, at 2:42:52 p.m. The log does not identify to whom the call was made or what number was called. The statement appearing in connection with the log entry reads:

LRC Received Payoff Quote Request:

(1) Good Through Date: _____ 6/28 _____

(2) Requester's Name: _____ Brice Hutchings _____

(3) Requester's Telephone# :

_____

(4) Delivery method and address: _____ please mail prop address

(5) Customer Advised Advised of fees & turnaround

Time: _____

Details: Phone Call Out; Phone Call Out; Payoff Rqst Recd—LRC

Plaintiff's Exhibit 3 at 9.

It appears that this call was made manually by Ms. "McPh___," and was not initiated by Ocwen's automatic system. There is nothing in the entry indicating that this call was made to Mr. Hutchings. And Mr. Bryant could not determine from the entry whether the call was made to Mr. Hutchings. Similarly, Mr. Hutchings does not contend that he received a telephone call from Ocwen on this date at this time. Based on these facts, the Court concludes that the called listed for June 5, 2002, was not made to Mr. Hutchings.

In addition, even if this call were made to Mr. Hutchings, it appears that the subject of the call was information Mr. Hutchings needed and wanted. That information was a "payoff" amount for his loan.

The call apparently did not involve the collection of the arrears on the loan.

### r. June 11, 2002, at 2:28:20 p.m.—Call # 18

The log lists another *outgoing* call made by Ms. "McPh____." This one was made on June 11, 2002, at 2:28:20 p.m. The log does not identify to whom the call was placed or to what number. The statement appearing in connection with the log entry reads, "Phone Call Out; Phone Call Out; Customer Contact; mailed p/o . . . ." Plaintiff's Exhibit 3 at 3.

Again, the call appears to have been dialed manually by Ms. "McPh____" and was not initiated by Ocwen's automatic system. The phrase "Customer Contact" suggests the call may have been made to Mr. Hutchings; however, Mr. Bryant denied that the inclusion of that language means that the call was made to Mr. Hutchings. He explained Ms. "McPh____" did not manually type that phrase in the comment section. It was, instead, he explained, posted automatically by the computer system, as were the phrases, "Phone Call Out; Phone Call Out . . . ." He said that the only words that Ms. "McPh____" could have manually typed in the comment were "mailed p/o." Mr. Bryant could not, therefore, say from the language contained in that entry if the call was made to Mr. Hutchings.

On the other hand, Mr. Hutchings testified that he received a telephone call from Ocwen, specifically from someone named "Jennifer," on June 12, 2002. He does not, however, contend that he received a telephone call from Ocwen on June 11, 2002. He may, of course be slightly mistaken and he may have received a call about the time he thinks he did from a female caller at Ocwen. Certainly, the inclusion of the words, "Customer Contact," would attest to the validity of that possibility. It could, therefore, be concluded, despite Mr. Bryant's explanation to the contrary, that

the June 11, 2002, call, which is described in the log, was made to Mr. Hutchings. However, it is not plain from the log annotation that the call and conversation, if any, had anything to do with the collection of Ocwen's debt. In fact, the inclusion of the words "mailed p/o" would, to the contrary, suggest that the call and conversation, if any, had to do with Mr. Hutchings pay off request, which, of course would not constitute a violation of the stay.

### s. June 20, 2002, at 3:47:00 p.m.—Call # 19

The log lists another *outgoing* call made by Ms. "McPh____." This one was made on June 20, 2002, at 3:47:00 p.m. This is the last telephone call, whether incoming or outgoing, described on the log. Like many others, the log does not indicate to whom the call was made or the number called.

The statement appearing in connection with the log entry reads, "Phone Call Out; Phone Call Out; Customer Contact; Foreclosure Sale Ltr Rqst LCR . . . ." Plaintiff's Exhibit 3 at 3. It appears that the call was dialed manually by Ms. "McPh____" and was not initiated by Ocwen's automatic system. But nothing in the entry indicates that the call was made to Mr. Hutchings. And Mr. Bryant could not say whether it was made to Mr. Hutchings. And Mr. Hutchings does not contend that he received a telephone call from Ocwen after June 12, 2002. Based on these facts, the Court may reasonably conclude that the called listed for June 20, 2002, was not made to Mr. Hutchings.

### t. Telephone Calls before May 26, 2002

In his testimony, Mr. Hutchings specifically recounted two calls he received from Ocwen before May 22, 2002, when he started making written notes about the calls as suggested by his attorney. One call was made to his home on a Saturday he was working. The caller left a message with his wife. He returned the call at the

number left and spoke with someone named "Jennifer." Mr. Hutchings' recollection agrees with the telephone activity described in Ocwen's log for the date May 11, 2005. The log reflects that a call was placed by Ocwen's automatic calling system to Mr. Hutchings' residence on that date, the collector left a message, and Mr. Hutchings returned the call and spoke with a collector named "Jennifer."

The second call Mr. Hutchings' described receiving before he started making notes was one made on May 26, 2002, where he talked to a collector named "Anthony." Mr. Hutchings could not remember exactly when he received that second call, but as described above, the log shows that Mr. Hutchings spoke with Ocwen's collectors on three occasions before May 26, 2002. None of the collectors on those occasions was named "Anthony." The log reflects that Mr. Hutchings did speak with a collector named "Anthony" on May 28, 2002. But that, of course, was after the day that Mr. Hutchings said he started making written notes of the calls he received from Ocwen.

Based on the above, one of three scenarios is possible. The first most probable is that Mr. Hutchings is correct that he received a call from and spoke with an Ocwen collector before May 26, 2002 (in addition to the call that he received from Jennifer and his conversation with her), but is mistaken about the name of the person with whom he had a conversation.

The second most probable is that Mr. Hutchings is correct about the fact that he received a call from and spoke with an Ocwen collector named "Anthony," but is mistaken about when the call occurred.

The third possibility is that Mr. Hutchings' received a call from "Anthony" which was not recorded in Ocwen's log. Given the fact that Ocwen's log reflects that Mr. Hutchings had three conversations with collectors before May 26, 2002, even

though he remembers two, this third possibility is not probable.

## u. Summary Comments about the Telephone Calls

In summary, it appears from Ocwen's log that eight calls were placed to Mr. Hutchings from May 11, 2002, through June 11, 2002. Those calls resulted in five conversations between Ocwen collectors and Mr. Hutchings, either where Mr. Hutchings answered the telephone or where Mr. Hutchings returned the call. In addition, Mrs. Roe had two conversations with Ocwen collectors on behalf of Mr. Hutchings.

## VII. Applicable Law

Section 362(a)(6) of the Bankruptcy Code provides that the filing of a bankruptcy petition operates automatically as a stay of "any act to collect, assess or recover a claim against the debtor that arose before the commencement of the case under this title...." 11 U.S.C. § 362(a)(6). Under subsection (c)(2) of section 362, the stay provided for under subsection (a)(6) continues until the case is closed, or the time the case is dismissed, or a discharge is granted or denied to the debtor, whichever occurs first. 11 U.S.C. § 362(c)(2).

Section 362(h) provides, "An individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." 11 U.S.C. § 362(h). For damages to be awarded to an individual under that section, the individual *must prove an injury caused by the stay violation and that the violation of the stay was willful.* A violation of the automatic stay is a "willful violation" if, "the violator (1) knew of the automatic stay and (2) intentionally committed the violative act, regardless whether the violator specifically intended to violate the stay." *Jove Eng'g, Inc. v.*

*Internal Revenue Serv.,* 92 F.3d 1539, 1555 (11th Cir.1996).

▇▇▇ Section 362(h) allows an award of punitive damages for stay violations only in "appropriate circumstances." "Appropriate circumstances" has been interpreted to require that the violator's acts be egregious, vindictive, malicious, or accompanied by bad faith. "[E]gregious, intentional misconduct on the violator's part is necessary to support a punitive damages award." *United States v. Ketelsen (In re Ketelsen),* 880 F.2d 990, 993 (8th Cir.1989). "An additional finding of maliciousness or bad faith on the part of the offending creditor warrants the further imposition of punitive damages pursuant to 11 U.S.C. § 362(h)." *Crysen/Montenay Energy Co. v. Esselen Assocs., Inc. (In re Crysen/Montenay Energy Co.),* 902 F.2d 1098, 1105 (2nd Cir.1990). "[O]nly egregious or vindictive misconduct warrants punitive damages for willful violations of the automatic stay of 11 U.S.C. § 362." *Davis v. Internal Revenue Serv.,* 136 B.R. 414, 424 (E.D.Va.1992).[18]

## VIII.  Conclusions of Law

It is absolutely clear that Ocwen's intrusion on Mr. Hutchings was unnecessary. And anyone subjected to those actions, would, like Mr. Hutchings, be aggravated. Who would not be upset by threatening letters and threatening telephone calls? Who would not react like Mr. Hutchings? But how should this Court respond? This Court speculates that most courts' initial responses would be similar to this Court's, that is, a creditor who violates the automatic stay should be punished. That response, this Court again speculates, is based on a bankruptcy court's instinct to

protect the automatic stay. But is it the correct response? Would it satisfy a bankruptcy court's legal responsibility? The remainder of this opinion explains why this Court believes it would not.

## A.  The Extent of the Stay Violations

### 1.  The Telephone Calls

▇▇▇ According to Mr. Hutchings' testimony, he received ten prohibited telephone calls from Ocwen during the period between May 2002 and June 2002. Those calls include two calls from Ocwen made before May 26, 2002, and eight calls from May 26, 2002, through June 12, 2002. Those eight calls include one on May 26, 2002; one on May 27, 2002; two on May 28, 2002; one on June 1, 2002; one on June 2, 2002; one on June 3, 2002, and one on June 12, 2002.[19] And as discussed above, five of the ten calls Mr. Hutchings contends he received, resulted in conversations between Ocwen's representatives and him.

Ocwen's transactions log and Mr. Hutchings' testimony do not agree. The log reflects that no calls were placed to Mr. Hutchings on either May 26, 2002, May 27, 2002, June 1, 2002, June 2, 2002, June 3, 2002, or June 12, 2002. It also indicates that only one call was placed to him on May 28, 2002. According to Ocwen's log, as discussed above, eight calls were placed to Mr. Hutchings from May 11, 2002, through June 11, 2002. Five of those calls resulted in conversations between Mr. Hutchings and Ocwen's collectors and Mr. Hutchings. Those five calls occurred either because Mr. Hutchings answered the telephone when the call was made or

---

18.  See this Court's opinion in *In re Cox,* 214 B.R. 635 (Bankr.N.D.Ala.1997).

19.  Of course, the Court may not consider the 23 other attempted calls which, according to

Mr. Hutchings' testimony, were registered by his caller identification mechanism on June 3, 2002, as stay violations as those calls did not result in any prohibited contact with Mr. Hutchings.

where he returned a call after a message was left.

In regard to the telephone calls, while the Court cannot reconcile the differences in the evidence established by Mr. Hutchings' testimony and Ocwen's log, exact reconciliation is not necessary. Each body of evidence suggests the same conclusion. That conclusion is: Ocwen placed eight to ten prohibited calls to Mr. Hutchings and five of those calls resulted in conversations between Ocwen representatives and Mr. Hutchings. Therefore any differences in the specific evidence is of no consequence.

### 2. The Correspondence

In addition to the telephone calls, the evidence establishes that Mr. Hutchings received five items of correspondence relating to the collection of his mortgage deficiency from Ocwen or its attorneys between May 10, 2002, and June 21, 2002. The first, dated May 10, 2002, purports to have been initiated and authored by the law firm of "Moss, Codilis, *et al.*" The second item of correspondence, dated May 22, 2002, contained no demand, but instead offered Ocwen's assistance in helping Mr. Hutchings resolve his deficiency and informed him that there were several alternatives available to him for that purpose. The third item of correspondence, dated June 4, 2002, also purports to have been authored by the law firm of "Moss, Codilis, *et al.*" The fourth item of correspondence, dated June 18, 2002, was authored by and sent to Mr. Hutchings by Ocwen's outside counsel, "Pierce, Ledyard, *et al.*" The fifth item of correspondence, dated June 21, 2002, also purports to have been authored by the law firm of "Moss, Codilis, *et al.*"

### 3. Conclusions of the Extent of the Stay Violations

█ Based on the evidence, the Court concludes; (1) Ocwen placed eight to ten telephone calls to Mr. Hutchings relating to the collection of his mortgage debt; (2) as a result of those calls Ocwen representatives had five conversations with Mr. Hutchings relating to the collection of his mortgage debt; and (3) Ocwen sent five items of correspondence to Mr. Hutchings relating to the collection of his mortgage debt. Ocwen admits as much, and this Court concludes, that those ten or so contacts constituted violations of the automatic stay.[20]

### B. Damages

█ The plain language of section 362(h) of the Bankruptcy Code explicitly requires, *as a prerequisite to maintaining such an action, that a debtor must have first been "injured" by the stay violation.* The section reads, "An individual injured by any willful violation of a stay provided by this section shall recover...." 11 U.S.C. § 362(h). The section also explicitly requires, as a prerequisite to such an action, that the creditors' actions caused the debtor to suffer damages which are "actual," that is damages that the debtor in fact incurred.

In this case, neither of section 362(h)'s prerequisites were satisfied, at least prior to the time that Mr. Hutchings filed this adversary proceeding. Ocwen's stay violation did not result in any direct harm to Mr. Hutchings and did not directly cause him to suffer any damages, injuries, or loss. *All* of his alleged "damages" flowed strictly and directly from his own actions and efforts involved in prosecuting the present adversary proceeding.

---

**20.** Ocwen contends that the contacts were made because its representatives mistakenly believed that it had been granted relief from the stay. Even if that were true, it would not, of course, excuse the consequences, if any, of those violations.

**1. Compensatory Damages—Mr. Hutchings is Not Entitled to Compensatory Damages in the form of "actual damages, including attorneys' fees and costs. . . ."**

**a. Mr. Hutchings May Not Recover Compensatory Damages, Expenses, or Attorneys Fees Because He Was Not Injured by Ocwen's Stay Violations**

By its plain language, the "actual damages, including costs and attorneys' fees. . ." available to a debtor through section 362(h) of the Bankruptcy Code, are restricted to "[a]n individual *injured* by any willful violation of a stay. . . ." 11 U.S.C. § 362(h) (emphasis added). Consequently, by its terms section 362(h) does not authorize an award of "actual damages, including costs and attorneys' fees. . ." to an individual *who has not been injured* by a willful violation of the stay. 11 U.S.C. § 362(h).

Given this limited scope of section 362(h), the practical question before the Court is: Was Mr. Hutchings injured by Ocwen's actions?

There are two common situations where a debtor might file a complaint under section 362(h). In one, a debtor may be suffering from an ongoing stay violation or there may be a specific event that must be stopped, such as an impending foreclosure. In another, while there is no immediate concern, a debtor may have suffered damages because of a stay violation for which a debtor would like to recover. Either situation is a sufficient justification for filing a section 362(h) complaint. Unfortunately for Mr. Hutchings, neither exists here.

**(1) Was Mr. Hutchings Under Any Immediate Threat?**

In regard to any immediacy for relief, Mr. Hutchings testified that his last telephone call from Ocwen was *June 12, 2002*. Mrs. Roe testified that after Mr. Hutchings gave her the letter and foreclosure notice he received from Ocwen dated *June 18, 2002*, she immediately called Mr. Ledyard, one of Ocwen's attorneys, by telephone. While she did not speak to him then, he returned her call within the hour and told her that the foreclosure was improper and would be discontinued. He followed their telephone conversation with a letter to Mr. Roe dated *June 21, 2002*. Plaintiff's Exhibit 24. **The June 21, 2002, sent by facsimile to Mrs. Roe on *June 24, 2002*, assured Mr. Hutchings that the foreclosure would be stopped immediately.** *Id.*[21]

Mr. Hutchings file the pending adversary proceeding on *June 25, 2002*, at least 13 days after his last telephone contact with Ocwen, at least four days after Mrs. Roe received oral confirmation from Mr. Ledyard that the foreclosure action would be stopped immediately, and at least one day after Mrs. Roe received written confirmation from Mr. Ledyard that the foreclosure action would be stopped immediately.

Ocwen's account history log supports these conclusions. Entries in the log dated June 21, 2002, read:

BANKRUPTCY STATUS COMMENTS; BK MODULE CLOSED IN ERROR. ORDER GRANTED ON 4–26–02 WAS IN REFERENCE TO A MOTION FILED ON 4-1-02 BY THE DEBTOR TO REFINANCE HIS HOME. NEW BK MODULE

---

**21.** Mrs. Roe testified that she did not have any other contact with Ocwen after she spoke with Mr. Ledyard.

OPENED. POSTPET DUE FOR 1–1–01.

F/C ON HOLD FOR BANKRUPTCY—ATTORNEY NOTIFIED; E-mailed Atty Pierce to put FC back on hold due to BK error, relief was not granted the order was for debtor to refinance his house per reale [sic].

Foreclosure has been interrupted, bankruptcy case filed Details: <User bann Entered No Details>

Plaintiff's Exhibit 3 at 2.

The preponderance of the evidence, and for that matter, the only evidence on the issue, proves: (1) Ocwen discontinued its efforts to telephone Mr. Hutchings no later than June 12, 2002, and did not contact him by telephone after that date; (2) Ocwen discontinued its efforts to contact Mr. Hutchings as of June 21, 2002, and did not contact him in writing after that date; and (3) Ocwen discontinued its foreclosure proceedings on June 21, 2002, and clearly communicated that fact to Mr. Hutchings' attorney.

Based on the above evidence, and in the absence of any evidence to the contrary, the Court cannot find that it was necessary for Mr. Hutchings to file the present adversary proceeding in order to compel Ocwen to abide by the stay and to stop calling him or writing him. It was not necessary for Mr. Hutchings to file this adversary proceeding to stop Ocwen from violating the stay. Ocwen stopped violating the stay several days prior to the filing. Consequently, there was no immediate reason to file the pending litigation. All intrusion on Mr. Hutchings had stopped. *His* attorney's office confirmed that fact.

### (2) Did Mr. Hutchings Suffer any Direct Injury from Ocwen's Actions?

The Court's conclusion is similar in regard to any damages Mr. Hutchings suffered because of Ocwen's stay violations. First, there is no evidence that Mr. Hutchings was injured, or otherwise suffered any actual damages, as a result of the telephone calls and letters he received from Ocwen. Second, and in contrast, there is ample evidence that all of the evidence Mr. Hutchings did provide in regards to damages, is evidence of damages that: (1) occurred after he filed the pending adversary proceeding; (2) were incurred solely through the prosecution of the pending adversary proceeding; and (3) were incurred exclusively because of his participation in and prosecution of the pending adversary proceeding.

As discussed above in detail in the section reviewing Mr. Hutchings' testimony, Mr. Hutchings testified that the only actual damages he suffered as a result of Ocwen's stay violations are the wages that he lost when he had to miss work in order to travel to and from the bankruptcy court and Mr. Toffel's office, and the gasoline that he was required to purchase in order to make those trips. None were caused by Ocwen's stay violations.[22]

### (a) Lost Wages and Gasoline Expenses

Specifically, Mr. Hutchings claims that he lost $800 in wages and commissions because he missed about 40 hours of work. He testified that he spent that time, "running around in this courthouse or something like that," transcript at 183, or, "Running around to different places—courts...." *Id.*

---

**22.** As noted earlier, the argument could be made that but for Ocwen's stay violation, Mr. Hutchings would never have had to have filed anything. Any concern that argument raises is of course what is discussed later in regard to Mr. Hutchings' responsibility to mitigate any damages he might have incurred.

Mr. Hutchings did not specify what "courts" he was referring to, although it is apparent he was talking about this Court. He testified, "I have been down here several times." Transcript at 184. He estimated that he came to the bankruptcy court five or six times. But he added, that each time he came, "they put the case off." *Id.*

He testified that he had to go to Mr. Toffel's office twice. Those visits would of course be after the pending complaint was filed as Mr. Toffel's firm filed its notice of appearance in this case on February 24, 2003. Proceeding No. 12.

Mr. Hutchings also testified that he did not lose any time from work as a result of the trips that he made to Mr. Roe's office. He testified:

Q. Okay. So if you got a letter when you would go home, as you testified, and it was from Ocwen, you would go run to Mr. Roe's office; correct?

A. Well, I was right there at Mr. Roe's office.

Q. But the week's worth of work that you lost wasn't in one week, though, was it?

A. It was running around in this courthouse or something like that.

Q. All right. So one week included time at Mr. Roe's office, correct?

A. **No, it didn't have anything—I can pass by Mr. Roe's office going home.**

Transcript, page 183 (emphasis added).

Consequently, the Court must conclude that none of the wages Mr. Hutchings lost because of time he spent away from work can be attributed to Ocwen's stay violations. The only evidence on this point is his testimony that the time he lost from work was caused by "running around" after he filed his case and that he did not lose anytime with any visits with his attorney Mr. Roe before he filed the complaint.

Mr. Hutchings also seeks reimbursement for $50 for gasoline used to travel back and forth in his automobile to Mr. Toffel's office and the bankruptcy court.

Mr. Hutchings did provide the dates of hearings at the bankruptcy court or the dates he traveled to Mr. Toffel's office.

No hearings regarding Ocwen's stay violations were held in either Mr. Hutchings' bankruptcy or, of course, in this adversary proceeding prior to the date that the complaint was filed. In fact, the last hearing held in Mr. Hutchings' bankruptcy case prior to the filing of this adversary proceeding was the hearing on his request to refinance his home, which was held on April 22, 2002, before Ocwen's first stay violation. And the first hearing in this adversary proceeding was not held until August 5, 2002, after Ocwen's last stay violation. Furthermore, Mr. Toffel was not involved in Mr. Hutchings' bankruptcy case and did not enter an appearance in this adversary proceeding until February 24, 2003. And, according to his fee application, Mr. Toffel did not perform any work for Mr. Hutchings before February 20, 2003. The conclusion is, therefore, inescapable, that any trips made by Mr. Hutchings prior to June 25, 2002, cannot possibly have been made in connection with, or as a consequence of, Ocwen's stay violation.

Consequently, any wages which he may have lost, and any gasoline that he may have used, prior to June 25, 2002, are necessarily the result of Mr. Hutchings' participation in his own Chapter 13 bankruptcy case, and not from anything done or not done by Ocwen. There is simply no evidence that would support any other factual conclusion.

### (b) Attorneys Fees

In addition to his request for lost wages and gasoline expenses, Mr. Hutchings has requested reimbursement for attorneys fees. While Mr. Hutchings' own testimony

was that he was not obligated to pay any such fees, assuming that he is, the evidence is clear that any fees due are fees that came into existence for work performed after the pending complaint was filed. The summary below explains.

Mr. Roe filed the present adversary proceeding for Mr. Hutchings and represented Mr. Hutchings in this proceeding for several months after it was filed. No reimbursement has been requested by Mr. Hutchings for fees paid or owed to Mr. Roe or for the services rendered by Mr. Roe. Unfortunately, Mr. Roe died. After his death, Mr. Hutchings has been represented by three attorneys. Those are Mr. Toffel and Mr. Willis, of the law firm of Andre M. Toffel, P.C., who have filed applications for fees totaling $44,981.99, and Ms. Heather Bellew, who has filed an application for $7,254.00 in fees. None of these three attorneys became involved in the case until after it was filed and had proceeded for several months. The first time entry on Ms. Bellew's application is

dated October 21, 2002. And the first time entry on the Toffel firm's application is dated March 5, 2003.

It is clear from the above that there is no evidence that Mr. Hutchings suffered any damages, if any at all, until *after* Ocwen stopped violating the stay. That includes any reimbursement for attorney fees that arose from work performed after the complaint was filed.[23] This Court must then ask: May a debtor maintain a section 362(h) action where the debtor's *only* provable "actual damages" are the costs and expenses, including attorneys fees, of participating in that action?

**b.    What Have Other Courts Said?**

Many courts reporting decisions on the issue before this Court have held that where a debtor was not injured by a creditor's stay violation, the debtor is not entitled, under section 362(h), to recover any of the costs and expenses, including attorneys fees, which were incurred in maintaining the 362(h) action.[24] Those courts include the following.

---

**23.** There is also no evidence that Mr. Hutchings is obligated to pay *any* attorney fees. But even if there were, there is certainly no evidence that he is obligated to pay any attorneys fees for Mr. Roe's work in this proceeding before the complaint was filed. There is simply no evidence on that point, including any attorney fees that he may have incurred because of time spent drafting the complaint.

**24.** *Accord, Bostanian v. American Hilton Corp. (In re Bostanian),* 41 Fed.Appx. 66, 2002 WL 1418433, *1 (9th Cir., July 1, 2002)(unpublished opinion); *Glenshaw Glass v. Ontario Grape Growers' Marketing Board,* 67 F.3d 470, 477 (3rd Cir.1995); *Lovett v. Honeywell,* 930 F.2d 625, 628 (8th Cir.1991); *Archer v. Macomb County Bank,* 853 F.2d 497, 500 (6th Cir.1988); *Yarinsky v. Saratoga Springs Plastic Surgery, P.C. (In re Saratoga Springs Plastic Surgery, P.C.),* No. 1:03CV896, 2005 WL 357207 (N.D.N.Y., Feb. 11, 2005), *aff'd* 172 Fed. Appx 339 (2nd Cir.2006); *Mann v. Chase Manhattan Mortgage Corp.,* No. CIV. A. 00–192–T, 2002 WL 32157516, at *5 (D.R.I., March 7, 2002), *aff'd,* 316 F.3d 1 (1st Cir.

2003); *Aiello v. Providian Fin. Corp.,* 257 B.R. 245, 249 (N.D.Ill.2000), *aff'd,* 239 F.3d 876 (7th Cir.2001); *Salem v. Paroli,* 260 B.R. 246, 257 (S.D.N.Y.2001), *aff'd,* 79 Fed.Appx. 455, No. 02–7090, 2003 WL 22440245 (2nd Cir., Oct. 28, 2003)(unpublished opinion); *Lucabaugh v. United States (In re Lucabaugh),* 262 B.R. 900, 905 (E.D.Pa.2000); *Miller v. Blatstein (In re Main, Inc.),* No. CIV. A. 98–5947, 1999 WL 424296, at *5 (E.D.Pa., June 23, 1999); *Fidelity Nat'l Title Ins. Co. Of New York v. Bozzuto,* 227 B.R. 466, 473 n. 18 (E.D.Va.1998); *Phillips v. Smith (In re Ayscue),* No. CIV. A. 3:94CV730, 1995 WL 908383, at *3 (E.D.Va., May 4, 1995); *United States v. Academy Answering Service, Inc. (Academy Answering Service, Inc.),* 100 B.R. 327, 330 (N.D.Ohio 1989); *H.T. Bowling, Inc. v. Bain (In re Bain),* 64 B.R. 581 (W.D.Va. 1986); *Wolkowitz v. Shearson Lehman Brothers, Inc. (In re Weisberg),* 193 B.R. 916, 927 (9th Cir. BAP 1996), *aff'd,* 136 F.3d 655 (9th Cir.1998), *cert. denied,* 525 U.S. 826, 119 S.Ct. 72, 142 L.Ed.2d 56 (1998); *McHenry v. Key Bank (In re McHenry),* 179 B.R. 165 (9th Cir. BAP 1995); *In re Haas,* No. 04–11534–SSM,

In *Lovett v. Honeywell,* 930 F.2d 625, 628 (8th Cir.1991), the debtor was a trucking company that transported products for the creditor. A bankruptcy auditor appointed by the bankruptcy court notified the creditor that it owed the trustee of the debtor's estate $271,151.41 for undercharges. The creditor filed a petition with the Interstate Commerce Commission seeking a declaratory order that the debtor's claimed undercharges constituted an unreasonable practice in violation of applicable federal statutes. The next day, the trustee filed an adversary proceeding in the bankruptcy court against the creditor seeking to recover the undercharges. The trustee notified the creditor that its commencement of proceedings before the ICC violated the automatic stay and requested that it withdraw that proceeding. The creditor refused. The trustee moved for a temporary restraining order from the bankruptcy court and filed an action to recover damages against the creditor pursuant to section 362(h).

The bankruptcy court held that the creditor's action before the ICC was barred by the stay and that the creditor violated the stay by initiating that proceeding. The court also awarded a judgment against the creditor for punitive damages in the amount of $5,000.00 and also ordered the reimbursement of the $1,500.00 in attorneys' fees incurred by the trustee in prosecuting the section 362(h) proceeding. The district court reversed the bankruptcy court's judgment, holding that the creditor did not violate the stay. The circuit court affirmed the judgment of the district court, although on different grounds. It declined to consider whether the creditor's actions violated the stay, after concluding that, assuming those actions constituted a willful stay violation, the

2004 WL 3132027 (Bankr.E.D.Va., Dec. 22, 2004); *In re Wiley,* 315 B.R. 682, 690 (Bankr. E.D.La.2004); *In re Coley,* No. 03–13234C–7G, 2004 WL 229519 (Bankr.M.D.N.C., Jan. 2, 2004); *In re Peterson,* 297 B.R. 467, 470 (Bankr.W.D.N.C.2003); *Clement v. GF Winnelson Co. (In re Clement),* No. 02–30096, 2002 WL 31342411, at *5 (Bankr.D.N.D., Aug. 6, 2002); *Adams v. Peterson (In re Adams),* No. 01–9226, 2002 WL 844350, at *2 (Bankr.N.D.Iowa, April 19, 2002); *In re Martinez,* 281 B.R. 883, 886 n. 4 (Bankr.W.D.Tex. 2002) (dicta); *Garland v. Lawton (In re Garland),* No. 99–1076, 2001 WL 34798966, at *7 (Bankr.D.Vt., Aug. 1, 2001); *Moodie v. Thrifty Rent–A–Car System, Inc. (In re Moodie),* Nos. 00–10501, 00–01056 CAB, 2001 WL 34050728, at *3 (Bankr.D.Vt., July 16, 2001); *Felder v. American General Finance (In re Felder),* No. 97–05465–B, 2000 WL 33710885, at *6 (Bankr.D.S.C., July 7, 2000); *In re Skeen,* 248 B.R. 312, 318 (Bankr.E.D.Tenn. 2000); *Aiello v. Providian Fin. Corp.,* 231 B.R. 684, 689 (Bankr.N.D.Ill.1999), *aff'd,* 257 B.R. 245 (N.D.Ill.2000), *aff'd,* 239 F.3d 876 (7th Cir.2001); *Mullins v. Land (In re Mullins),* No. 96–83540, 1998 WL 34064588, at *2 (Bankr.C.D.Ill., Jan. 15, 1998); *In re Craine,*

206 B.R. 594, 597 (Bankr.M.D.Fla.1997); *In re Brock Utilities & Grading, Inc.,* 185 B.R. 719, 721 (Bankr.E.D.N.C.1995); *In re Palumbo Family Limited Partnership,* 182 B.R. 447, 471 (Bankr.E.D.Va.1995); *General Ins. Co. of America v. Anderberg–Lund Printing Co. (In re Anderberg–Lund Printing Co.),* Nos. 4–93–6995, 4–94–398, 1994 WL 692953, at *6 (Bankr.D.Minn., Dec. 9, 1994); *In re Smith,* No. 93–25553–A, 1994 WL 900507, at *3 (Bankr.E.D.Va., Aug. 29, 1994); *Gordon v. Dennis Burlin Sales, Inc.,* 174 B.R. 257, 260 (Bankr.N.D.Ohio 1994); *New MMI Corp. v. Robec, Inc. (In re Micro Marketing International, Inc.),* 150 B.R. 573, 575 (Bankr.M.D.Pa. 1992); *In re Wright,* 156 B.R. 549, 552 (Bankr.N.D.Ill.1992); *Loethen Oil Co. v. Hen House Interstate, Inc. (In re Hen House Interstate, Inc.),* 136 B.R. 220 (Bankr.E.D.Mo. 1992); *In re Still,* 117 B.R. 251, 254–255 (Bankr.E.D.Tex.1990); *In re Haan,* 93 B.R. 439, 441 (Bankr.W.D.N.C.1988); *Federal Land Bank of St. Louis v. Heiserman (In re Heiserman),* 78 B.R. 899, 904 (Bankr.C.D.Ill. 1987); *Whitt v. Philadelphia Housing Authority (In re Whitt),* 79 B.R. 611, 615–616 (Bankr. E.D.Pa.1987); *In re Freunscht,* 53 B.R. 110 (Bankr.D.Vt.1985).

trustee failed to prove "appropriate circumstances" of the nature required to support a punitive damages award, and was not entitled to an award of attorneys fees *because the estate was not injured by the creditor's alleged stay violations,* other than having incurred attorneys fees in prosecuting the 362(h) proceeding.

In affirming the reversal of the bankruptcy award of attorneys fees pursuant to section 362(h), Circuit Judge John R. Gibson wrote for the court:

> We are also satisfied that there is insufficient evidence in the record to support an award of actual damages, and therefore, an award of attorneys' fees is not appropriate. See, e.g., *Whitt v. Philadelphia Hous. Auth.,* 79 B.R. 611, 616 (Bankr.E.D.Pa.1987) ("costs and attorneys' fees, by the terms of § 362(h) are allowable only to embellish 'actual damages' ..."). The proceedings in the bankruptcy court consisted of the trustee's motion for a temporary restraining order and a finding of contempt. The trustee alleged that unless the bankruptcy court enjoined the ICC proceeding, the trustee would be forced to expend time and resources to defend the administrative proceeding. The evidence of damage before the bankruptcy court consisted of the time expended by trustee's counsel in bringing this motion. No evidence existed of time actually expended in defending the administrative action. **We do not believe that the time expended bringing the motion for a temporary restraining order and contempt sanctions, in the absence of any other damage, is the type of damage contemplated by section 362(h).** *Id.* Moreover, any claim of damage to the trustee by Honeywell's filing the ICC action evaporated when the bankruptcy court later appropriately referred

the reasonable rate issue to the ICC for ruling.

930 F.2d at 629 (emphasis added).

In *Phillips v. Smith (In re Ayscue),* No. CIV. A. 3:94CV730, 1995 WL 908383 (E.D.Va., May 4, 1995), the Chapter 7 debtor owned one-third of the shares of stock in a corporation and was its president. His mother, who was the corporation's secretary, and her daughter, owned the remaining two-thirds of the company in equal parts. The corporation owned equipment which was encumbered. The notes which were secured by the equipment were personally guaranteed by the debtor, his mother, and her daughter. The corporation was indebted to the debtor's mother for approximately $200,000 in cash advances she had made to, or for, the corporation.

The corporation became unable to meet its obligations. After the debtor's bankruptcy filing, and for tax reasons, the three shareholders liquidated the corporation. All the corporation's assets and liabilities were transferred to the debtor's mother. In exchange for releases and indemnifications from liability, her daughter and the debtor returned their stock to the corporation.

The trustee in the debtor's Chapter 7 case filed a complaint against the debtor's mother seeking the turnover of certain property, the avoidance of liens held by her, the equitable subordination of her claims against the estate, and damages for a purported violation of the automatic stay. The bankruptcy court determined that debts owed by the corporation to the debtor's mother were the result of loans and not capital contributions, and that the corporation was, consequently, insolvent at the time of its liquidation and its stock had no value. The court ruled in the debtor's mother's favor on all counts. On appeal, the district court remanded the case for

the bankruptcy court to determine whether the defendant had violated the stay. But it affirmed the bankruptcy court's other rulings.

On remand, the bankruptcy court found that although the defendant had willfully violated the automatic stay by her post-petition receipt of the estate's shares of the corporation's stock, *the trustee did not sustain any injury as a result of this transaction* because the stock was worthless. Accordingly, the bankruptcy court declined the trustee's demand, pursuant to section 362(h), for $56,000.00 in attorney's fees generated in prosecuting the case against the debtor's mother, ruling that, as a matter of law, those attorneys fees, "did not constitute an 'injury' as contemplated under that section." 1995 WL 908383 at *2.

On appeal, the district court affirmed the bankruptcy court's decision on the stay violation issue for the reasons cited by the bankruptcy court. The district court recognized that the estate had not been injured by the stay violation and therefore was not entitled to actual damages of any sort, including the fees and costs required to prosecute the section 362(h) proceeding.

The court succinctly explained its ruling as follows:

Appellant claims that the appellee, Smith, attempted to conceal her actions and hinder the appellant's efforts to uncover and pursue this matter. As a result, such actions "resulted in great expense and delay to the detriment of unsecured creditors." Appellant is claiming approximately $56,000 in damages, which constitutes attorney's fees and costs, for seeking the turnover of an asset which the debtor valued at $10,000 on his schedules, and which the bankruptcy court valued at zero following a three-day trial.

The dispositive section relied upon by the trustee provides:

"An individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages."

11 U.S.C. § 362(h) (emphasis added). The plain language of this statute mandates a two-prong inquiry:

"[b]efore [recovery of attorneys' fees and costs under § 362(h)] can be had, however, the Bankruptcy Court must make at least two determinations. First, the Bankruptcy Court must determine that the individual seeking the award was indeed injured by the violation of the automatic stay. Second, the court must determine that the violation was willful."

*In re Bain,* 64 B.R. 581, 584 (W.D.Va. 1986); see also *In re Smith,* No. 93–25553–A, 1994 WL 900507, at *13 (Bankr.E.D.Va.1994) ("Recovery [of attorney's fees] for automatic stay violations . . . [requires] the court [to] decide whether the individual seeking the award has been harmed or injured by the violation of the stay, and if so, whether the violation was willful").

. . . .

**Resolution of this apparent paradox is unnecessary, as the bankruptcy court clearly found that the appellant had not been "injured" apart from his claim for attorney's fees and costs. The Court finds no clear error in this finding. Since the Court is not convinced that the appellant's attorney's fees and costs, in of themselves, constitute an "injury" under § 362(h), the bankruptcy court's refusal to apply the mandatory sanctions provided by that section will not be disturbed.**

1995 WL 908383 at *2–3 (footnotes omitted)(emphasis added).

In *H.T. Bowling, Inc. v. Bain (In re Bain)*, 64 B.R. 581 (W.D.Va.1986), the district court reversed the bankruptcy courts' award of attorney's fees and costs incurred by the debtor in prosecuting an action against a creditor for violation of the stay. The district court based the reversal on the grounds that the debtor was not injured by the stay violation, a prerequisite to recovery of any sort under section 362(h). Judge James C. Turk, then Chief District Judge, explained:

> Section 362(h) seems to permit the recovery of attorneys' fees and costs in certain cases where the automatic stay is violated. Before such recovery can be had, however, the Bankruptcy Court must make at least two determinations. **First, the Bankruptcy Court must determine that the individual seeking the award was indeed injured by the violation of the automatic stay. Second, the court must determine that the violation was willful. In the instant case, neither determination was made by the Bankruptcy Court. Accordingly, its award of attorneys' fees and costs cannot stand.**

64 B.R. at 584 (emphasis added).

In *In re Brock Utilities & Grading, Inc.*, 185 B.R. 719 (Bankr.E.D.N.C.1995), the IRS mailed a computer-generated notice of intention to levy to the debtor post-petition despite having received ample notice of the debtor's bankruptcy case. Debtor's counsel filed a complaint for damages pursuant to section 362(h) without first contacting or attempting to resolve the matter with the IRS. The only "actual damages" claimed by the debtor were the attorneys fees and costs which it incurred in connection with the prosecution of its section 362(h) proceeding. The bankruptcy court denied the debtor's request on the grounds that the debtor had not been injured by the IRS's stay violation. Judge Thomas Small stated:

The court need not decide in this case whether the IRS's violation of the stay was "willful" because under the facts of this case, the debtor suffered no injury. Debtor's counsel had established contact with Mr. Richardson of the IRS and had received assurances from him that the IRS would not seek to collect its claim in violation of the stay. A simple phone call to Mr. Richardson would have allayed any fears that the debtor might have had, and the motion for sanctions would not have been required. Any costs involved in bringing this motion were unnecessarily incurred and should not be reimbursed by the IRS. In a case in which a computer-generated notice legitimately warrants a debtor incurring attorney fees, such fees may constitute an injury compensable under § 362(h), but this is not such a case. Thus, there was no injured party in this case, and only an "injured" party may recover under § 362(h).

185 B.R. at 720–721 (emphasis added).

In *In re Craine*, 206 B.R. 594 (Bankr. M.D.Fla.1997), the debtors filed a petition under chapter 13 of the Bankruptcy Code. Despite having received notice of the petition, the IRS mailed a letter to the debtors claiming that the debtors owed withholding taxes for a corporation. The debtors filed an action against the IRS pursuant to section 362(h) contending that the letter constituted a willful violation of the stay. The only damages requested by the debtors were the attorneys fees involved in prosecuting the section 362(h) action. The bankruptcy court agreed that the letter constituted a willful violation of the stay, but denied the debtors' request for attorneys fees because the debtors were not injured by the stay violation.

Judge Paul M. Glenn explained, "**To recover under Section 362(h) of the Bankruptcy Code, however, a debtor must**

**show not only the existence of a 'willful violation,' but must also show that he or she was injured by the violation."** *Id.* at 597 (emphasis added).

Judge Glenn added:

In this case, as in... [*In re Brock Utilities & Grading, Inc.*, 185 B.R. 719 (Bankr.E.D.N.C.1995)], there is nothing in the record to show that the Debtors suffered any damages other than the attorney's fees associated with filing the motion. There is no allegation that the Debtors incurred any expense in responding to the letter from the Internal Revenue Service, or that the tax penalty was actually assessed or paid. The only claim for damages that appears in the Motion consists of the "fees incurred up to and including the filing of this motion" in the approximate amount of $125. The court notes that the Debtor's attorney disclosed on his Statement of Compensation pursuant to Rule 2016(b) that he would charge the Debtors at the rate of $175 per hour for services rendered in connection with the case. Consequently, it appears that the Debtors' attorney spent less than forty-five minutes on this matter "up to and including the filing of this motion." The record does not reflect that any portion of this forty-five minutes included efforts to resolve the issue and obviate the need for court intervention. The Debtors have not shown that they are individuals "injured" by a violation of the stay within the meaning of Section 362(h) of the Bankruptcy Code.

*Id.* at 598 (parenthetical added).

In *In re Haan*, 93 B.R. 439 (Bankr. W.D.N.C.1988), the debtors filed a Chapter 7 petition and listed the secured creditor holding a lien on their pick-up truck. At that time, the debtors were in arrears on the truck payments. In their petition, the debtors declared their intention to surrender the truck to the creditor.

Notice of the bankruptcy was mailed to the creditor at its Alaska office where the truck had been financed. The debtors had recently moved to North Carolina from Alaska and all of their contact had been with the Alaska office. Consequently, the creditor did not receive notice of the bankruptcy case until well after it had violated the stay. Post-petition, and without knowledge of the bankruptcy case, the creditor located the debtors and sent someone to repossess the truck. After realizing that someone was taking the truck, the debtor-husband gave chase in another vehicle, over a rural, mountain road. The debtor had a pistol with him which he fired at least once during the chase, either in the air or at the other driver. He ultimately forced the other vehicle to stop and held the driver at bay. A sheriff's deputy arrived before matters became worse. The truck was taken to the sheriff's department where it remained for three days before it was returned to the debtor.

The debtors filed a section 362(h) proceeding against the creditor, the repossession company, and the latter's employee who performed the repossession. They did not claim in their complaint that they had suffered any injury as a result of the defendants' conduct. And they offered no evidence at trial of any injury or damages other than to present a claim for attorney's fees for prosecuting the section 362(h) proceeding. Because of that, in addition to the fact that none of the defendants had knowledge of the bankruptcy case before proceeding with the repossession, the bankruptcy court denied the debtors' complaint, including a request for attorneys fees. Judge George R. Hodges explained:

9. Finally, it is important to note that this case involves an isolated, inadvertent stay violation in which there was *no injury to the debtors.*

Section 362(h) provides that: "An *individual injured* by any willful violation of the stay ... shall recover actual damages ... including attorneys fees...." 11 U.S.C. § 362(h). (Emphasis added). Here, taking the statute literally, there is no "individual injured" since there is no evidence that the debtors were injured by the respondents' actions. That may be a too strict and literal reading of the statute where the facts demonstrate an abusive creditor attempting to hide behind the fortunate (for them) circumstance of a debtor's thick skin. But, the "individual injured" standard should operate in a case like this one to discourage filing of the sanctions motion in the first place—and require its denial if filed.

10. There are a number of competing considerations in § 362 sanctions litigation: First, it appears that some creditors are abusive in their collection efforts by ignoring or paying little attention to bankruptcy stays as a matter of course. Second, most creditors appear to be scrupulous in their efforts to avoid violation of bankruptcy stays. Occasionally, these creditors may violate a stay inadvertently. Third, many debtors are not injured at all by collection efforts that violate a bankruptcy stay. Some debtors are bothered, scared or worse by such efforts. Some debtors ignore it. And, to some the only reaction is realization of the chance for a sanctions motions.

**Imposed on all of this is the statutory provision for attorney's fees in stay litigation which may provide an inducement for filing a motion when the attorney's fees of the motion are the only realistic damages in the case. That provision provides real bait for spurring sanctions litigation. The court has a responsibility to restrict that when appropriate. This is such a case. Here there is "no harm—no foul" and no injury—no attorney's fees.**

93 B.R. at 441 (emphasis added).

In *McHenry v. Key Bank (In re McHenry)*, 179 B.R. 165 (9th Cir. BAP 1995), the bankruptcy appellate panel denied the debtors' request, pursuant to section 362(h), for attorneys fees involved in filing and prosecuting a section 362(h) proceeding, where the evidence showed that those fees were the only "actual damages" suffered as a result of the creditor's stay violation and those were actually suffered after the filing of the section 362(h) proceeding.

In *McHenry*, the joint debtors filed a chapter 7 petition where they listed the secured creditor holding an interest in their automobile. The creditor's employees misplaced the notice of the section 341 meeting sent to the creditor by the clerk's office. Post-petition, an employee of the creditor telephoned the debtor-husband to discuss the couple's delinquent car payments. The debtor husband advised the employee of the bankruptcy filing, told him that they probably would not reaffirm the debt, and gave the caller the name and telephone number of their attorney. Two days later, another of the creditor's employees called the debtors' attorney. The attorney confirmed the filing and confirmed that the debtors would not be reaffirming the debt and would return the car to the creditor. Another employee of the creditor then called the debtor-husband directly and made arrangements to pick up the car. The car was subsequently repossessed by the creditor in accordance with arrangements made with the debtor husband.

The debtors then filed a proceeding to obtain actual and punitive damages against the creditor pursuant to section 362(h). In their complaint, the debtors alleged actual damages in the form of alleged aggrava-

tion of the debtor's wife's preexisting illness. They also sought attorneys fees in the amount of $2,683.41 for work performed strictly in connection with their section 362(h) motion. The bankruptcy judge denied the motion. On appeal, the appellate panel affirmed. It concluded that although the creditor's action technically constituted a willful violation of the stay, the debtors were not entitled to a damage award of any nature, because they had not proved that they were injured by the violation. The bankruptcy appellate panel recognized:

Thus, these cases can be distinguished on the basis of egregious, continuing conduct existing in *Neal* and *Knaus,* and the fact that the bringing of the motion in each case may have been necessary to stop the continuing stay violations, thus justifying an award of attorney's fees. *Bunch* is distinguishable because there the creditor failed to undo its action. Here, the Appellants have never sought return of the car. The Appellants claim damages because the Appellee took what the Appellants offered and intended to give to them. The Appellants' injury is that they permitted the Appellee to obtain the car without going through the technicalities, a merely formal process where the Appellants intended to return the vehicle.

Appellants have shown no actual damages. They were inconvenienced and annoyed, but fully intended to return the vehicle to the Appellee, anyway. The attorney's fees would not have been incurred but for the bringing of the motion. The Appellee's "invasion of [Appellants'] right to be left alone and the disruption its invasion caused in their lives" does not justify a monetary award for actual damages. The bankruptcy judge was correct in not making an award of actual damages. **Only if an award of punitive damages were warranted would the debtors be justified in bringing the motion and in incurring additional attorney's fees relative thereto. This is not a case where "appropriate circumstances" exist under "section 362(h) that warrant an award of punitive damages." The Appellee's actions were not "egregious, intentional misconduct" on the Appellee's part.** [*In re*] *Knaus,* 889 F.2d [773], 776 [(8th Cir.1989)].

*Id.* at 168 (emphasis added) (parenthetical added).

In *In re Still,* 117 B.R. 251 (Bankr. E.D.Tex.1990), the debtors filed a chapter 13 petition on April 17, 1989. Without knowledge of the bankruptcy, the American Pipeline Company initiated a condemnation action on June 6, 1989, in state court to secure a gas pipeline easement across debtors' property. The state court appointed special commissioners to hear the condemnation. A hearing to determine damages was scheduled before those commissioners for June 29, 1989, and the parties were duly noticed. American learned of the debtors' bankruptcy and accordingly filed an emergency motion for relief from the stay on June 19, 1989. That motion was granted by the bankruptcy court on June 28, 1989, but the order was made effective as of July 14, 1989. In reliance on that order, the state court commissioners rescheduled the condemnation hearing for July 17, 1989. The notice of the hearing that the commissioners' sent to both parties was sent prior to the effective date of the order granting relief from the stay, which the debtors viewed as a violation of the stay.

At the July 17, 1989, hearing, the condemnation board awarded damages to the debtors. The debtors were not present at the hearing due to their contention that the hearing was conducted in violation of the automatic stay. On July 20, 1989, the debtors' filed a motion in the state court to

abate the condemnation proceeding. Before the hearing scheduled on that motion, America laid its pipeline across debtors' property. On October 20, 1989, the state court granted the debtors' motion, concluding that the automatic stay voided all actions prior to the effective date of the bankruptcy court's June 28, 1989, order.

In response to the state court ruling, American filed a motion to annul the automatic stay *ab initio*, which was denied. On November 22, 1989, the debtors filed state court actions against American seeking damages for trespass and injunctive relief. The requested injunctive relief was granted on December 12, 1989. On January 10, 1990, American filed a new state court condemnation action. At a hearing held on January 25, 1990, the condemnation board entered an award of damages identical to that it awarded in the first condemnation action. The debtors and their attorney failed to attend. On May 18, 1990, the debtors moved the state court to dismiss the second condemnation action. Their contention was that the bankruptcy court's July 14, 1989, order did not allow American to initiate any suit other than the first condemnation.

On June 7, 1990, the debtors filed a motion in the bankruptcy court seeking damages, including $20,000.00 in attorneys fees, pursuant to section 362(h). They contended that the premature sending of the notice of hearing in the first condemnation action, the condemnation award entered in that action, and the institution and prosecution of the second condemnation action, constituted willful violations of the stay.

The bankruptcy court refused to award any of the damages requested by the debtors, including the attorneys fees, after holding that they were not injured by American's technical violation of the stay pertaining to the first condemnation action, and that no stay violation had taken place in connection with the second action. The court explained its declination to award attorneys fees for the stay violations which took place in connection with the first condemnation proceeding. Judge Donald R. Sharp wrote:

In this regard, it cannot be denied that American's sending of its premature notice was, under this definition, a willful violation of the Automatic Stay. However, parties alleging willful violations of the automatic stay are charged with demonstrating actual damages. Failure to proffer credible evidence of damages results in an inability for Debtors to qualify for damage awards. *In re Whitt,* 79 B.R. 611 (Bkrtcy.E.D.Pa.1987)(Holding that de minimis violations of the stay are not compensable without a showing of actual damages); *In re Hill,* 19 B.R. 375 (Bkrtcy.N.D.Tex.1982).

At a regularly scheduled hearing, this Court heard testimony from the Debtor and other parties referring to the damages Debtor had suffered as a result of American's violation of the automatic stay. The Court found this testimony to be wholly speculative and lacking in credibility. Debtor's testimony that he suffered approximately $1,400.00 in additional actual damage over and above the condemnation award (to land and trees); $1600.00 in lost compensation for time spent and $3000.00 in appraisal fees was not viewed as credible by this Court. The Court did take judicial notice of the fact that Debtors' primary damages were the approximately $20,000.00 he had incurred in legal expenses. The vast disparity between the actual damages allegedly suffered ($1400.00) and the expenses related to the recovery of said damages ($23,000) gives, in the opinion of this Court, new meaning to the phrase "killing an ant with an elephant gun". In that this

Court does not find that Debtor suffered any damages over and above the condemnation award, this Court is unwilling to award any of the damages requested by Debtor. See *Matter of Schewe*, 94 B.R. 938 (Bkrtcy.W.D.Mich.1989)(Damages for willful violations of the automatic stay cannot be speculative). Furthermore, the Court is also of the opinion that the Debtor's prosecution of a de minimis violation of the stay should not be ennobled by the award of attorney's fees. **The Court is in accordance with the holding in *In re Whitt*, supra, that "costs and attorney's fees, by the terms of § 362(h), are allowable only to embellish 'actual damages ....'"** *Id.* **at 616. Therefore, since this Court finds no actual damages suffered by Debtor, the Court correspondingly will not award attorney's fees or costs associated with the prosecution of this action.**

*Id.* at 254–55 (emphasis added).

In *In re Haas*, No. 04–11534–SSM, 2004 WL 3132027 (Bankr.E.D.Va., Dec.22, 2004), the debtor filed a motion to reopen his closed case in order to file a section 362(h) proceeding against his former wife and her attorney. The issue before the bankruptcy court was whether a state court contempt motion seeking the debtor's incarceration for nonpayment of support is prohibited by the automatic stay. The court concluded that the filing of the contempt petition violated the automatic stay, but denied the relief requested by the debtor because he failed to show that he was actually injured as a result of the stay violation. Judge Stephen S. Mitchell wrote:

> **While bankruptcy courts are always vigilant to enforce the automatic stay, there nevertheless must be some actual injury before damages can be awarded to a debtor under § 362(h) for willful violation of the stay. In the absence of some demonstrable in-**
> **jury, there is no relief the court can award, and prosecution of the action would therefore be pointless.**
>
> In summary, the court concludes that a willful violation of the automatic stay has been shown, but no resulting injury. The state court contempt proceeding was commenced with actual notice of the bankruptcy filing during the period the automatic stay was in effect. That is all that is required to make a violation of the automatic stay willful. Ms. Duncan's and Mr. Surovell's erroneous view, however sincerely held, as to the legal effect the automatic stay does not make the violation any less willful. The contempt action here was not brought to vindicate the dignity of the Fairfax County Circuit Court but rather to enforce payment of the debt owed to Ms. Duncan. Accordingly, it was not excluded from the automatic stay by § 362(b)(1). Additionally, since the contempt petition was not specifically targeted at "property," it did not fall within the exclusion in § 362(b)(2)(B) for collection of support from property that is not property of the bankruptcy estate. That said, however, there is simply no showing of any actual injury resulting from the violation. The mere issuance of the rule to show cause-which was not served on the debtor until after the automatic stay had expired-did not alter or prejudice the debtor's legal rights. The debtor has not been forced to defend himself against the contempt petition, nor has he been jailed or threatened with jail, during any period the automatic stay was in effect. In the absence of any actual damages, no useful purpose could be served by prosecution of the motion for sanctions.

2004 WL 3132027 at *8–9 (emphasis added).

In *In re Peterson*, 297 B.R. 467 (Bankr. W.D.N.C.2003), after the debtor filed her bankruptcy petition, a secured creditor sent her a letter threatening repossession of her car and offering to discuss refinancing. The debtor's attorney contacted the creditor about the letter. Within a week the creditor sent a second letter to the debtor advising the first letter was sent in error and apologizing for it. The creditor, at a subsequent point, caused the debtor's checking account to be debited in the amount of $478.48 for payment on its loan, which in turn resulted in an overdraft in the account, which required the debtor to borrow $300.00 from family and friends to make up the account deficiency and caused the bank to debit her account for overdraft protection charges. The electronic draft was caused by the fact that the automatic debit status originally set up on the debtor's account was, as a result of mistake or inadvertence, not removed when she filed bankruptcy. Five days after the debtor notified her attorney of the draft, without contacting the creditor or its attorney, the debtor filed a proceeding pursuant to section 362(h) seeking $15,000.00 in damages and attorney's fees, plus cancellation of the creditor's claim and punitive damages. Two months later, the creditor issued a check to debtor in an amount sufficient to reimburse her for the amount debited from her account plus miscellaneous expenses.

Chief Judge George R. Hodges entered judgment for the creditor, denying the debtor's request because the creditor's inappropriate actions resulted from simple error or mistake made by the creditor's employees. Judge Hodges wrote, "There appears to be no real injury to the debtor by Chevy Chase Bank's actions. There was some measure of shock, disturbance and annoyance, but nothing that would amount to an injury meriting damages. The actual monetary cost to the debtor was minimal and was quickly remedied." *Id.* at 472 (emphasis added).

In [*In re*] *Rashid*, 1998 WL 288426 (E.D.Pa. June 3, 1998) prior to bankruptcy, the debtor was convicted of several crimes. Consequently, he was sentenced to prison, assessed $2,700, fined $15,000, and ordered to pay restitution of $1,696,470. Following sentencing, his interest in real property in Philadelphia was forfeited to the United States. After the debtor filed a Chapter 7 bankruptcy petition, the United States Attorney filed the forfeiture judgment in his criminal case as a lien. The debtor, in response, filed a proceeding seeking compensatory and punitive damages pursuant to section 362(h). Several days later, the United States Attorney asked the state court to remove the judgment lien. But the lien was not removed until a year later, after the United States Attorney repeated his request to the state court. The bankruptcy court granted summary judgment against the debtor, denying his request for damages, on the grounds that he had failed to produce any evidence that he was injured by the lien being created and remaining in existence for the time that it did before it was removed by the state court. The district court affirmed for the same reason. District Judge Norma L. Shapiro wrote:

Rashid has offered no evidence he was actually injured by the imposition of the lien from August 19, 1994, to November 10, 1994, when the government first requested its removal. There is evidence that the lien was not actually removed until October, 1995, but the delay in removing it does not show Rashid was injured by its imposition or pendency. Rashid was not residing in the property at any time the lien was in place. He failed to produce any evidence that the government attempted or threatened to foreclose on the lien, or that he attempted to sell or mortgage his interest in the

property. His conclusory argument that he was injured by the lien, without any evidentiary support, does not carry his burden. Without any evidence that Rashid actually suffered harm from the lien, whatever its duration, the Bankruptcy Court could not award compensatory damages.

1998 WL 288426 at *3.

Judge Shapiro concluded, **"No damages can be 'awarded as a result of the violation of the automatic stay ... [if] there was no evidence that the debtor suffered any harm.'"** *Id.* at *3 (quoting *In re Whitt,* 79 B.R. 611, 616 (Bankr.E.D.Pa. 1987)) (emphasis added).

The Third Circuit Court of Appeals affirmed, on the same basis relied upon by the bankruptcy court and the district court, that is, as a prerequisite to a section 362(h) damage award of any sort, the debtor must have been injured by a stay violation. The per curiam opinion of the circuit court reads in part:

> We agree with the Bankruptcy and District Courts that Rashid cannot allege any injury from the lien. He was incarcerated at the time the lien was in effect and not residing at the property. The Government did not attempt to foreclose on the lien nor did Rashid attempt to mortgage or sell the property. Moreover, once the forfeiture became final, ownership of the premises reverted to the Government from the day that Rashid's criminal activity began. This preceded the date the Government placed a lien on the property. Accordingly, Rashid's request for damages is without merit and was properly dismissed.

*Rashid v. Powel (In re Rashid),* 210 F.3d 201, 209 (3d Cir.2000) (superseded by statute on other grounds as stated in *In re Thompson,* 418 F.3d 362 (3d Cir.2005)).

In *Yarinsky v. Saratoga Springs Plastic Surgery, P.C. (In re Saratoga Springs Plastic Surgery, P.C.),* No. 1:03CV896, 2005 WL 357207,(N.D.N.Y., Feb.11, 2005), prior to bankruptcy, the state court granted judgments against the debtor corporation and its sole shareholder and officer for amounts that the shareholder was in arrears for previously court-ordered child support, maintenance for his former wife, and counsel fees. The corporation subsequently filed a Chapter 11 bankruptcy petition. After the bankruptcy was filed, the state court entered additional judgments against the debtor and its owner, one for $20,000 in attorneys fees and a second for $151,691.58 in child support and maintenance arrearages. Counsel for the owner's former wife recorded the $151,691.58 judgment, caused restraining orders to be issued against the bank accounts of the debtor and its owner, filed a claim against the debtor's bankruptcy estate, and moved for *nunc pro tunc* relief from the automatic stay. She refrained from taking any further actions to enforce the judgment against the debtor, pending a ruling on the motion for relief from the stay. During the time the debtor's account was restrained, it contained only 27 cents.

The bankruptcy court orally denied the motion for relief from the stay. Before the court entered its written order commemorating that ruling, the debtor moved, pursuant to section 362(h), for an award of damages, including attorneys fees and costs. The bankruptcy court concluded that the owner's former wife and her attorney had willfully violated the stay and that the debtor was entitled to compensatory damages in the form of attorneys fees and expenses. The bankruptcy court directed the debtor to submit documentation of those fees. The attorney for the owner's former wife subsequently withdrew the offending income execution and replaced it with a new one. This one was directed at the debtor's owner. However, due to mistake, the second income execution referred

to the debtor in the body of the text. Upon notification of the error, the owner's former wife's attorney immediately withdrew the second income execution before any account was restrained. Nevertheless, the debtor requested that he again be sanctioned for willful violation of the stay. The bankruptcy court concluded the owner's former wife's attorney had indeed willfully violated the stay a second time. In total, the bankruptcy court awarded the debtor $5,792.50 in compensatory damages, all in the form of attorneys fees ($5,758.75) and costs ($38.75).

On appeal, the district court agreed that the former wife's attorney had, as a technical matter, willfully violated the stay, but vacated the bankruptcy court's damage award because the debtor had not been injured by either of the stay violations. District Court Judge David N. Hurd wrote:

Debtor was not injured by the violation of the stay in either instance. It suffered no actual damages in either instance. Accordingly, it is not entitled to an award of damages.

. . . .

Attorney Smith was aware of the stay and took deliberate action in causing the income execution to attach to SSPS's operating account (in both the first and second instances). **Thus there was a willful violation of the automatic stay. However, debtor suffered no actual damages related to either incident and is not entitled to an award of attorneys fees under 11 U.S.C. § 362(h).**

2005 WL 357207 at *5 (emphasis added).

Other courts have held similarly and made similar comments. Those include:

"[E]ven if it is assumed that the continuing levy upon the male Debtor's wages constituted a willful violation of the automatic stay, it does not follow that the Debtors are entitled to any recovery from the Department of Revenue because the Debtors failed to establish that they were actually damaged by any such violation." *In re Coley,* No. 03–13234C–7G, 2004 WL 229519 (Bankr. M.D.N.C., Jan.2, 2004).

"In order to establish a prima facie case for damages under 11 U.S.C. § 362(h), an individual debtor must show that she was injured by a willful violation of the automatic stay." *Bostanian v. American Hilton Corp. (In re Bostanian),* 41 Fed.Appx. 66, 2002 WL 1418433, *1 (9th Cir., July 1, 2002)(unpublished opinion) (judgment of bankruptcy court denying debtor's request for damages under 362(h) affirmed were evidence reflected that creditor did not willfully violate the stay and, in addition, the debtor was not injured by the purported stay violation).

"Parties injured by a willful violation of the automatic stay are entitled to seek actual damages, costs and attorneys' fees, and punitive damages." *Glenshaw Glass v. Ontario Grape Growers' Marketing Board,* 67 F.3d 470, 477 (3rd Cir.1995)(judgment of district court awarding damages to debtor pursuant to section 362(h) reversed where debtor was unable to prove that it suffered any injury as a result of stay violation).

"Thus, two elements are necessary to recover damages under § 362. First, there must be a violation of § 362(a)'s automatic stay provision. Second, there must be an actual resultant injury." *Aiello v. Providian Fin. Corp.,* 257 B.R. 245, 249 (N.D.Ill.2000), *aff'd,* 239 F.3d 876 (7th Cir.2001)(affirming grant of summary judgment against debtor seeking damages for emotional distress, as well as attorneys fees and costs involved in prosecuting the adversary proceeding filed to collect those damages, from creditor who willfully violated the stay, where debtor produced no evidence that she was injured by the stay violation).

"Even assuming, *arguendo,* that § 362(a) operated to stay Count I in these circumstances, no damages would be appropriate in this case, because (i) there is no evidence of injury from violation of the stay ...." *Fidelity Nat'l Title Ins. Co. of New York v. Bozzuto,* 227 B.R. 466, 473 n. 18 (E.D.Va.1998)(summary judgment granted against debtor seeking actual and punitive damages, as well as attorneys' fees and costs, under section 362(h), where creditor's actions were not prohibited by the automatic stay and, in addition, the debtor was not injured by those actions).

"The protection afforded by § 362(h), finally, is available only to individuals '*injured* by any *willful* violation of a stay ....'" *United States v. Academy Answering Service, Inc. (Academy Answering Service, Inc.),* 100 B.R. 327, 330 (N.D.Ohio 1989)(reversing bankruptcy courts' award of attorneys fees to debtor pursuant to section 362(h) where the debtor was not injured by the stay violation).

"[I]n the absence of injury, sanctions under section 362(h) are inappropriate." *Wolkowitz v. Shearson Lehman Brothers, Inc. (In re Weisberg),* 193 B.R. 916, 927 (9th Cir. BAP 1996)(affirming bankruptcy court's denial of trustee's complaint for award of damages pursuant to section 362(h) where estate suffered no injury, even if creditor's actions constituted a violation of the stay), *aff'd,* 136 F.3d 655 (9th Cir.1998), *cert. denied,* 525 U.S. 826, 119 S.Ct. 72, 142 L.Ed.2d 56 (1998).

"In order for a willful violation to occur, the court must determine that a violation occurred, the individual seeking damages was injured and the violation was willful." *In re Wiley,* 315 B.R. 682, 690 (Bankr.E.D.La.2004)(Chapter 11 debtor was not entitled to recover damages of any sort pursuant to section 362(h) for stay violation which occurred when defendants sought and obtained civil contempt order against debtor in state court post-petition, where defendants did little more than continue to argue in favor of their pre-petition motion after learning, at or moments before the hearing, that a bankruptcy petition had been filed, and where the debtor failed to show that he had suffered any injury as a result of the stay violation).

"The burden is on the debtor to show there was: (1) an injury; (2) from a willful; (3) violation of the stay." *Adams v. Peterson (In re Adams),* No. 01–9226, 2002 WL 844350, at *2 (Bankr. N.D.Iowa, April 19, 2002)(denying request by debtor for *de minimis* damages plus attorneys fees where debtor sustained no injury as a result of anything done by the creditor).

"Section 362(h) is designed to compensate an individual who *has been* harmed by the violation of the stay. It is not designed as a device to *generate* damages in the form of fees incurred in bringing the action." *In re Martinez,* 281 B.R. 883, 886 n. 4 (Bankr.W.D.Tex.2002)(dicta). "If an attorney cannot identify actual damages incurred by the stay violation *before* filing the motion, then the attorney should not file the motion in the first place." *Id.* at 886–887. "In short, a debtor suffers no actual damages from merely being notified of a missed mortgage payment—and cannot 'manufacture' such damages in the form of attorneys' fees for filing a sanctions motion that, but for those fees, has no independent basis for recovery." *Id.* at 887

"Pursuant to the credible evidence presented during the final hearing, the Court finds there was no related actual injury to plaintiff even assuming that these contested post-petition contacts

occurred." *Garland v. Lawton (in re Garland),* No. 99–1076, 2001 WL 34798966, at *7 (Bankr.D.Vt., Aug.1, 2001)(debtor entitled to no relief under section 362(h) where he was not injured by the creditors' purported stay violations). "Based upon the foregoing, plaintiff has failed to provide sufficient credible evidence to warrant a finding of a compensable violation of the automatic stay as set forth in Counts I and II of the Complaint." *Id.*

"Even if a defendant's actions violate the automatic stay, an individual debtor does not have a claim under § 362(h) if the stay violation does not result in any injury to the debtor." *Felder v. American General Finance (In re Felder),* No. 97–05465–B, 2000 WL 33710885, at *6 (Bankr.D.S.C., July 7, 2000)(summary judgment entered against debtor seeking compensatory damages, punitive damages, and attorney's fees where debtor was not injured by the creditor's willful violation of the stay). "The Code requires injury in fact from a violation; not injury per se as a result." *Id.* at *15.

"Section 362(h) 'requires a finding of actual injury.'" *In re Skeen,* 248 B.R. 312, 318 (Bankr.E.D.Tenn.2000)(quoting *Archer v. Macomb County Bank,* 853 F.2d 497, 500 (6th Cir.1988)(debtors' request for an award of damages pursuant to section 362(h) was denied where debtors were not injured by the alleged stay violation and *only so-called "actual damages" requested were for wages lost as a result of attending hearings held in connection with their section 362(h) proceeding and attorneys fees and costs incurred solely in connection with prosecution of that proceeding)).*

"Thus, the general rule of law is that absent some out-of-pocket injury or some extreme and on-going misconduct by the creditor, fees and costs will not be allowed under § 362(h)." *Aiello v.* *Providian Fin. Corp.,* 231 B.R. 684, 689 (Bankr.N.D.Ill.1999)(summary judgment entered against debtor denying her request for compensatory damages, including attorneys fees, where there was no proof that she was actually injured as a result of the stay violation), *aff'd,* 257 B.R. 245 (N.D.Ill.2000), *aff'd,* 239 F.3d 876 (7th Cir.2001). "The Debtor has failed to meet her burden of proof as to actual injury under § 362(h). Providian's motion for summary judgment is therefore granted." *Id.* at 692.

"An award of attorney's fees, without any other actual damages, would benefit only the DEBTORS' attorney without any benefit to the DEBTORS or their creditors." *Mullins v. Land (In re Mullins),* No. 96–83540, 1998 WL 34064588, at *2 (Bankr.C.D.Ill., Jan. 15, 1998)(damages, in the form of attorneys fees and costs solely associated with filing and prosecuting a section 362(h) proceeding, could not be awarded where creditor's stay violation did not injure the debtors).

"Important to the Court's determination, though, is that there must be injury from the willful disregard of the automatic stay." *Weisberger v. United States (In re Weisberger),* 205 B.R. 727, 733 (Bankr.M.D.Pa.1997)(debtor's complaint for award of compensatory damages, including attorneys fees, and punitive damages was denied where debtor was not injured by the creditor's willful stay violation).

"Section 362(h) permits only those individuals who have been 'injured' by a willful violation of the automatic stay to recover money damages." *In re Palumbo Family Limited Partnership,* 182 B.R. 447, 471 (Bankr.E.D.Va.1995)(debtor who was not injured by creditor's stay violation was not entitled to award of damages pursuant to section 362(h)). "In other words, absent proof of injury,

a technical violation of the stay, no matter how willful, is not enough to support an award of damages." *Id.*

Even if a creditor has willfully violated the stay, section 362(h) authorizes no relief if the debtor cannot "demonstrate . . . injuries which may be causally related to the [stay violation]." *Gordon v. Dennis Burlin Sales, Inc.*, 174 B.R. 257, 260 (Bankr.N.D.Ohio 1994)(judgment rendered against debtor in section 362(h) action where debtors failed to prove that creditor's stay violation resulted in any injury to them).

"[Creditor's] actions constitute a willful violation of the automatic stay which threatened to put Debtor out of business, but the effort failed. Debtor has failed to establish actual damages." *General Ins. Co. of America v. Anderberg-Lund Printing Co. (In re Anderberg-Lund Printing Co.)*, Nos. 4–93–6995, 4–94–398, 1994 WL 692953, at *6 (Bankr.D.Minn., Dec.9, 1994)(judgment entered against debtor corporation in section 362(h) action, refusing its demand for actual damages, including attorneys fees and costs involved in prosecuting the adversary proceeding, where debtor failed to prove that it was injured by the stay violation).

"Courts have generally found that a violation of the automatic stay does not, in itself, support an award of damages and attorneys' fees." *In re Smith*, No. 93–25553–A, 1994 WL 900507, at *3 (Bankr. E.D.Va., Aug.29, 1994)(debtor's motion for sanctions, attorneys fees, costs and punitive damages filed as a result of actions by the agent of the debtor's landlord and its attorney to regain the townhouse occupied by the debtor and to collect past due rent was denied where stay violation resulted in no injury to debtor and debtor proved no damages other than attorneys fees). "Since there is insufficient evidence in the record to support an award of actual damages, an award of attorneys' fees would be inappropriate." *Id.* at *4. "Debtor's counsel failed to provide this Court with any evidence of injury resulting from Pensouth's actions and without such evidence, an award of actual damages cannot be granted." *Id.* at *3.

"Thus, in order to recover damages under § 362(h), Wright must demonstrate that he has suffered actual injury as a result of the IRS's alleged violation of the automatic stay, and must relate that injury to the damages sought." *In re Wright*, 156 B.R. 549, 552 (Bankr.N.D.Ill.1992)(debtor lacked standing to assert claim for compensatory damages, attorneys fees, and punitive damages pursuant to section 362(h) because he was not injured by the stay violation).

"The Plaintiff has failed to establish any actual damages apart from legal fees and costs. Accordingly no award for damages shall be assessed pursuant to Section 362(h) of the Code." *New MMI Corp. v. Robec, Inc. (In re Micro Marketing International, Inc.)*, 150 B.R. 573, 575 (Bankr.M.D.Pa.1992)(Chapter 11 debtor's transferee's request for award of attorneys fees pursuant to section 362(h) for creditor's willful violation of stay was denied where debtor was not injured by the stay violation and failed to establish any damages other than attorneys fees and costs resulting from the same).

" '[T]he violation of the stay, by itself, does not support an award of damages and attorney's fees.' " *Whitt v. Philadelphia Housing Authority (In re Whitt)*, 79 B.R. 611, 615–616 (Bankr.E.D.Pa.1987)(debtors complaint to recover attorneys fees and costs pursuant to 362(h) was denied where debtor offered no proof that she was injured by creditor's stay violation or suffered damages other than attorneys fees and

costs)(quoting *In re Wagner*, 74 B.R. 898, 902 (Bankr.E.D.Pa.1987)). " '[N]o damages will be awarded as a result of the violation of the automatic stay ... [if] there was no evidence that the debtor suffered any harm.' " *Id.* at 616 (quoting *In re Wagner*, 74 B.R. at 905).

"Even if we were to find a violation of the stay, 11 U.S.C. § 362(h) requires a finding of actual injury, and here there was none." *In re Freunscht*, 53 B.R. 110 (Bankr.D.Vt.1985)(denying debtors section 362(h) counterclaim where they were not injured by the creditor's stay violation).[25]

■ As the above demonstrates, a debtor is precluded from obtaining an award pursuant to section 362(h) of the costs, expenses and attorneys fees incurred or generated as part of the process of prosecuting a section 362(h) proceeding where the debtor: (1) was not injured by a creditor's stay violation; (2) has not incurred damages as a result of a creditor's stay violation prior to institution of a section 362(h) proceeding; (3) does not stand to incur any damages as a result of a creditor's stay violation subsequent to institution of a section 362(h) proceeding except for costs, expenses and attorneys fees incurred or generated as part of the process of prosecuting the section 362(h) proceeding; or (4) was not required to institute the section 362(h) proceeding in order to force the creditor to desist from further violating the stay, or to prevent the creditor from again violating the stay, or to

**25.** *See also Archer v. Macomb County Bank*, 853 F.2d 497, 500 (6th Cir.1988)("[T]he bankruptcy court [must] [bear] in mind that '11 U.S.C. § 362(h) requires a finding of actual injury ....' ")(quoting *In re Freunscht*, 53 B.R. 110, 113 (Bankr.D.Vt.1985)); *Salem v. Paroli*, 260 B.R. 246, 257 (S.D.N.Y.2001)(affirming bankruptcy court's dismissal of debtor's section 362(h) proceeding where facts alleged in debtor's complaint showed that he had not been injured by the alleged stay violation), *aff'd*, 79 Fed.Appx. 455, No. 02–7090, 2003 WL 22440245 (2nd Cir., Oct.28, 2003)(unpublished opinion)("The district court correctly affirmed the bankruptcy court's dismissal of Salem's claim that certain defendants violated the automatic stay in bankruptcy because Salem failed to allege a cognizable injury."); *Mann v. Chase Manhattan Mortgage Corp.*, No. CIV. A. 00–192–T, 2002 WL 32157516, at *5 (D.R.I., March 7, 2002)(summary judgment entered against debtors in 362(h) proceeding where debtors failed to present any evidence that the mortgagee's actions violated the automatic stay or that they were injured as a result of the alleged violations), *aff'd*, 316 F.3d 1 (1st Cir. 2003); *Lucabaugh v. United States (In re Lucabaugh)*, 262 B.R. 900, 905 (E.D.Pa.2000)(affirming dismissal of debtor's 362(h) complaint by bankruptcy court because facts described in complaint did not constitute a stay violation and debtor did not allege that he was injured as a result of the alleged stay violation); *Miller v. Blatstein (In re Main, Inc.)*, No. CIV. A. 98–5947, 1999 WL 424296, at *5 (E.D.Pa., June 23, 1999)(affirming judgment rendered by bankruptcy court against trustee in action brought pursuant to 362(h) where trustee failed to prove that estate suffered any harm as a result of creditor's stay violation); *Clement v. GF Winnelson Co. (In re Clement)*, No. 02–30096, 2002 WL 31342411, at *5 (Bankr.D.N.D., Aug.6, 2002)(debtor's complaint to recover damages pursuant to 362(h) was dismissed where debtor suffered no injury other than the attorneys fees and costs associated with prosecuting the 362(h) action); *Moodie v. Thrifty Rent–A–Car System, Inc. (In re Moodie)*, Nos. 00–10501, 00–01056 CAB, 2001 WL 34050728, at *3 (Bankr.D.Vt., July 16, 2001)(even if the creditor willfully violated the stay, debtors were not entitled to any relief under section 362(h) because they failed to present, "evidence sufficient to demonstrate actual injury to [them] arising out of the violation of the automatic stay....."); *Federal Land Bank of St. Louis v. Heiserman (In re Heiserman)*, 78 B.R. 899, 904 (Bankr.C.D.Ill.1987)(although mortgagee's post-petition procurement and filing of sheriff's deed following pre-petition foreclosure constituted willful violation of the stay, debtors would be denied relief under 362(h) where they, "were not injured in any way by the premature recording of the Deed.").

undo the effects of the creditor's stay violation.[26]

■ Those are precisely the circumstances in this matter. There is no factual evidence that this debtor was injured by Ocwen's violation of the stay, unless the Court considers that prosecution of a section 362(h) action is in and of itself, injury. But as the above demonstrates, even in that situation, injury of that sort is not compensable.

### c. Mr. Hutchings May Not Recover Expenses and Attorneys Fees Because He Did Not Mitigate His Damages

■ Even if Mr. Hutchings had proven damages suffered because of Ocwen's stay violation, he was required to make reasonable attempts to mitigate those damages. The evidence establishes that he did not.

Ocwen had discontinued violating the stay prior to the date the adversary proceeding was filed. Therefore, Mr. Hutch-

**26.** Some courts disagree with this Court's conclusion. Note five in the opinion in *In re Skeen*, 248 B.R. 312 (Bankr.E.D.Tenn.2000) discusses those cases. It reads:

> The *Whitt* decision along with a few others hold that attorney's fees may not be awarded absent separate injury to the complainant. See, e.g., *In re Whitt*, 79 B.R. at 616 (costs and attorney fees are allowable only to embellish actual damages); *Lovett v. Honeywell*, 930 F.2d 625, 629 (8th Cir. 1991) (same, citing *Whitt*); *Loethen Oil Co. v. Hen House Interstate, Inc. (In re Hen House Interstate, Inc.)*, 136 B.R. 220, 223 (Bankr.E.D.Mo.1992) (court denied attorney's fees incurred in bringing motion for sanctions because there were no actual damages proven to which the attorney's fees could attach); *In re Haan*, 93 B.R. at 441 ("Here there is 'no harm—no foul' and no injury—no attorney's fees."). However, other courts have recognized that attorney's fees may be recoverable as damages under section 362(h) for a willful violation of the automatic stay even if the debtor has suffered no other compensable harm. See, e.g., *Singley v. American Gen. Finance (In re Singley)*, 233 B.R. 170, 174 (Bankr.S.D.Ga. 1999); *In re Robinson*, 228 B.R. at 85. Recognizing that a response by the debtor's attorney may be appropriate even if the stay violation has not otherwise injured the debtor, this court believes the latter view to be the better reasoned one.

*Id.* at 322, n. 5.

This Court could agree in a case even where there were no other damages proven, if there were some other reason that required a debtor to bring an action against the stay violator. But that is not the situation here. Ocwen's attorney confirmed with the debtor's counsel that all contact with the debtor had stopped, no further contact would occur, and

that foreclosure was improper. Only after that assurance did the debtor file the pending complaint.

The case of *In re Robinson*, 228 B.R. 75, 86 (Bankr.E.D.N.Y.1998) cited above in *Skeen* does indeed agree with the general statement that, "A court may award attorneys' fees pursuant to section 362(h) even if the debtor has suffered no other compensable harm." *Id.* at 85. But in application, it appears that the court in *Robinson* generally agrees with this Court. The court in *Robinson* wrote:

> In appropriate circumstances, a court may determine that a section 362(h) motion was wasteful and limit the attorney's compensation award to the amount that he would have earned had he handled the matter efficiently. Such circumstances are those where "the injury caused and damages incurred, other than attorneys' fees, only amount to the cost of appearing in court to litigate the contempt motion; the burden of requiring the debtor's attorney to notify the creditor of the violations is insignificant; and no bad faith on the part of the defendant exists." *Price [v. Pediatric Academic Assn.]*, 175 B.R. [219] at 222 [(S.D.Ohio 1994)].

*Id.* at 86. And that court applied those principles in its case and reduced the attorney fees requested.

While this Court has not discussed all of the cases that support the proposition that attorney fees may be awarded even where there are no other compensable damages, this Court must believe that in most situations, other courts would agree that for a response by a debtor's attorney to be appropriate, "even if the stay violation has not otherwise injured the debtor...," there must be some reason for bringing that action, other than the simple non-injurious stay violation.

ings did not need to file the adversary proceeding to stop Ocwen from violating the stay, or to prevent Ocwen from further violating the stay—but he did. Ocwen's stay violations, when they occurred, did not create a situation which, if left undone, would result in any damage or injury to Mr. Hutchings in the future. Therefore, Mr. Hutchings did not need to file this adversary proceeding to undo the effects of Ocwen's stay violations—but he did. And finally, and probably most important-ly, the uncontroverted evidence is, *none* of the damages Mr. Hutchings is claiming, including $800 in lost wages, $50 in gaso-line expenses, and about $52,000 in attor-neys fees, occurred before the adversary proceeding was filed, but *all* resulted from the continued prosecution of, and partic-ipation in, this adversary proceeding. Therefore, Mr. Hutchings did not need to file this adversary proceeding to collect actual damages suffered as a direct result of Ocwen's stay violations.

Based on these conclusions, the Court must find that the adversary proceeding was not necessary, at least from the stand point of a section 362(h) violation. Conse-quently, any fees and expenses incurred in prosecution of the complaint are also un-necessary because they could have been avoided completely. Those fees and ex-penses did not result from anything Ocwen did. They were, in contrast, the conse-quence of Mr. Hutchings' reaction to what Ocwen did. Therefore, Mr. Hutchings is not entitled to recover the damages from Ocwen which he in fact caused to occur because of his own actions, actions that could have easily been avoided, and would have been if Mr. Hutchings had mitigated his damages.[27]

The general rule in regard to miti-gation of damages is:

> Where one person has committed a tort, breach of contract, or other legal wrong against another, it is incumbent upon the latter to use such means as are reasonable under the circumstances to avoid or minimize the damages. The person wronged cannot recover for any item of damage which could thus have been avoided.

Charles T. McCormick, Handbook on the Law of Damages, page 127 (West Publish-ing Co.1935).

That rule of law has been applied by bankruptcy courts to damages, including costs and attorneys fees, in actions brought pursuant to section 362(h).[28]

---

**27.** That is particularly true in regard to attor-neys fees. According to their fee applications, Mr. Hutchings' current attorneys entered this case after the section 362(h) complaint had been filed. It is this Court's opinion that it was apparent that at that time Ocwen had ceased violating the stay, had done nothing which needed to be undone by legal proceed-ings, and that Mr. Hutchings had not, at that point, suffered any damages as a direct result of anything done by Ocwen. After that point, it was not necessary to continue the section 362(h) prosecution. Consequently, any fees generated and expenses incurred after that point, which includes everything that has been requested in this case, could have been avoided in their entirety if this adversary pro-ceeding had been discontinued.

**28.** *See Rosengren v. GMAC Mortgage Corp.,* No. CIV. 00–971 (DSD/JMM), 2001 WL 1149478 (D.Minn., Aug.7, 2001); *Eskanos & Adler, P.C. v. Roman (In re Roman),* 283 B.R. 1 (9th Cir. BAP 2002); *In re Oksentowicz,* 324 B.R. 628 (Bankr.E.D.Mich.2005); *In re Ris-ner,* 317 B.R. 830 (Bankr.D.Idaho 2004); *Westman v. Andersohn (In re Westman),* 300 B.R. 338 (Bankr.D.Minn.2003); *In re Gene-Sys, Inc.,* 273 B.R. 290 (Bankr.D.D.C.2001); *In re Sammon,* 253 B.R. 672 (Bankr.D.S.C. 2000); *In re Flack,* 239 B.R. 155, (Bankr. S.D.Ohio 1999); *Clayton v. King (In re Clay-ton),* 235 B.R. 801 (Bankr.M.D.N.C.1998); *In re Robinson,* 228 B.R. 75 (Bankr.E.D.N.Y. 1998); *In re Belcher,* 189 B.R. 16 (Bankr. S.D.Fla.1995); *In re Price,* 179 B.R. 70 (Bankr.S.D.Ohio 1995); *In re Esposito,* 154 B.R. 1011 (Bankr.N.D.Ga.1993); *Sizemore v. Dayton Emergency Specialists (In re Sizemore),*

Those cases include the following.

In *In re Risner*, 317 B.R. 830 (Bankr.D.Idaho 2004), the debtors listed a creditor on their Chapter 7 petition at a particular address. But that address was for the creditor's billing agent, not the creditor. When the billing agent received the notice of the debtors' bankruptcy, it "zeroed out" all outstanding balances on the debtors' accounts. At the same time the creditor was reviewing a $100 charge which had not yet been posted to the debtors' account. It subsequently posted that charge to the debtor's account. The billing agent accordingly sent a bill to the debtors, and a billing statement a month later reminding the debtors of the balance. When the debtors received the bill and reminder statement, without first trying to contact the creditor, or otherwise resolve the matter, the debtors' attorney filed a section 362(h) motion, seeking compensatory damages, including attorney's fees and costs.

A clerk working for the billing agent received the debtors' first section 362(h) motion but did not understand the significance. Thinking that it was sent to advise the company that the debtors had filed a bankruptcy case, the clerk reviewed the debtors' account and eliminated the remaining $100 charge. The bankruptcy court denied the debtors' section 362(h) motion after having determined service had not been properly effected.

The debtors filed a second motion, which they properly served. Afterwards, the creditor and its billing agent attempted, with no success, to negotiate a resolution with the debtors' attorney. The evidence submitted at trial indicated that had either the debtors or their attorney called the billing agent after receiving the offending bill, the bill would have been immediately reduced to zero, an apology made, and any damage rectified.

Chief Judge Terry L. Myers concluded that the two letters constituted willful violations of the stay, but declined to award any compensatory damages (aside from attorneys fees and costs) because the debtors offered no evidence of having incurred any. Judge Myers recognized, **"The Court must evaluate the costs and fees claimed and determine if those expenses could have been mitigated."** *Id.* at 840. Based on that standard, Judge Myers also refused to award attorneys fees and costs because the section 362(h) proceeding was unnecessary, and consequently, the fees and costs involved in prosecuting that litigation were entirely avoidable.

In *In re Sammon*, 253 B.R. 672 (Bankr. D.S.C.2000), the debtors filed a joint federal income return for 1997. Their return showed that they owed $23,046 in income taxes, which they did not remit. The debtors sent a letter to the IRS offering to compromise their 1997 tax liability for $13,600. They included a payment in that amount. While the IRS was considering the offer, the debtors filed a Chapter 13 bankruptcy petition. They listed the IRS in their schedules as holding an unsecured priority claim in the amount of $7,000. The IRS advised the debtors that it would not consider their offer due to their bankruptcy filing. The debtors withdrew the offer and requested the IRS to apply the payment toward their 1997 tax liability. The IRS informed the debtors that their payment would be applied to their outstanding tax liability. But the IRS filed a proof of claim for $24,106.71 because, at the time the claim was reviewed and signed, the debtors' payment had not yet been credited.

138 B.R. 540 (Bankr.S.D.Ohio 1992); *In re Newell*, 117 B.R. 323 (Bankr.S.D.Ohio 1990).

The chapter 13 trustee informed the debtors that, due to the IRS's claim, they would have to increase their plan payments to $780 per month. In response, the debtors filed a modified plan which provided for the increased payments. The debtors did not object to the IRS's claim. And they did not advise the trustee of any questions or concerns regarding the claim.

Due to unexpected medical costs, and the debtor-husband's surgery and inability to work, the debtors filed a motion for a moratorium on their payments, which the bankruptcy court granted. The day after the moratorium ended, the debtors' attorney, through his office manager, wrote a letter asking the IRS to explain why its claim did not reflect credit for the debtors' payment.

Prior to receiving a response to the letter, the debtors filed an objection to the IRS's claim. They also filed a motion for permission to surrender their residence to their mortgagee. In addition, they filed a motion pursuant to section 362(h) requesting damages, including attorneys fees and costs, from the IRS. Their contention was that the IRS violated the stay by not crediting their payment or by filing a proof claim which did not reflect the correct amount of their tax liability. In response, the IRS filed an amended proof of claim in the amount of $8,426.93, which reflected the amount owed by the debtors' after application of their payment.

The bankruptcy court rejected the debtors' contention that the IRS violated the automatic stay by filing an inaccurate claim. In addition, it concluded that, even if the IRS violated the stay, the debtors were not entitled to an award of damages, including attorneys and costs, because all of their claimed damages could have been avoided.

Judge John E. Waites wrote:

As to Debtors' claim that the IRS's conduct caused emotional distress and further caused Mr. Sammon to lose one week of work, the Court finds that Debtors failed to mitigate their damages by not seeking formal redress until approximately seven months after the subject Proof of Claim was filed. "[T]he debtor **is under a duty to exercise due diligence in protecting and pursuing his rights and in mitigating his damages with regard to such violations.**" *Clayton v. King (In re Clayton)*, 235 B.R. 801, 811 (Bankr.M.D.N.C.1998)(citing *Mitchell Constr. Co. v. Smith (In re Smith)*, 180 B.R. 311, 320 (Bankr. N.D.Ga.1995)); *see also Lori v. Lori (In re Lori)*, 241 B.R. 353, 356–57 (Bankr. M.D.Pa.1999); *In re Brock Utilities & Grading, Inc.*, 185 B.R. 719, 720 (Bankr. E.D.N.C.1995).

*Id.* at 681 (emphasis added).

In *Clayton v. King (In re Clayton)*, 235 B.R. 801 (Bankr.M.D.N.C.1998), the debtor in a Chapter 13 case did not list unpaid fees he owed to the law firm who represented him in a previous, and dismissed, bankruptcy case. An attorney with the previous law firm called the trustee's office and was told that the debtor had filed a new case. At the suggestion of the debtor's current attorney, the prior attorney sent a letter to the debtor offering to settle the matter. The debtor did not respond. The prior attorney passed the matter to another attorney in his law firm and advised that attorney that the debtor was involved in a pending Chapter 13 case. The second attorney's paralegal called the trustee's office on two separate occasions and was purportedly informed both times that the debtor had no pending case. The second attorney sent the debtor a letter threatening a collection suit if the fees were not paid. The debtor did not respond. The second attorney then filed suit against the debtor in state court on behalf of the law firm. The debtor filed a motion for extension of time to file an answer in

the state court action. The debtor did not inform either the law firm's attorneys who first contacted him, or the firm's attorney who filed the suit, or the state court, that he was in Chapter 13.

The debtor filed his answer in the state court case. In his answer, he alleged, as a defense, that he was in bankruptcy and asserted a counterclaim seeking monetary damages. The law firm filed a motion to dismiss the counterclaim and a motion for the imposition of sanctions for frivolous pleading. The debtor received a notice of hearing to consider the law firm's motions. The two attorneys from the law firm who had contacted him were served by the debtor with a subpoena to appear at a hearing in the bankruptcy court on a motion to dismiss the debtor's case filed by the trustee.

The hearing was held in the bankruptcy court. The court found that due to the existence of an automatic dismissal provision in the confirmation order, the case had been automatically dismissed a month earlier without the need for an additional hearing.

The debtor then filed a Chapter 7 case. In that case, he filed a section 362(h) complaint for damages, including attorneys fees and costs, against the two attorneys who contacted him and sued him in state court during his preceding Chapter 13 case and their law firm.

The bankruptcy court concluded that the defendants willfully violated the stay by filing the state court action, and by filing the motion for sanctions, and scheduling subsequent hearings in the lawsuit. But the court refused to award any of the damages requested by the debtor, including attorneys fees and costs, where the debtor could have completely avoided those damages. Chief Judge William L. Stocks wrote:

**Although the Bankruptcy Code does not require a debtor to warn his credi-** **tors of existing violations prior to moving for sanctions, the debtor is under a duty to exercise due diligence in protecting and pursuing his rights and in mitigating his damages with regard to such violations.** *Mitchell Constr. Co.,* 180 B.R. [311], 320 (parenthetical added); *General Motors Acceptance Corp. v. Miller,* 10 B.R. 74, 76 (Bankr.S.D.Ohio 1981). This duty includes "such cooperation as might reasonably and promptly mitigate [the debtor's] damages." *In re Esposito,* 154 B.R. 1011, 1015 (Bankr.N.D.Ga.1993).

*Id.* at 811–12 (emphasis added).

In *In re Oksentowicz,* 324 B.R. 628 (Bankr.E.D.Mich.2005), after receiving a Chapter 7 discharge, the debtor submitted a rental application for subsidized housing. The management company for the apartments rejected his application because a check of the debtor's credit revealed that the debtor had a bad credit history. The letter of rejection further stated that the debtor could respond in writing, within 14 days, to request a meeting with management to discuss the rejection. The debtor sent the company a letter where he requested a meeting and informed the company that all of his past debts had been discharged. The meeting was scheduled and the debtor was informed of its date and time. Prior to the scheduled meeting, the debtor's attorney sent a letter to the company claiming that its rejection of the debtor's rental application violated the anti-discrimination provision of section 525 of the Bankruptcy Code. The company called the debtor and informed him that his appearance at the hearing was still required despite his attorneys' letter. The debtor's attorney responded with a second letter to the company indicating that he and his client would only meet with the company if it agreed to reverse its denial of the debtor's application. The company did not accede to that demand, and the

debtor did not attend the scheduled meeting. The company sent a letter to the debtor stating that, because he failed to attend the meeting, the original decision to reject his application would stand.

The debtor filed suit in the bankruptcy court claiming that the denial of his rental application constituted a violation of section 525(a). The debtor sought damages, including attorneys fees. The bankruptcy court held that the same mitigation rule that was applicable to a section 362(h) proceeding was applicable to a section 525 action. The court concluded that the debtor was not entitled to any damages, because all of his damages could have been avoided, even though the defendant had indeed violated section 525.

Chief Judge Steven Rhodes wrote:

The Court concludes that Oksentowicz's conduct in this matter precludes awarding damages. **In cases involving automatic stay violations, in which debtors frequently file motions for contempt or for damages under 11 U.S.C. § 362(h), courts have overwhelming held that debtors have an obligation to attempt to mitigate damages prior to seeking court intervention.** "Although the Bankruptcy Code does not require a debtor to warn his creditors of existing violations prior to moving for sanctions, the debtor is under a duty to exercise due diligence in protecting and pursuing his rights and in mitigating his damages with regard to such violations." *Clayton v. King (In re Clayton)*, 235 B.R. 801, 811 (Bankr. M.D.N.C.1998). *See also In re Risner*, 317 B.R. 830, 840 (Bankr.D.Idaho 2004)("[I]n determining reasonable damages under § 362(h), the bankruptcy court must examine whether the debtor could have mitigated the damages[.]"); *In re Rosa*, 313 B.R. 1, 9 (Bankr.D.Mass.2004)("Debtors are indeed under a duty to mitigate their dam-

ages resulting from automatic stay violations."); *Shadduck v. Rodolakis*, 221 B.R. 573, 585 (D.Mass.1998); *In re Craine*, 206 B.R. 594, 597–98 (Bankr. M.D.Fla.1997); *In re Brock Utilities & Grading, Inc.*, 185 B.R. 719, 720 (Bankr. E.D.N.C.1995); *McHenry v. Key Bank (In re McHenry)*, 179 B.R. 165 (9th Cir. BAP 1995); *In re Esposito*, 154 B.R. 1011, 1015 (Bankr.N.D.Ga.1993)(Debtor has a duty to mitigate damages.). "The automatic stay was not designed to be used as a kind of spring-loaded gun against creditors who wander into traps baited by the debtor." *Clayton*, 235 B.R. at 807.

*Id.* at 630 (emphasis added).

*In re GeneSys, Inc.*, 273 B.R. 290 (Bankr.D.D.C.2001), the debtor and the United States Air Force owed one another mutual debts. The Air Force owed the debtor about $126,000.00. (The court's opinion does not reveal what was owed by the debtor to the USAF.) When the debtor filed its petition, the USAF informed it that it was exercising its right to setoff and would not be remitting the amounts that it owed the debtor. The debtor's attorney demanded that the USAF reverse the setoff and remit the sums it owed to the debtor. The USAF reversed the setoff as requested but refused to send any money to the debtor. The debtor responded by filing an action pursuant to section 362(h), seeking, as damages for the post-petition setoff, the funds that the USAF owed to the debtor, attorneys fees and costs.

Recognizing that, "Bankruptcy courts... impose a duty on the debtor to mitigate its damages stemming from a violation of the automatic stay," *id.* at 296, Judge S. Martin Teel, Jr., wrote, "The court looks to two factors in determining the appropriate amount of attorney's fees to award as a sanction: (1) what expenses or costs resulted from the violation and (2)

what portion of those costs was reasonable, as opposed to costs that could have been mitigated." *Id.* at 296 (emphasis added).

Applying that test, Judge Teel ruled that the USAF willfully violated the stay, but that the debtor suffered no direct injury as a result of the stay violation because the USAF was ultimately entitled to setoff the amount that it was owed by the debtor and that, consequently, the debtor was not entitled to recover any of the funds that it was owed by the USAF. Consequently, the only "actual damages" that the debtor was left with were the $17,000 in fees incurred in prosecuting the action. The bankruptcy court concluded that the debtor's attorney was instead entitled to only $205.56, representing the time spent writing the initial letter to the USAF and drafting the section 362(h) complaint. The court denied the remainder of the requested fees, concluding that they essentially constituted self-inflicted injuries, that is, they were strictly the result of actions taken by the debtor and its attorneys, and were not necessitated by anything that was done or not done by the USAF.

In *In re Newell*, 117 B.R. 323 (Bankr. S.D.Ohio 1990), the debtor in a Chapter 13 case listed a creditor who held a security interest in certain equipment used by the debtor in his business. The creditor was notified of the bankruptcy filing and appeared at the meeting of creditors through counsel. The debtor's plan, which provided for payment of the creditor's debt through the trustee, was confirmed. The creditor subsequently mailed an invoice directly to the debtor requesting payment of the original note plus attorneys fees incurred by the creditor in the bankruptcy proceeding. Later, the creditor sent a second invoice to the debtor requesting only the amount due on the note. The debtor's attorney chose not to contact the creditor or its attorney about the problem, but instead filed a section 362(h) motion seeking an award of actual damages, including attorneys fees and costs, and punitive damages.

The bankruptcy court concluded that by sending the two invoices, the creditor willfully violated the stay but that punitive damages were unwarranted. After concluding that the creditor's actions were inadvertent and would have ceased had it received a communication from the debtor or his counsel, the court awarded the debtor $150 in damages, representing the value of legal fees for two long distance telephone calls. The court denied the remaining damages requested by the debtor, which were not specifically delineated in the opinion, *on the grounds that the same were avoidable.*

In *In re Belcher*, 189 B.R. 16 (Bankr. S.D.Fla.1995), in her Chapter 13 petition, the debtor listed a creditor holding a security interest in her car, and proposed, in her plan, to pay the creditor's claim over 48 months with interest. For some reason, the creditor was not notified of the bankruptcy filing and, post-petition, repossessed the vehicle. The day following the repossession, the debtor's attorney sent a letter by facsimile to the creditor, along with a copy of the bankruptcy petition. Two days later, the creditor sent a letter to the debtor's attorney acknowledging receipt of the document and stating that it was awaiting advice from its attorney. That same day, the debtor filed her section 362(h) motion seeking an award of actual damages, including costs and attorney's fees, and punitive damages. Six days later, the creditor returned the vehicle, which was nine days after the initial demand.

The debtor claimed that because of the repossession: she missed one day of work, which cost her $121.00 in lost wages; she had to pay $60 to be driven to work; and

that a $12 item of medicine was missing from the glove compartment when the vehicle was returned. The debtor contended that the creditor's failure to return the vehicle for nine days after it received the demand from her attorney constituted a willful violation of the stay.

The bankruptcy court agreed, but only awarded the debtor actual damages in the amount of $42.00, and attorneys fees of $20.00, even though the debtor's attorney had requested fees totaling $1,400. Judge A. Jay Cristol recognized that a simple notice or letter from the debtor or her attorney to the creditor would, "have avoided this whole sorry mess." 189 B.R. at 18. As such, he allowed minimal damages to the debtor and her attorney *because it was within their power to avoid the majority of the damages requested.*

In *In re Esposito*, 154 B.R. 1011 (Bankr.N.D.Ga.1993), the *pro se* chapter 7 debtors prepared a reaffirmation agreement for an automobile which was their sole means of transportation. They persuaded the creditor who held the security interest in the car to execute the agreement. Before the reaffirmation agreement was approved by the court, the creditor repossessed the vehicle without obtaining relief from the stay. As a result of the repossession, the debtor-husband's employment was terminated, and the wife debtor lost the opportunity of a new job. The debtors consequently filed a section 362(h) motion seeking damages from the creditor. The creditor then returned the vehicle to the debtors. The creditor attempted to settle the matter, but was frustrated in that effort by the debtors, who told the creditor that they were represented by counsel, but refused to identify the counsel. Accordingly, for ethical reasons, the creditor's attorney could not negotiate with the debtors directly. The creditor ultimately submitted an offer of settlement to the debtors' at-torney when the debtors finally revealed the identity. Specifically, the creditor offered to cancel its debt and return the vehicle free and clear of any lien, an offer which the bankruptcy court considered fair and reasonable. At trial, the court concluded that the creditor willfully violated the stay and awarded actual damages in the total amount of $2,003.24. That amount included only $500.00 in attorneys fees, even though the debtors' attorney had requested fees totaling $2,711.25. The court denied the remainder of the fees requested, finding that it had been within the debtors' powers to avoid those fees by accepting the creditor's settlement offer. Judge Margaret H. Murphy wrote:

> Both Debtors and Dailey Motors had a duty of good faith and fair dealing to attempt to settle the case per the instructions of the court at the hearing May 24, 1993. **In Debtors' case, their duty included such cooperation as might reasonably and promptly mitigate their damages.** Debtors did not cooperate nor attempt to mitigate their damages.

*Id.* at 1016.

A common conclusion in the above cases is that if the debtor or the debtor's attorney had just contacted the offending creditor, both damages and a subsequent lawsuit could have been avoided. That, of course is exactly what happened here. Mr. Hutchings contacted Mr. Roe. And before any damages were incurred. Mrs. Roe contacted Ocwen. And again, before any damages were incurred, Ocwen stopped violating the stay and stopped its foreclosure proceeding.

But, as the cases discussed above demonstrate, a debtor is not entitled to recover damages pursuant to section 362(h) where it was within the debtor's power to avoid, or at least mitigate, those damages. Again, that was the situation

here. Having suffered no damages, and having obtained the exact result he desired, Mr. Hutchings could have avoided any damages simply by not filing his complaint or timely discontinuing it. But he did neither. And because he did not, he did not mitigate his damages as he was required to do. Consequently, he cannot be awarded those damages in this proceeding.

### d. Even if Fees Could be Awarded, Mr. Hutchings Testified that He Was Not Obligated to Pay Attorneys Fees

Reimbursement for attorneys fees rendered necessary by a creditor's stay violation is one element of "actual damages" that may be awarded a section 362 violation. **But, the person claiming those fees as damages must be the person obligated on those fees.**

Section 362(h) requires that before attorney fees may be awarded, the fees must have been actually incurred by the *debtor*. In other words, the mandate of the statute is to award "actual damages, including costs and attorneys' fees...." to the "individual injured by [the] willful violation of a stay...." 11 U.S.C. § 362(h). By limiting the ability to recover "costs and attorneys' fees" to the "individual injured" by the stay violation, the statute makes it plain that only the person who actually paid or incurred an obligation to pay the "costs and attorneys' fees" may recover those damages.

Use of the term "including" makes it grammatically clear that "costs and attorneys' fees" are a subspecies of "actual damages," and not some distinct category of damages. If Congress had intended otherwise, it would have used the word "and" instead of "including." So, in order to obtain an award of "costs and attorneys' fees," the "individual injured" must prove, by a preponderance of the evidence, that those "costs and attorneys' fees" constitute "actual damages" to the individual personally, that the individual was actually damaged as a result of being required to pay or incurring an obligation to pay the "costs and attorneys' fees" as a result of the creditor's stay violation.

Mr. Hutchings did not testify that he has incurred or actually owes any attorneys fees as a result of Ocwen's purported stay violation, or for the institution or prosecution of this adversary proceeding. To the contrary, he specifically testified that he has *no* agreement with his attorneys regarding the amount or payment of any compensation to them for the work involved in this adversary proceeding. He testified:

> Q. Mr. Hutchings, do you have any agreement with your attorney on attorney fees?
>
> A. No, I don't.
>
> Q. Do you have any written contract with him in regard to attorney fees?
>
> A. No, I don't.

Transcript at 196–97.[29]

### e. Mr. Hutchings Did Not Request, and Has Not Proven, He Is Entitled to, Damages for Emotional Distress

Mr. Hutchings did not contend that he suffered emotional distress as a result of Ocwen's stay violations. And he did not seek damages for such distress. In support of these conclusions, the Court notes that Mr. Hutchings testified that the only compensatory damages he was seeking were those to allow him to recover for the time he missed from work participating in this adversary proceeding and the expenses he incurred for gasoline to make

---

**29.** Again, the Court recognizes that Mr. Hutchings may have been waiting to present this evidence at the anticipated hearing on attorneys' fees.

trips for the purpose of participating in this adversary proceeding.

At no time has Mr. Hutchings mentioned any emotional distress damages, or otherwise suggested that he is seeking any damages for emotional distress, or that he has proved entitlement to damages for emotional distress.

Consequently, the Court must conclude, based on all of the evidence, that Mr. Hutchings' has not sought, nor does he expect to receive, "actual damages" for emotional distress, and that he is not, therefore, entitled to an award of such damages in this case.

In contrast, the Court raises the issue now because of certain testimony which would appear to bear no relevance to any damages other than to a claim of emotional distress.

First, in his testimony, Mr. Hutchings suggested that "this Ocwen deal" was the genesis of some personal difficulties between his wife and him. He testified:

Q. Relating to the problems about what we are here about today, not about the refinancing, what, if any, other problems have you personally had?

A. Well, like I said in my deposition, it has caused me and my wife to separate for six months behind this, with this Ocwen deal. See, I have been trying to get out from under them for a pretty good while. That is what I was trying to say. The refinancing don't bother me. Trying to get out from under Ocwen do. See, what Ocwen, they don't understand, they—I am going to say it again. They have overcharged me for what they bought.

Transcript at 179.

Mr. Hutchings did not provide any additional information on this subject, and the Court cannot discern any from the record.

Clearly, Mr. Hutchings did not testify that the phone calls and letters that he received from Ocwen's representatives caused his separation. Therefore, any conclusion with respect to the cause of that separation and its connection, if any, to the actions of Ocwen's representatives must be based on pure speculation, which is, of course, impermissible. Indeed, Mr. Hutchings did not suggest that he is seeking any form of damages for said separation.

Second, in regard to his health, Mr. Hutchings testified that he did not require medical attention because of the calls and letters that he received from Ocwen. He testified:

Q. All right. And as we discussed, you sought no medical attention for this; correct?

A. Right.

Transcript, page 195.

He did say however that he suffers from hypertension, but that this condition existed prior to his first receiving any of those calls and letters, and he had been receiving medical treatment for that condition prior to his first receiving any of those calls and letters. He claimed, however, his dealings with Ocwen, "kind of raised [his blood pressure] up." Transcript at 176 (parenthetical added). He did not however explain. Consequently, Mr. Hutchings' testimony regarding his blood pressure does not provide any basis for determining that Ocwen's contacts caused him to suffer any significant, or consequential, or discernable adverse emotional or physical injury.

And third, Mr. Hutchings did not specifically testify that Ocwen's contacts caused him to be upset, disturbed, mad, angry, aggravated, annoyed, sick, nauseous, nervous, depressed, agitated, annoyed, anxious, disconcerted, dismayed, distraught, or perturbed. Similarly, he did not testify that Ocwen's contacts caused him embarrassment, humiliation, anguish, distress,

trauma, inconvenience, loss of sleep, loss of appetite, inability to concentrate, social stigma, agitation, or stress. And it is reasonable to conclude that the contacts he did receive from Ocwen's representatives were not of a nature that would be reasonably likely to have caused him such problems.

■ Based on the above, the Court concludes that Mr. Hutchings failed to establish that he endured any more than fleeting, inconsequential, and medically in-

significant annoyance, aggravation, or indignation, which does not, as a matter of law, justify an award of "actual damages" pursuant to section 362(h).[30]

## 2. Punitive Damages—Mr. Hutchings May Not Recover Punitive Damages Because Ocwen's Actions Were Not Egregious, Vindictive, Malicious, or Accompanied by Bad Faith

■ Section 362(h) authorizes an award of *punitive damages* for stay viola-

**30.** Mere aggravation, indignation and annoyance, or being "upset," does not warrant compensation under section 362(h). *Dawson v. Washington Mutual Bank (In re Dawson),* 390 F.3d 1139 (9th Cir.2004), *cert. denied,* —— U.S. ——, 126 S.Ct. 397, 163 L.Ed.2d 275 (2005), *on subsequent appeal, Allen v. Allen,* 163 Fed.Appx. 598 (9th Cir.2006), *petition for cert.* filed 74 USLW 3772 (U.S. June 14, 2006); *Aiello v. Providian Fin. Corp.,* 239 F.3d 876 (7th Cir.2001); *Taylor v. United States (In re Taylor),* 263 B.R. 139 (N.D.Ala.2001); *Rosengren v. GMAC Mortgage Corp.,* 2001 WL 1149478 (D.Minn., Aug.7, 2001); *Patton v. Shade,* 263 B.R. 861 (C.D.Ill.2001); *Aiello v. Providian Fin. Corp.,* 257 B.R. 245 (N.D.Ill. 2000), *aff'd,* 239 F.3d 876 (7th Cir.2001); *McHenry v. Key Bank (In re McHenry),* 179 B.R. 165 (9th Cir. BAP 1995); *In re Bryant,* 294 B.R. 791 (Bankr.S.D.Ala.2002); *In re Parker,* 279 B.R. 596 (Bankr.S.D.Ala.2002); *In re Skeen,* 248 B.R. 312 (Bankr.E.D.Tenn.2000); *Stewart v. United States (In re Stewart),* 2000 WL 1194437 (Bankr.S.D.Ga., July 9, 2000); *Aiello v. Providian Fin. Corp. (In re Aiello),* 231 B.R. 684 (Bankr.N.D.Ill.1999), *aff'd,* 257 B.R. 245 (N.D.Ill.2000), *aff'd,* 239 F.3d 876 (7th Cir.2001); *In re Robinson,* 228 B.R. 75 (Bankr.E.D.N.Y.1998); *Diviney v. NationsBank of Texas (In re Diviney),* 211 B.R. 951 (Bankr.N.D.Okla.1997), *aff'd,* 225 B.R. 762 (10th Cir. BAP 1998); *Meis–Nachtrab v. Griffin (In re Meis–Nachtrab),* 190 B.R. 302 (Bankr.N.D.Ohio 1995); *Washington v. Internal Revenue Service (In re Washington),* 172 B.R. 415 (Bankr.S.D.Ga.1994), *aff'd in part, reversed in part,* 184 B.R. 172 (S.D.Ga.1995); *In re McPeck,* 1991 WL 8405 (Bankr.D.Minn., Jan.29, 1991); *In re Suarez,* 149 B.R. 193 (Bankr.D.N.M.1993); *Colon v. Hart (In re Hart),* 114 B.R. 890 (Bankr.E.D.Pa.1990), *appeal dismissed sub nom., Szostek v. Hart,* 123

B.R. 719 (E.D.Pa.1991), *aff'd in part, appeal dismissed in part,* 941 F.2d 242 (3rd Cir. 1991); *Crispell v. Landmark Bank (In re Crispell),* 73 B.R. 375 (Bankr.E.D.Mo.1987); *Worthing v. Connecticut Nat'l Bank (In re Worthing),* 24 B.R. 774 (Bankr.D.Conn.1982); *In re Demp,* 23 B.R. 239 (Bankr.E.D.Pa.1982).

Section 362(h) "requires a finding of actual injury." *Archer v. Macomb County Bank,* 853 F.2d 497, 500 (6th Cir.1988). See also *Whitt v. Philadelphia Housing Auth. (In re Whitt),* 79 B.R. 611 (Bankr.E.D.Pa.1987) ("[N]o damages will be awarded as a result of the violation of the automatic stay if there was no evidence that the debtor suffered any harm."). "A damage award must not be based on 'mere speculation, guess, or conjecture.'" *Id.* at 499.

The court in *In re Skeen,* 248 B.R. 312 (Bankr.E.D.Tenn.2000) explained:

Although Mrs. Skeen testified that she was "torn-up," shaken, and nervous the rest of the day as a result of the telephone calls, there was no evidence that she sought medical relief or that the anxiety caused by City Finance's collection efforts rendered her incapable of going about her daily routine. Mrs. Skeen further testified that soon after receiving these calls, she contacted her attorney's office and received assurances that repossession was not possible. As succinctly stated by one bankruptcy court, "[b]ecause the emotional distress suffered ... was fleeting, inconsequential, and medically insignificant, ... it is not compensable." *Crispell v. Landmark Bank (In re Crispell),* 73 B.R. 375, 380 (Bankr.E.D.Mo.1987).

*Id.* at 319–20. But see the recent decisions in *In re Chew,* 346 B.R. 1 (Bankr.D.Mass.2006). But even there, the debtor suffered actual compensatory damages.

tions only in "appropriate circumstances." "Appropriate circumstances" has been interpreted to require that the violator's acts be egregious, vindictive, malicious, or accompanied by bad faith. "[E]gregious, intentional misconduct on the violator's part is necessary to support a punitive damages award." *United States v. Ketelsen (In re Ketelsen)*, 880 F.2d 990, 993 (8th Cir.1989). "An additional finding of maliciousness or bad faith on the part of the offending creditor warrants the further imposition of punitive damages pursuant to 11 U.S.C. § 362(h)." *Crysen/Montenay Energy Co. v. Esselen Assocs., Inc. (In re Crysen/Montenay Energy Co.)*, 902 F.2d 1098, 1105 (2nd Cir.1990). "[O]nly egregious or vindictive misconduct warrants punitive damages for willful violations of the automatic stay of 11 U.S.C. § 362." *Davis v. Internal Revenue Serv.*, 136 B.R. 414, 424 (E.D.Va.1992).

Mr. Hutchings testified that none of the calls he received from Ocwen's representative were threatening in nature, or contained any threats, or could be characterized as "threatening." He stated, "Well it wasn't threatening. None of them . . . ." Transcript at 191.

He also testified that, with one exception, none of the callers were rude, and that none of the calls that he received from Ocwen's representatives can be characterized as rude. The one exception was one conversation where "Anthony" used the word "damn". He testified:

Q. But my question is the calls, except for the one from Anthony where he used the word profanity, they were not rude or threatening to you; correct?

A. No, no, not in that way. I am not going to lie about it.

Transcript at 192.

Except for saying that "Anthony" used the word "damn" in the conversation that they were having, Mr. Hutchings' did not describe that conversation as acrimonious or that Anthony was otherwise rude, or discourteous, or mean-spirited during that conversation. He simply said that Anthony told him, "Ocwen wants their damn money." Transcript at 166.

With the exception of that conversation, according to Mr. Hutchings' testimony, there is no evidence that any of Ocwen's representatives were rude, disrespectful, belligerent, or abusive to Mr. Hutchings. He did not say that anyone else ever used language which he considered inappropriate or offensive. He did not say that anyone ever raised his or her voice to him, or spoke to him in an offensive tone of voice, or hung up on him, or called him at inappropriate times of the day. He was not berated or harassed or threatened in any manner. On each occasion, the representative terminated the conversation when he or she was told that Mr. Hutchings was in bankruptcy. Apparently, each call lasted only for a few moments, just long enough for Mr. Hutchings to inform the representative that he was in bankruptcy and for him to provide the representative with Mr. Roe's name and number.

In addition to the telephone calls, the evidence reflects that Mr. Hutchings received five items of correspondence relating to the collection of his mortgage deficiency from Ocwen and its attorneys between May 10, 2002, and June 21, 2002.

The first correspondence, dated May 10, 2002, purports to have been initiated and authored by the law firm of "Moss, Codilis, *et al.*," but was, if the Court understands Mr. Bryant's testimony correctly, actually initiated and generated by Ocwen's computer system. Plaintiff's Exhibit 9. It notified Mr. Hutchings that: (1) he was in default; (2) that the amount necessary to cure the default was $16,899.77; (3) de-

manded that he cure the default within 33 days from the date of the letter; and (4) informed him his mortgagee would exercise its rights under the mortgagee, including the right to accelerate and foreclose, if he did not pay the full amount of the default within the designated time period. The letter furthermore informed Mr. Hutchings that: (1) "Moss, Codilis, et al.," would not contact him at work by telephone if he would send them a written request that he not be contacted at work; and (2) "Moss, Codilis, et al.," would not contact him at all, except by legal action, if he would send them a written request that he not be contacted except by legal action.

The second correspondence, dated May 22, 2002, did not contain a demand but instead offered Ocwen's assistance in helping Mr. Hutchings resolve his deficiency. It informed him that there were several alternatives available to him for that purpose. It is conciliatory and benevolent in tenor, and espouses a cooperative relationship between the parties with the common goal of facilitating Mr. Hutchings' efforts to keep his home. It read in part:

> Ocwen is here to build a mutually beneficial relationship, rectify any problems, resolve any issues and assist you with your needs. We are experienced in assisting our borrowers in resolving their delinquency and would like to present you with some of the alternatives that you may have available regarding your delinquent loan.

Plaintiff's Exhibit 11.

The third correspondence, dated June 4, 2002, also purports to have been authored by the law firm of "Moss, Codilis, et al.," but was, according to Mr. Bryant, actually initiated by Ocwen's computer system. Plaintiff's Exhibit 15. It informed Mr. Hutchings that "Moss, Codilis, et al." had been engaged by Ocwen to contact him regarding his delinquent mortgage loan and to work with him on Ocwen's behalf to resolve that delinquency and avoid foreclosure. It requested him to provide certain financial information on a form included with the letter and explained to him various alternatives to foreclosure, including taking advantage of "an alternate payment method" which might permit him to cure his default and retain his home. The letter read in part, "While it is our primary objective to assist Ocwen in the collection of past due amounts on your loan, we do want to work with you to find the best available alternative for you and our Client to bring your mortgage loan obligation current." Plaintiff's Exhibit 15.

The fourth correspondence, dated June 18, 2002, was authored by and sent to Mr. Hutchings by Ocwen's outside counsel, "Pierce, Ledyard, et al." Plaintiff's Exhibit 20. The letter informed Mr. Hutchings that foreclosure proceedings had been instituted. Enclosed with the letter was a foreclosure notice which indicated that a foreclosure sale would take place on July 23, 2002, for the purpose of satisfying the mortgage debt owed by Mr. Hutchings.

The fifth correspondence, dated June 21, 2002, also purports to have been authored by the law firm of "Moss, Codilis, et al.," but was, according to Mr. Bryant, actually initiated by Ocwen's computer system. Plaintiff's Exhibit 22. It reiterated to Mr. Hutchings that a foreclosure sale had been scheduled and implored him to contact Ocwen for the purpose of discussing possible alternatives that might preserve his credit and save his property. It read in part as follows:

> Although Moss, Codilis has made several attempts to contact you regarding the serious situation concerning your home, we have received no response from you. A FORECLOSURE SALE HAS BEEN SCHEDULED ON THE ABOVE-REFERENCED PROPERTY.
>
> We urge you to contact us to:

1. Discuss possible alternatives;
2. Preserve your credit; and
3. Save your property

PLEASE CONTACT ME UPON RECEIPT OF THIS LETTER.

Plaintiff's Exhibit 22.

None of Ocwen's correspondence to Mr. Hutchings were egregious, vindictive, malicious, or a product of bad faith. To the contrary, the correspondence plainly portrays a good faith effort on Ocwen's part to avoid foreclosure, to keep Mr. Hutchings' in his home, and to facilitate his efforts to catch up his delinquent payments. All was respectful, straightforward, and without guile. All was conciliatory in tenor, encouraging mutual cooperation toward a common goal. Non had the intent to intimidate Mr. Hutchings.

The correspondence was not offensive and was not insulting or belligerent. It was deferential to Mr. Hutchings' desire to retain his home and considerate of his disadvantageous economic position. The correspondence does not contain any attempt by Ocwen to take advantage of its superior bargaining position to force Mr. Hutchings' from his home. Instead, it purports to express legitimate concern over the possibility of Mr. Hutchings' losing his home, as well as a willingness to work with him to avoid that deleterious result.

Mr. Hutchings argues that punitive damages are appropriate because Ocwen's representatives continued to contact him despite the fact that he told each one who called that he was in bankruptcy and instructed them to contact Mr. Roe. Mr. Hutchings concludes that these circumstances prove that Ocwen intended to violate the stay, as opposed to simply intending the actions which violated the stay. The Court disagrees.

Ocwen knew that Mr. Hutchings was in bankruptcy, that is, he was the debtor in a pending Chapter 13 case, because they had been dealing with that case for many months prior to Ocwen's first stay violation. By its own admission, Ocwen was never operating under the misconception that Mr. Hutchings was not in bankruptcy. Instead, according to the evidence presented, Ocwen's representatives were suffering under the misconception that Ocwen had been granted relief from the stay. Therefore, Mr. Hutchings' assurances to those representatives that he was in bankruptcy would not, and should not, have dissuaded them from the misconception that Ocwen had been granted relief from the stay. In fact, according to his testimony, Mr. Hutchings told those representatives nothing that would or should have dissuaded them from the misconception that Ocwen had been granted relief from the stay. And the fact that Ocwen's representatives were operating in accordance with their belief that Ocwen had been granted relief from the stay precludes the conclusion *that they intentionally violated the stay,* as opposed to simply *intending the actions which violated the stay.*

Mr. Hutchings' also argues that punitive damages are at least appropriate for the telephone calls and correspondence that Mr. Hutchings received after Mrs. Roe spoke with Messrs. "Garfield" and "Morris" on May 24, 2002. He argues that Mrs. Roe provided information to those Ocwen representatives which made them aware that Ocwen had not in fact been granted relief from the stay.

Mrs. Roe testified that she told both Messrs. "Garfield" and "Morris" that the April 26, 2002, order only authorized Mr. Hutchings' to refinance his home and did not grant Ocwen relief from the stay. She also said that she unsuccessfully attempted to send a copy of the order to Mr. "Garfield" by facsimile but was successful in doing so to the number given to her by Mr. "Morris." Ocwen's log, however, does

not reflect that it ever received that facsimile from Mrs. Roe. Consequently, the evidence on the subject of whether or not Ocwen received the facsimile is in equal dispute. The evidence submitted by Mr. Hutchings on the subject is counterbalanced by the evidence submitted on the same subject by Ocwen. The preponderance of the evidence on the subject, therefore, does not suggest that it is more likely than not that Ocwen received the facsimile, or vice versa. Consequently, the Court is without sufficient evidence to conclude that Ocwen received the facsimile, or that by virtue of its receipt of the facsimile, it became aware that it had not in fact been granted relief from the stay.

Of course, it is undeniable that on that occasion, Mrs. Roe verbally informed Ocwen's representatives that Ocwen was not granted relief from the stay by virtue of the April 26, 2002, order. However, if those representatives did not, for whatever reason, receive the facsimile promised by Mrs. Roe, they may have naturally discounted her assertions regarding the April 26, 2002, order and continued to act in accordance with the information contained in the log. Consequently, it cannot be assumed from the fact that Ocwen's representatives continued to contact Mr. Hutchings after May 24, 2002, that they did so *in conscious or deliberate disregard* of the stay.

In summary, none of the contacts made by Ocwen with Mr. Hutchings were egregious, vindictive, malicious, abusive, belligerent, or a product of bad faith. To the contrary, other than the possibility of the one conversation that Mr. Hutchings had with "Anthony," Ocwen's contacts with Mr. Hutchings can more accurately be described as respectful, courteous, deferential, and conciliatory. Those contacts did not involve any physical contact or face-to-face confrontation with Mr. Hutchings. Mr. Hutchings was not berated or harassed or insulted. He suffered no economic loss or disadvantage as a result of those contacts and was not deprived of any assets. The fact that most of the correspondence that Mr. Hutchings received illustrates efforts on Ocwen's part to work out a means for him to catch up his deficiency, and thereby avoid foreclosure, clearly negates the suggestion of any maliciousness or bad faith on Ocwen's part.

In contrast, had Ocwen intended to act egregiously, vindictively, or maliciously toward Mr. Hutchings, or wanted to deal with him in bad faith, it would have expeditiously proceeded to foreclosure without fan fair, rather than attempting to work with him, by telephone and correspondence, even on the eve of foreclosure, in an effort to find a way for him to keep his home. Moreover, the fact that Ocwen's representatives terminated their conversations with Mr. Hutchings the moment that he told them that he was in bankruptcy negates the conclusion that they intentionally acted in disregard of the stay.

Based on the evidence, the Court concludes that Ocwen's actions were not egregious, vindictive, malicious, or accompanied by bad faith, therefore, an award of punitive damages in this proceeding is inappropriate and unwarranted.

## IX. Conclusion

Does section 362(h) create a cause of action that allows damages generated solely by the acts of the plaintiff rather than the acts of the defendant? Does it authorize an award of damages that the plaintiff had the power to mitigate completely? Does it permit the plaintiff, who suffered no damages as a result of anything done by the defendant prior to the lawsuit, to file a lawsuit supported solely by prospective damages? Courts addressing these questions have consistently recognized that the answer to each of these questions is no.

Had Congress intended to permit uninjured debtors to prosecute adversary proceedings in situations involving harmless stay violations it could have easily made that intention plain in any number of ways. It could have omitted the requirement that a debtor must have been injured by a stay violation. It could have replaced the "injured" requirement with an automatic statutory penalty or included such a penalty for cases in which a debtor has incurred no "actual damages." It could have omitted the "injured" requirement and provided that a debtor could file a stay violation action merely to vindicate his or her rights and obtain reimbursement of the expenses and attorneys fees involved in filing and prosecuting such an action.

Had Mr. Hutchings been required to maintain this lawsuit in order to force Ocwen to desist from further violating the stay, or to prevent Ocwen from again violating the stay, or to undo the effects of Ocwen's stay violations, or to recover compensatory damages that he actually incurred as a result of those violations prior to the institution of the lawsuit, the result would be completely different. Certainly, a debtor is entitled to recover the attorneys fees and expenses that he or she has actually incurred in filing and maintaining a section 362(h) action for those purposes. A debtor is also entitled to recover the costs and expenses which he or she has actually incurred as a result of being forced to defend against a legal proceeding or action instituted by a creditor in violation of the stay. However, the proof in this case clearly indicates that Mr. Hutchings' adversary proceeding was not intended to serve any of those purposes.

The uncontroverted evidence is that Ocwen ceased violating the stay prior to the institution of this lawsuit. At the time it stopped violating the stay, Mr. Hutchings had not as yet suffered any compensatory damages, and nothing Ocwen had done had produced any prejudicial situation that would have caused Mr. Hutchings to have suffered any such damages, such as a lien recording having to be expunged, or an item of property returned. And there is no evidence which suggests that Ocwen would have violated the stay again had Mr. Hutchings not filed the present lawsuit.

Based on the evidence, the Court must conclude that Mr. Hutchings did not have to file the lawsuit in order to force Ocwen to stop violating the stay, or to prevent Ocwen from violating the stay again, or to undo the effects of Ocwen's stay violations, or to recover compensatory damages that he had, as of that point, actually incurred.

Consequently, because he was not injured by Ocwen's stay violation, Mr. Hutchings is not entitled, under section 362(h), to recover any of the costs and expenses, including attorneys fees, which he has incurred in maintaining said action.

Therefore, based on the above, the Court concludes that the *Complaint for Violation of Stay Under § 362* filed on June 25, 2002, by the plaintiff, Mr. Brice M. Hutchings, should be denied.

A separate order will be entered in conformity with this memorandum opinion.